PUBLIC VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **U.S. GLASS PRODUCERS COALITION,** |
|                **Plaintiff,** |
|    **v.** |
| **UNITED STATES,** |
|                **Defendant,** |
|     **and,** |
| **BERLIN PACKAGING L.L.C., TRICORBRAUN INC., ENCORE GLASS, INC.** |
|                **Defendant-Intervenors.** |

**Before:  Hon. Joseph A. Laroski, Jr., Judge**

**Court No. 24-00199**


### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel B. Pickard, Esq.
Claire M. Webster, Esq.

**BUCHANAN INGERSOLL & ROONEY PC**
1700 K Street, NW
Washington, D.C. 20006
(202) 452-7900

*Counsel to U.S. Glass Producers Coalition*

Dated: April 15, 2025

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................... 1

II.   STATEMENT PURSUANT TO RULE 56.2 ........................................................... 2

    A.   Administrative Determination Under Review ................................................... 2

    B.   Reasons for Contesting the Administrative Decision ....................................... 2

    C.   Issues Presented for Review and Summary of Argument ................................. 2

III.  STATEMENT OF FACTS ...................................................................................... 4

IV.   STANDARD OF REVIEW ....................................................................................11

V.    ARGUMENT ......................................................................................................... 13

    A.   The Commission's Price Effects Analysis was Not Supported By Substantial Evidence and Was Otherwise Contrary to Law ........................................................................... 13

        1.   Factually Incorrect and/or Illogical Statements Regarding Underselling and Market Share ......................................................................................................... 13

        2.   The Commission Did Not Provide a Reasoned Analysis as to the Data Issues Concerning Pricing Products 1 through 5 ................................................................. 15

        3.   The Commission Failed to Meaningfully Address the Contemporaneous Business Documentation Regarding Subject Import Underselling ..................................... 17

        4.   The Commission Impermissibly Failed to Address the Frequency of Underselling and Lost Sales ................................................................................................ 19

        5.   The Commission Failed to Fully Address Evidence of Price Suppression .................. 20

        6.   The Commission's Analysis of the Inventory Overhang and Its Negative Price Effects is Not Supported by Substantial Evidence and is Otherwise Contrary to Law ........................ 22

    B.   The Commission's Determination that There Was No Adverse Impact By Reason of the Significant Volume of Unfairly Priced Imports Was Not Supported By Substantial Evidence and Was Otherwise Contrary to Law ........................................................................... 24

        1.   The Commission Misapplied the Causation Standard ................................................. 24

        2.   The Commission Misapplied the Material Injury Standard ..........................................30

        3.   The Commission Failed to Examine Material Arguments and Evidence the Industry Entered the POI in an Injured State ....................................................................31

4.    Objectively Factually Incorrect Statements in the Commission's Impact Analysis .....33

C.    The Commission's Threat Analysis Was Not Supported By Substantial Evidence and Was Otherwise Contrary to Law ........................................................................................34

1.    The Commission's Likely Volume of Subject Imports Finding Was Not Supported by Substantial Evidence and Was Otherwise Contrary to Law.....................................................34

2.    The Commission's Likely Price Effects Analysis in its Threat Determination is Not Supported by Substantial Evidence and Is Otherwise Contrary to Law .............................. 37

3.    The Commission Failed to Address Relevant Evidence that Inventories Posed a Significant Threat to the Domestic Industry ....................................................................... 38

4.    The Views Did Not Address the Likelihood of Continued Closures and Curtailments of Domestic Production.......................................................................................................... 39

5.    The Commission's Statement That There Was No Evidence of Any Change in Conditions of Competition is Objectively False ................................................................. 40

VI.    CONCLUSION.............................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altx, Inc. v. United States*,
 25 CIT 1100, 167 F. Supp.2d 1353 (2001) ...........................................................12, 17, 33, 39

*Gerald Metals, Inc. v. United States*,
 132 F.3d 716 (Fed. Cir. 1997)....................................................................................... 18-19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983)......................................................................................................12, 25

*Nippon Steel Corp. v. U.S. International Trade Commission*,
 345 F.3d 1379 (Fed. Cir. 2003).............................................................................24, 25, 28

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
 44 F.3d 978 (Fed. Cir. 1994).............................................................................12, 25, 41

*Universal Camera Corp. v. NLRB*,
 340 U.S. 474 (1951) .........................................................................................................17

*Usinor Industeel, S.A. v. United States*,
 26 CIT 467 (2002) ............................................................................................................17

*Usinor v. United States*,
 26 CIT 767 (2002) ...............................................................................................11, 12, 25

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) .....................................................................................................11

19 U.S.C. § 1677(7)(A)......................................................................................................30, 31

19 U.S.C. § 1677(7)(C)(ii)(I)...................................................................................................28

19 U.S.C. § 1677f(i)..................................................................................................................19

**Other Authorities**

Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 at 892,
 *reprinted in reprinted in* 1994 U.S.C.C.A.N. 4040 .................................................19

*Certain Glass Wine Bottles from Chile: Termination of Less-Than-Fair-Value
 Investigation*, 89 Fed. Reg. 106,425 (Dec. 30, 2024) ..................................................4

*Certain Glass Wine Bottles from Mexico: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 90 Fed. Reg. 79 (Jan. 2, 2025) ...................................................................5

*Certain Glass Wine Bottles from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 89 Fed. Reg. 68,395 (Aug. 26, 2024) ............................................................................................................5, 41

*Certain Glass Wine Bottles from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 90 Fed. Reg. 76 (Jan. 2, 2025) ...............................................................................................4

*Glass Containers from China*, Inv. Nov. 701-TA-630, USITC Pub. 5068 (June 2020)............................................4

*Glass Wine Bottles from China*, 89 Fed. Reg. 83,515 (Oct. 16, 2024)...........................................2

## I.    __INTRODUCTION__

U.S. companies and American workers have suffered an injustice. The U.S. International Trade Commission (the "Commission") had a case before it with massive amounts of subject imports, more than $365 million by value in every full year of the period of investigation ("POI"), which were found to be heavily subsidized by the government of the People's Republic of China. Domestic industry witnesses testified to the causal connection between the harm to their business and subject imports. The domestic industry provided [


], and more than one in five purchasers stated on the record that they bought subject imports, rather than domestically produced product, because the imports were lower priced. Workers suffered as a result, and the record contained contemporaneous business documentation that domestic manufacturers idled or shuttered facilities because of low-priced imports, and the domestic industry operated [        ] in every full year of the POI. Despite this evidence, the Commission found <u>no</u> causal connection between the large volume of subject imports, the demonstrated price effects of those imports, and the injury to the domestic industry.

Adding insult to injury, the Commission's determination contains objective factual errors, fails to address material evidence and arguments, is inconsistent with basic notions of economics, impermissibly ignores conflicting evidence, and misapplied relevant legal standards.   The Commission denied relief to the domestic industry and its workers, and it did not even provide a reasonable explanation why. This is both unjust and contrary to law. For the reasons set forth in this brief, the Commission's determination that the presence of unfairly priced imports was not at least <u>a</u> cause of injury that was more than inconsequential, unimportant, or immaterial must be remanded. The domestic industry deserves justice, and, at the very least, it deserves an explanation.

On behalf of the U.S. Glass Producers Coalition ("Plaintiff"), we respectfully submit the following brief in support of Plaintiff's motion for judgment on the agency record.

## II.     STATEMENT PURSUANT TO RULE 56.2

### A.     Administrative Determination Under Review

The administrative determination under review is the U.S. International Trade Commission's ("Commission") Final Determination in the investigation of *Glass Wine Bottles from China*. The Final Determination was issued on October 9, 2024, and was published in the Federal Register on October 16, 2024. *See Glass Wine Bottles from China*, 89 Fed. Reg. 83,515 (Oct. 16, 2024).

### B.     Reasons for Contesting the Administrative Decision

Plaintiff's reasons for contesting the administrative decision are set forth in the Summary of Argument below, and in more detail in the Argument section of this memorandum.

### C.     Issues Presented for Review and Summary of Argument

> 1.     Was the Commission's determination that the domestic industry did not experience negative price effects due to subject imports supported by substantial evidence and in accordance with law?

No. Pervasive throughout the Commission's price effects analysis is a reliance on simplistic trends over the three-year period and an unlawful unwillingness to consider the arguments that color these trends, much less to provide a reasoned explanation of why it reached its conclusions. Despite finding that subject imports and the domestic like product were fungible and interchangeable and that price was an important purchasing factor, the Commission discounted the significance of underselling, including failing to address a level of trade issue with five of the eight pricing products Plaintiff raised throughout the investigation. Concerningly, the Commission's analysis was, in part, based on factually incorrect statements that were contradicted by its own Staff Report. It also failed to address contemporaneous business documentation of lost sales and

competition on the basis of price and evidence of price suppression and of an inventory overhang in the market that caused a downward pressure on prices.

> 2.    Was the Commission's determination that the domestic industry was not adversely impacted by subject imports supported by substantial evidence and in accordance with law?

No. The Commission's determination misapplied both the causation standard and the material injury standard, attributing the entirety of the injury to the domestic industry to a decline in demand. The Commission's analysis fails to address material evidence and fails to recognized that injury from subject imports need only be a cause of material injury, not the sole cause of material injury. The Commission also fails to address the sufficiency of the evidence that was directly attributable to imports and whether it was more than inconsequential, unimportant or immaterial. The remainder of the impact analysis flowed from these errors, including a staggering misunderstanding of basic supply and demand. Here, too, the Commission relied on overly simplified trends, failed to materially grapple with evidence of record, impermissibly failed to respond to material arguments, and relied on a factually incorrect finding.

> 3.    Was the Commission's determination that the domestic industry was not threatened with material injury by subject imports supported by substantial evidence and in accordance with law?

No. The Commission's likely volume and price analyses were illogical and lacked explanation required by law. The Commission indicated that because imports were currently increasing, and had been doing so since 2022, this supported a finding that they were not likely to increase in the imminent future. Lacking a reasonable explanation, this is illogical. The Commission also found that while the U.S. industry could not increase prices to fully cover costs, because the domestic industry's cost of goods sold ("COGS") as a percentage of net sales improved marginally at the end of the POI, the domestic industry's prices would be unlikely to be suppressed

in the imminent future. The Commission did not address the record evidence that massive inventories posed a threat to the domestic industry or that there were changes in conditions of competition, nor did it address the death spiral of domestic manufacturers curtailing production and shuttering facilities. Moreover, the Commission's determination includes an undeniable error as to the extent of underselling by subject imports. Lastly, the Commission impermissible denied even the existence of conflicting evidence that had been put on the record.

## III.  <u>STATEMENT OF FACTS</u>

On December 29, 2023, Plaintiff filed a petition with the Department of Commerce and the Commission alleging the domestic glass wine bottle industry was materially injured or threatened with material injury by reason of dumped and subsidized imports from China and dumped imports from Mexico and Chile. PR1, CR1. On December 29, 2023, the Commission instituted antidumping and countervailing duty investigations on wine bottles from the subject countries. PR2.

This was not the first time the domestic glass packing industry had petitioned for relief against unfairly priced imports from China. The Commission had previously denied relief for the domestic industry, in large part by signaling that any injury to the domestic industry was actually due to Mexican imports. *See Glass Containers from China*, Inv. Nov. 701-TA-630, USITC Pub. 5068 (June 2020) (Final). Accordingly, the U.S. industry included in its petitions all sources of imports that were believed to be unfairly priced – including those from Mexico and Chile, as well.

The Department of Commerce made preliminary and final determinations of dumping as to the subject countries.[1] *See Certain Glass Wine Bottles from the People's Republic of China:*

---

[1] Plaintiff withdrew its petition as to Chile following the Commission's determination underlying this appeal and, accordingly, Commerce made no final determination as to Chilean wine bottles. *See Certain Glass Wine Bottles from Chile: Termination of Less-Than-Fair-Value Investigation*, 89 Fed. Reg. 106,425 (Dec. 30, 2024).

*Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 90 Fed. Reg. 76 (Jan. 2, 2025); *Certain Glass Wine Bottles from Mexico: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 90 Fed. Reg. 79 (Jan. 2, 2025). Commerce also found the Chinese industry received large subsidies, including policy loans, export buyer's credits, and provision of land, utilities, and raw materials for less than adequate remuneration. Issues and Decision Memorandum accompanying *Certain Glass Wine Bottles from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 89 Fed. Reg. 68,395 (Aug. 26, 2024) at 7-8.

The record in the preliminary phase investigation demonstrated a reasonable indication that the domestic glass packaging industry was injured as a result of subject imports, and the Commission's preliminary determination was consistent with the record. Preliminary Views, PR91 at 29, 35, 39, CR81 at 39, 45, 52.

Prior to the final phase, the Commission issued draft questionnaires for comment by interested parties. *See* Draft Questionnaire Comment Letter, PR98; Blank Draft Questionnaires, PR99. In its comments on the draft questionnaires, Plaintiff suggested that the Commission collect import pricing product data using acquisition costs. *See* Petitioner's Comments on Draft Questionnaires, PR106, CR83/84. Specifically, Plaintiff warned:

> When gathering data { in the preliminary phase } on the sales price of the domestic like product [
>           ], the Commission examined the sales price from a U.S. producer to a distributor. However, when gathering data on the sales price of subject imports from [                  ], the Commission was looking at a price at a different level of trade [                    ].
> [
>
>                     ]. This is the most important point – the price competition from [

], is missing from the record.

*Id.* at 2-3. To cure this problem, Plaintiff requested that the Commission collect data on the sales price of the domestic like product to distributors and on the acquisition costs by distributors/importers of subject imports, allowing the Commission to compare like-to-like data: importer-distributors' costs of acquiring subject merchandise from foreign producers and from U.S. producers, *Id.* at 3, as, "A significant part of competition in the market occurs in the sales not just <u>from</u> distributors, but <u>to</u> distributors." *Id.* at 4 (emphasis in original).

The Commission partially took note of Plaintiff's argument regarding level of trade discrepancies but did so only for a minority of the pricing products. Blank U.S. Importers' Questionnaire at III-2, PR110. The Commission effectively ignored the level of trade concern for the majority of the pricing products, although it had been repeatedly brought to the Commission's attention.

However, the Commission did request data for three pricing products of bulk packed imports, which it inferred were "imports for internal use or repackaging" be collected on a landed-duty paid basis. *Id.* at III-3. Given this difference in data collected among the pricing products, Plaintiff advocated in its prehearing and post-hearing briefs that importers' pricing product for the majority of pricing products was "necessarily higher because it is at a different level of trade and includes a markup." Petitioner's Prehearing Brief at 49, PR141, CR217/225; Petitioner's Post-Hearing Brief at Exhibit 1 pp.37-39, PR155, CR252/254. As a result, the Commission collected pricing product data for U.S. producers' sales directly to end users (*i.e.*, wholesale sales), which was compared to the final price of product that was sold first from foreign producers to distributors, and then sold from distributor to end users (*i.e.*, sales through distribution channel). The Commission failed to control for an apples-to-oranges pricing product comparison.

While the Commission ultimately determined there was no causal connection between the presence of imports in the market and the deteriorating performance of the domestic industry, it did make several findings regarding the nature of the competition between imports and U.S.-produced wine bottles. In its fungibility discussion for purposes of cumulation, the Commission acknowledged:

> All responding U.S. producers, most responding U.S. importers, and most responding purchasers reported that subject imports from each source were either "always" or "frequently" interchangeable with the domestic like product and imports from other subject sources. Large majorities or pluralities of responding purchasers rated domestically produced glass wine bottles as comparable to glass wine bottles imported from each subject country with respect to most of the 17 factors that influence purchasing decisions.

> Moreover, most responding purchasers reported shifting purchases from the domestic industry to subject imports from one or more of the subject countries during the POI, indicating head-to-head competition between domestically produced glass wine bottles and subject imports from all three subject countries.

> Furthermore, the record indicates that subject imports from each subject country for which data are available overlapped with each other and domestically produced glass wine bottles in terms of packaging (*i.e.*, bulk vs. case), bottle type and color, and bottle weight.

Views, PR187 at 21, CR279 at 27-28.

Domestic and imported products were primarily sold to wineries. *Id.*, PR187 at 22, CR279 at 29, although at different levels of trade: U.S. product was sold directly and imported product was sold through distributors. The Commission recognized that a significant amount of domestic production was internally consumed [                    ] and consequently Plaintiff argued that the merchant market was an important condition of competition. As to domestic supply, domestic producers Ardagh and O-I Glass announced shutdowns of production facilities and layoffs of workers during the POI, causing the domestic industry's capacity to decline by the end of the POI. *Id.*, PR187 at 30, CR279 at 40. The domestic industry submitted [

]. *See* Prehearing

Brief at Exhibit 7, PR141, CR217/225. The Views do not reference or cite this evidence.

The Commission found a "moderate-to-high degree of substitutability between domestically produced glass wine bottles and subject imports." Views, PR187 at 33, CR279 at 44. The Commission also acknowledged, as Plaintiff had argued, that price is an important factor in purchasing decisions for glass wine bottles and that purchasers reported price as one of the top three factors in its purchasing decisions. *Id.*, PR187 at 33, CR279 at 45.

Plaintiff argued and the Commission accepted that the volume of imports was significant both on an absolute basis and relative to consumption. *See id.*, PR187 at 36, CR279 at 49. Imports from the three subject countries were the [        ] source of wine bottles, accounting for more than 30 percent of the market in every year of the POI, never amounting to less than $365 million in any given year. Final Staff Report at C-3, PR187, CR273. The Commission determined, however, that the large volume of imports, which were found to be "significant" on both an absolute basis and by market share, which were interchangeable with the U.S. product, and which competed head-to-head on the basis of price, had no significant price effects or adverse impact on the domestic industry. In making this determination, the Commission did not address, in whole or in part, material evidence and arguments of the domestic industry.

The evidence demonstrated underselling by subject imports at the end of the POI.  On shipments at the same level of trade (i.e. pricing product 6 through 8) [      ] percent of the volume of subject imports undersold the domestic product in 2023, and that ratio climbed to [      ] percent in interim 2024. *See id.* at V-25–V-27. During the last five quarters of the POI, subject imports of in the apples-to-apples comparison undersold the domestic product in instances accounting for [      ] percent of the volume. *See id.* Not only was underselling accelerating at the end of the POI,

but also in an apples-to-apples comparison, imports undersold the majority of U.S. product in the pricing product data.

As the underselling accelerated the subject imports increased their market share. Subject market share was 21.1 percent in 2022, its lowest point of the POI and the year in which the lowest percentage of subject imports were undersold. *See id.* at C-3. In 2023, the frequency of underselling increased significantly, as subject share climbed to 22.2 percent. *Id.* This pattern continued into the first quarter of 2024 when [                    ] of subject imports in the apples-to-apples comparison undersold the U.S. products, and subject share climbed to 23.5 percent. *Id.* Thus, the subject imports significantly undersold the domestic product over the last five quarters of the POI, and the increase in underselling resulted directly in subject imports' increased market share.

As to the impact of the significant volume of subject imports and underselling, the Commission found that for "the quarterly price comparisons in interim 2024, subject imports from Mexico were higher priced than the domestic like product for products 1, 3, and 5 . . . ." *Id.*, PR187 at 54, n.286, CR279 at 73, n.286 (emphasis added). [                    ]. The Commission's own Staff Report confirms that for the [                    ] in pricing product 1, the U.S. price in 2024 was [       ], as compared to the [

                    ]. Final Staff Report at V-12, PR187, CR273. [

                                    ] concludes that, in pricing products 1 through 5, "subject imports from Mexico predominantly oversold the domestic like product in interim 2024." Views, PR187 at 54, CR279 at 73. This is objectively false and is also contradicted by the Commission's Staff Report.

Plaintiff had introduced evidence that 2021 was an aberrational year due in part to the COVID pandemic. *See* Petitioner's Prehearing Brief at Exhibit 1 pp.54-56, PR141, CR217/225. The Views do not address this argument or any of the evidence offered in support.

Plaintiff also argued that there was a large inventory overhang in the U.S. market. Foreign inventories were building in 2024 both absolutely, increasing from 2,674,329 gross in interim 2023 to 2,780,151 gross in the same period in 2024, and also as a ratio to subject shipments. *Id.* at VII-19, VII-11. The ratio of subject import inventories to import shipments increased throughout the POI, from [    ] percent in 2021, to [    ] percent in 2022, to [    ] percent in 2023, and to [    ] percent in interim 2024. *Id.* at VII-28. U.S. producers' ratio of inventories to shipments also increased throughout the POI, with inventory levels growing from [    ] percent in interim 2023, to a POI high of [    ] percent in interim 2024. *Id.* at III-19. Total U.S. inventories at the end of March 2024 were [        ] gross, which was [    ] percent higher than the beginning of 2021. Petitioner's Prehearing Brief at Exhibit 5, PR141, CR217/225. The Commission's determination did not address the increasing inventories in the context of the decrease in demand in the marketplace.

Imports surged on a relative basis in the first quarter of 2024, the end of the POI. Subject imports in interim 2024 grabbed an additional [    ] percentage points of merchant market share as compared to the previous year. Final Staff Report at C-5, PR187, CR 273.

Plaintiff argued that the record also supported an affirmative determination of threat of material injury. After filing the petitions, Ardagh indefinitely curtailed the remaining two furnaces at its Seattle plant.  This was a major focus of the domestic industry's arguments. [

]. Petitioner's Prehearing Brief at Exhibit 9, PR141, CR217/225. This evidence is not referenced or addressed in the Commission's decision.

Plaintiff submitted additional evidence regarding developments in the market that were further indicative of threat of material injury. The Commission did not state that it disagreed with such evidence but rather concluded that no such evidence existed. ("{t}here is no evidence of any change in conditions of competition that would cause cumulated subject imports to become injurious in the imminent future.") Views, PR187 at 65, CR279 at 88.

Petitioner and other parties submitted their Final Comments on September 17, 2024. The Commission voted on September 20, finding that subject imports did not injure the domestic industry, or threaten the domestic industry with material injury. Voting Sheet, PR181.The Commission issued its opinion on October 10, Views, CR279, and the public version was issued on October 15, PR187. The determination was published in the *Federal Register* on October 22. PR188. This action followed.

## IV.    <u>STANDARD OF REVIEW</u>

The Court of International Trade reviews the actions of the Commission in antidumping and countervailing duty proceedings to determine whether they are supported "by substantial evidence on the record or otherwise not in accordance with law." *See* 19 U.S.C. § 1516a(b)(1)(B). Under well-established case law, "substantial evidence is 'more than a mere scintilla'; it is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Usinor v. United States*, 26 CIT 767, 770 (2002). "Every party before an agency of the United States has a right to expect a fair and logical determination containing as much analysis as is necessary to adequately demonstrate the basis for its conclusions." *Id.* at 785.

11

The Commission has an affirmative obligation to respond to the parties' material evidence and arguments. "{T}he Court of International Trade and this court {the U.S. Court of Appeals for the Federal Circuit} cannot evaluate the substantiality of evidence supporting an ITC determination 'merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (internal citations omitted). The U.S. Supreme Court has held that agency actions would be arbitrary and capricious if the agency has, among other actions, "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Relevant to numerous issues in this appeal, while the Commission is presumed to have considered all the evidence in the record, it is also well established the Commission must explain or counter salient evidence militating against its conclusions. The Commission must address material evidence and arguments, and it cannot invoke the presumption of consideration of evidence "as a shield against examination of the Commission's failure to present required analysis of the record evidence." *Usinor v. United States*, 26 CIT 767, 783 (2002). It cannot use the presumption of consideration of the evidence as a "talismanic justification" for the absence of specific discussion regarding key evidence or arguments of the parties. *Id.*

Indeed, mere citation to record evidence does not constitute, by itself, a consideration of a party's argument and the Commission cannot fail to analyze evidence contradicting the agency's own conclusion where an interested party has specifically brought the possibility of conflicting

12

evidence to the agency's attention. *Altx, Inc. v. United States*, 25 CIT 1100, 167 F. Supp.2d 1353, 1359-60 (2001). Relevant to this case, it is axiomatic that objectively factually incorrect findings cannot be supported by substantial evidence and merely stating a conclusion, without more, is not a reasoned analysis that can withstand judicial review.

V.    **ARGUMENT**

A.    **The Commission's Price Effects Analysis was Not Supported By Substantial Evidence and Was Otherwise Contrary to Law**

Underlying the Commission's errors in its price effects determination is that the Commission found subject imports and the domestic like product were fungible and interchangeable, and price was an important purchasing factor. *See* Views, PR187 at 23, 33, CR279 at 30, 45. This should be kept in mind for the Court's consideration of the defects in the Commission's price effects analysis.

1.    **Factually Incorrect and/or Illogical Statements Regarding Underselling and Market Share**

The Commission's determination contains materially and objectively factually incorrect statements. The first of these is an alleged disconnect between imports underselling the domestic industry and resulting gains in subject import market share at the end of the POI. As one example, the Commission attempts to justify a lack of price effects by stating that the purchase cost data collected in pricing products 6 through 8 support a lack of price effects by subject imports. The Views make this statement in the core of its analysis:

> {A}lthough Domestic Parties argue the purchase cost data show that imports from subject sources were increasingly imported at lower costs than the domestic product during the latter portion of the POI, corresponding to market share gain by subject imports at the expense of domestic producers, the record indicates that the subject imports that gained market share during the latter portion of the POI were from Mexico, none of which were purchased at lower cost during that period.

PR187 at 42, CR279 at 55-56 (emphasis added). This is both factually incorrect and highly misleading. First, the Commission states that it was the Mexican imports that gained share at end of the period of investigation.  But that is not strictly true as both Mexican *and* Chinese imports gained share during the latter portion of the POI. This is not a question of interpretation of data, but, rather, the Commission's statement is directly contradicted by the Commission's own Staff Report. In the total market, subject imports from China increased market share from [    ] percent of the total market in 2022, to [    ] percent in 2023 and from [    ] percent in interim 2023 to [    ] percent in interim 2024. Final Staff Report at C-3, PR187, CR273. The same pattern was even more pronounced in the merchant market: Chinese imports increased from [    ] percent in 2022, to [    ] percent in 2023, to [    ] percent in interim 2023, to [    ] percent in interim 2024. *Id.* at C-5. The Commission's statement that it was Mexico that was gaining market share at the end of the POI is factually incorrect (or, at best, fails to address a material fact in the record).

The Commission also stated that, as Mexican imports gained market share, "none" of those imports were "purchased at lower cost during that period." Views, PR187 at 42, CR279 at 57. This is a half-truth. The domestic industry had argued throughout the investigation that underselling was increasing during the latter part of the POI as imports gained market share. To the extent that the Commission's statement was intended to be limited to only three of the Pricing Products (*i.e.*, 6 through 8), it is technically correct, but it is also highly misleading, as the Commission's own Staff Report confirmed that imports from Mexico were underselling the domestically produced product while they were gaining market share. Indeed, the Final Staff Report demonstrates that imports from Mexico gained market share from 2022 to 2023 and into 2024. Simultaneously, Mexican import prices [

]. *Id.* at V-

14

12 – V-13, PR187, CR273.  Accordingly, the uncontroverted evidence demonstrated that Mexican products were underselling the U.S. product and imports grabbed market share.

The Commission indicated that only Mexican imports were increasing at the end of the POI. But this is factually incorrect. The Commission also stated that there was no underselling by Mexican imports as they were gaining market share. This is also incorrect. In denying relief to the domestic industry, the Commission was factually wrong as to material findings.[2]

### 2. The Commission Did Not Provide a Reasoned Analysis as to the Data Issues Concerning Pricing Products 1 through 5

The Commission failed to provide a reasoned explanation of the level of trade issues in its pricing product examination in the underlying investigation. Namely, it did not address differences in level of trade in its pricing comparisons, comparing (1) sales from U.S. producers directly to end-users to (2) the ultimate price charged at the end of the foreign producers, to distributor, to end-users sales level.  This was a major issue in the investigation.  Specifically, for pricing products 1 through 5, the Commission compared sales that were predominantly at Sales Level #1 to Sales Level #2 as depicted below:

**U.S. Producer – (Sales Level #1) --> End User**

**Foreign Producer – (Sales Level #1) -> Importer/Distributor –> (Sales Level #2)--> End User**

In collecting price data this way, the Commission compared sales at different levels of trade. In addition, the data failed to capture the competition of sales to distributors, which was a not insignificant portion of the market. Plaintiff warned the Commission about the faults in this proposed methodology in its comments on the draft questionnaires: "[

---

[2] As discussed in the Impact Section, the Views also include incorrect material statements regarding the prevalence of underselling in 2024.

]. . . .

{P}rice competition from [

], is missing from the record." Petitioner's Comments on Draft Questionnaires at 2-3, PR106, CR83/84. What was compared was U.S. producers sales to end users, and imported sales prices after they had first been sold to a distributor.

The Commission's explanation of its treatment of this issue demonstrates that it misunderstood its own error. It believed Plaintiff's argument was "{P}remised on the assumption that its reported pricing data for products 1 to 5 are primarily sold to distributors, whereas subject importers' sales were primarily made to wineries." *Id.*, PR187 at 41, CR279 at 55 (emphasis added). This is the exact <u>opposite</u> of the domestic industry's argument. The domestic industry was selling primarily directly to end users (Sales Level #1), and that the pricing product data was comparing U.S. prices to imported sales prices out from importers/distributors (Sales Level #2). The Commission's additional analysis even further documents its error, stating: "While the domestic industry's argument appears to be premised on the assumption that its reported pricing data were of shipments to distributors, U.S. producers' overall U.S. shipments were also primarily to wineries, which generally accounted for over [   ] percent of their shipments during the POI, not to distributors . . . ." *Id.*, PR187 at 41, CR279 at 55-56. This was *exactly* Plaintiff's point: the domestic industry's pricing data was mostly at the "wholesale" level (Sales Level #1), which was being compared to a different level of "retail" sales through distribution (Sales Level #2).

Additionally, the Commission failed to collect acquisition costs for the majority of pricing products that would have allowed for a Sales Level #1 to Sales Level #1 comparison, in effect, U.S. producer sales and foreign producer sales to distributors. For example, [

]. *See* [            ] U.S. Importers' Questionnaire Response at III-2a – III-2c, CR145. Accordingly, competition between subject imports and the domestic like product was completely missing for very large customers such as [      ], and the Commission failed to provide a reasoned analysis regarding comparing sales prices at two different levels of trade.[3]

### 3.    The Commission Failed to Meaningfully Address the Contemporaneous Business Documentation Regarding Subject Import Underselling

The Commission has an obligation to address all material arguments and material evidence submitted by the parties. *See, e.g.*, *Usinor Industeel, S.A. v. United States*, 26 CIT 467, 478 (2002); *Altx, Inc. v. United States*, 25 CIT 1100, 167 F. Supp. 2d 1353, 1359-60 (2001). The Commission also has an obligation to discuss evidence detracting from or contradicting its findings. *See, e.g.*, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488-89 (1951).

Contradicting the Commission's finding of no price effects, the Plaintiff submitted:

- A letter from Chinese producer Shandong Changyu to its customers, informing them that it would be reducing the FOB price of its products, including subject glass wine bottles, to the U.S. market by 10 percent, effective from November 17, 2022, to December 31, 2023. *See, e.g.*, Petitioner's Prehearing Brief at Exhibit 4, PR141, CR217/225.

- [

---

[3]  Indeed, the Commission concedes, "the pricing data on the record does not distinguish between sales to distributors and sales to end users . . . ." Views, PR187 at 41, CR279 at 55.  This is exactly the point. The Commission's failure to collect the data in a meaningful way, which could have been addressed had it incorporated Petitioner's concerns raised in its comments on the Draft Questionnaires, creates a significant issue with the data, requiring reasoned explanation. Its discussion of average unit values suffers from the same problem.  *See id.,* PR187 at 44, CR279 at 59. AUVs from domestic producers directly to end users were lower compared to sales from foreign producers to importer/distributors and then on to end users. *Id.,* PR187 at 44-45, CR279 at 59-61. This was because the Commission was comparing data at two different levels of trade, in effect an apples-to-oranges price comparison.

17

]. *Id.* at Exhibit 6.

- [

]. *Id.* at Exhibit 15.

- [

]. *Id.* at Exhibit 16.

- [

]. *Id.* at Exhibit 17.

The contemporaneous business documentation was so extensive that it was a central part of Plaintiff's presentation at the hearing. *See* Witness Testimony and Presentation Materials, PR145, CR229; Hearing Tr. at 41-45, PR149. For the Court's convenience this and related evidence is attached to this submission at **Exhibit 1**.

The Views fail to address virtually all of this evidence and include a footnote that, at best, rings hollow in response to Plaintiff's argument, nominally addressing other issues but not refuting the core record evidence.[4] PR187 at 43, CR279 at 58 n.228. The Views, incredibly, state that the contemporaneous business documentation provided does not "detract from the other record evidence," but that is exactly what it does. *See id.*, PR187 at 43, CR279 at 58-59. Plaintiff is not asking the Court to impermissibly reweigh evidence, but instead is noting that the contemporaneous business documentation, much of which was originally provided by importers themselves, fundamentally detracts from the Commission's conclusion. As the Commission's determination ignores this evidence, without reasoned analysis, and as so is contrary to law and

---

[4] The footnote disingenuously represents that [

]. It otherwise provides a selective review of evidence by only addressing the facts that were supportive of the Commission's conclusion.

necessitates a remand. *See, e.g.*, *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997)

### 4.    The Commission Impermissibly Failed to Address the Frequency of Underselling and Lost Sales

The Commission is obligated to specifically reference in its determinations factors and arguments that are material and relevant, or it must provide a discussion or explanation in the determination that renders evident the agency's treatment of a factor or argument. H.R. Doc. No. 103-316, vol. 1 at 892, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4216; *see also* 19 U.S.C. § 1677f(i). This obligation is recognized in numerous decisions by the Commission's reviewing courts. The Views also failed to address Plaintiff's argument that underselling pervaded the U.S. market throughout the POI.

The uncontested record demonstrated that more than one out of every five purchasers indicated they purchased subject imports because they were lower priced than the domestic like product. Eight of 37 responding purchasers "reported that price was a primary reason for the decision to purchase imported product rather than U.S.-produced product." Final Staff Report at V-39, PR187, CR273. Plaintiff emphasized the importance of the frequency of underselling and briefed this issue extensively in its submissions before the Commission. *See e.g.*, Petitioner's Post-Hearing Brief at Exhibit 1, p.47, n.127; p.53, n.146, p.63, n.189, PR155, CR252/254.

In its Final Comments, Plaintiff stated:

> However, the frequency is remarkable, more than 1 in 5 purchasers admitted that over the POI they had bought subject imports on the basis of imports being lower priced. Distributors, large wineries, and {small and medium wineries} all confirmed that they bought lower priced imports on the basis of price and the frequency with which they did so is compelling evidence of negative price effects.

*See* PR 177, CR 275/277 at 9 (internal citations omitted). While the Commission did examine the volume of lost sales (though not mentioning that not all confirmed lost sales included reported

volumes) it utterly failed to address one of Plaintiff's main arguments, in effect the great frequency of confirmed lost sales was evidence of negative price effects. Views, PR187 at 44, CR279 at 59-60.

### 5.    The Commission Failed to Fully Address Evidence of Price Suppression

The Views also failed to fully address the record evidence of price suppression. Again, here, the Views offer a conclusion without an analysis. The Commission's Views do acknowledge that the domestic industry increased prices in the face of rising costs. *See* PR187 at 45, CR279 at 61-62. It is uncontested that costs increased more than prices, resulting in price suppression. This is also supported by the domestic industry's high COGS to net sales ratio, which stood at [      ] percent in interim 2024. Final Staff Report at C-4, PR187, CR273.

However, the Commission also found that "domestic producers had different trends in their COGS to net sales ratios over the POI, which suggests that their cost/price squeeze was due to internal factors, not external, industry-wide factors such as subject imports." Views, PR187 at 45 n.244, CR279 at 61 n.244. The Commission does not suggest what "internal factors" may have caused different trends in cost/price squeezes at the domestic producers. *See generally id.* Nor does the Commission discuss any legal authority requiring injury to be manifested in each member of the domestic industry uniformly and at the same time. Rather it is the opposite, the statute indicates the injury must be to the domestic industry as a whole.[5] 19 U.S.C. § 1677(4). As, the Commission

---

[5] The Commission's faulty analysis is similar in footnote 248. The Commission cites normal intra-industry competition and the natural shifting of market share between U.S. producers to discount the fact that the U.S. industry as a whole (the relevant legal inquiry) lost market share in the merchant market from 2022 to 2023 and again in 2024. *See* Views, PR187 at 47, CR279 at 63 n.248.

conceded, COGS increased more than net sales for the domestic industry, thus resulting in price suppression.[6]

The Commission cites the increase in COGS as being driven by changes in other factory costs. Views, PR187 at 46-47 n.247, CR279 at 62-63 n.247. As an initial point, regardless of where the increase in costs originated, the salient point is that the domestic industry could not fully cover its increased costs by increasing prices. This is price suppression regardless of where the cost increase came from but, and this is adding insult to injury, the increase in other factory costs is a function of plant closures. Plant closures were attributed to subject imports, both in uncontroverted testimony (respondents did not use the word "Seattle" once at the hearing) and in contemporaneous business documentation. Accordingly, the Commission used the increase in other factory costs, which were due in large part to imports, to discount that COGS increased as a percentage of net sales, in order to find no negative price effects.

In support of a lack of price effects, the Commission also commented favorably on the fact that if the nonrecurring costs connected with curtailments and furnace shutdowns are excluded from other factory costs, then the trend in COGS to net sales reverses. *Id.* It boggles the mind how the Commission can state that the removal of costs attributed to subject imports was evidence of a lack of injury on the rationale that the removal made the domestic industry's data appear healthier.

---

[6] While each firm's COGS to net sales ratio did vary throughout the POI, [

                                                                              ]. [

 ] U.S. Producers' Questionnaire Response at III-10b, -10d, CR121. [

                                                         ]. [          ] U.S.

Producers' Questionnaire Response at III-10b, III-10d, CR123. [

                                                               ]. Hearing

Tr. at 34, PR149. The Commission [

                                        ].

This is akin to saying that if one were to remove imports that gained market share in 2024, then the record would show a lack of market share gain, so there must be no injury.

Lastly the Commission concludes without analysis that the increase in other factory costs is attributable to declining demand and non-recurring costs. *Id.*, PR187 at 47, CR279 at 64. It is unclear, and unexplained, how a decrease in demand would lead to an absolute increase in other factory costs. Moreover, in looking at non-recurring costs, the Commission ignores the evidence of O-I and Ardagh's closures and only cites to a minor flooding event and a cyber-attack at Gallo. *Id.* The Commission essentially turns a blind eye to the evidence supporting that O-I and Ardagh's plant closures were by reason of subject imports, including questionnaire responses, uncontroverted testimony, and internal confidential business documents.

> **6.      The Commission's Analysis of the Inventory Overhang and Its Negative Price Effects is Not Supported by Substantial Evidence and is Otherwise Contrary to Law**

Domestic industry witnesses testified before the Commission that the large increase in inventories caused by subject imports overhangs the market and exerts downward pressure on prices:

> I think, by and large, this inventory overhang is having a massive impact on our business with a couple points.
>
> First off, inventory . . . creates a lot more cost into our business. It's warehousing costs. Of course, there's a risk . . . but it just is a compounding impact on an already very delicate financial situation in our industry. It just adds cost. So the overhang of inventory with our customers, with the entire supply chain, is putting pressure on us and, obviously, the tension is on further price reductions on a very low price point already overall.
>
> So I think the challenge that we have if we look at our business . . . . We took a factory out of production for nine months to control inventory from July of 2023 until this year. We shut down a factory furnace permanently in our industry. We are now looking at taking further actions right now {this has} been somewhat disclosed in our earnings call in the public domain, because of the inventory and the

challenging import with low price tariffs or low-priced imports. So this is an ongoing problem and a challenging problem for us as an industry that continues to impact us.

Hearing Tr. at 133-34, PR149. The Commission's analysis of inventory overhang in the market is not supported by substantial evidence and is not in accordance with law. The Views failed to acknowledge the growth in inventories relative to changes in the market. In response to Plaintiff, as well as domestic producer O-I's, arguments regarding an inventory overhang in the market, the Views stated:

> Although subject foreign producers' combined end-of-period inventories increased from 2021 to 2022 and were higher in interim 2024 than interim 2023, U.S. importers' inventories of subject imports declined by 9 percent from 2021 to 2023 and were 20 percent lower in 2024 than interim 2023. . .

PR187 at 48, CR279 at 64. The Commission also noted that [

]. *Id.* However, inventories increased on an absolute basis for the domestic industry as a whole. U.S. inventories grew by 30.6 percentage points over the three-year period and by 15.0 percentage points over the interim period. Final Staff Report at C-4, PR187, CR273. U.S. inventories as a percentage of shipments also increased by [     ] percent and [     ] percent over the same periods, *see id.*, corroborating witness testimony of a domestic industry inventory overhang on both an absolute basis and on a relative basis. The Views impermissibly focus on [                    ] but fail to examine the industry as a whole, as required by the statute.

Perhaps most troubling is that the Commission focused solely on import inventories' absolute volumes and ignored their increase relative to shipments. The ratio of U.S. importers' inventories of subject imports to U.S. shipments increased from [     ] percent in 2021 to [     ] percent in 2023 and reached [     ] percent in 2024. *Id.* at VII-28. For China this number increased from [     ] percent in 2021 to [     ] percent in 2023 and increased further to [     ] percent in

23

2024. *Id.* For Mexico, the same ratio increased from [     ] percent to [     ] percent to [     ] percent over the same period. *Id.* The ratio of inventories to import shipments also increased over the three-year period. *Id.* Accordingly, U.S. inventories increased, and subject inventories increased relative to shipments and to imports.

The Commission attempts to dodge these facts by only looking at absolute numbers. For this reason, too, the determination should be remanded back to the Commission for further consideration.

**B.** **The Commission's Determination that There Was No Adverse Impact By Reason of the Significant Volume of Unfairly Priced Imports Was Not Supported By Substantial Evidence and Was Otherwise Contrary to Law**

**1.** **The Commission Misapplied the Causation Standard**

The Views acknowledged that the domestic industry's condition worsened over the POI. PR187 at 50, CR279 at 67. The Views then state that the observed declines in the domestic industry's capacity, production, capacity utilization, sales, and shipments were "generally commensurate" with a decline in apparent U.S. consumption. *Id.* The Views then proceed to recite a comparison of numbers at the beginning of the POI and at the end of the POI. *See id.* A straightforward reading of "Impact of Subject Imports" section of the Views indicates the Commission determined the decline in demand was the most important cause of injury to the domestic industry. This analysis, however, is inconsistent with the causation standard as provided for in the statute and in decades of established case law.

The Federal Circuit, in addressing the causation standard of the statute, observed that "{a}s long as its effects are not merely incidental, tangential, or trivial, the foreign product sold at less than fair value meets the causation requirement." *Nippon Steel Corp. v. U.S. International Trade Commission*, 345 F.3d 1379, 1381 (Fed. Cir. 2003). Numerous cases at this Court, the Court of Appeals for the Federal Circuit, and the Supreme Court indicate if an agency fails to provide a

clear and logical explanation for its decisions it may be deemed arbitrary and capricious. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 46-47; *Suramerica*, F.3d at 985; *Usinor v. United States*, 26 CIT 767, 783-85 (2002).

For an affirmative determination, imports do not need to be the most important cause of injury but rather a cause of injury. Similarly, there can be multiple causes of injury to the domestic industry, but an affirmative determination is warranted as long as the imports are more than an incidental, tangential, or trivial cause. *Nippon Steel Corp.*, 345 F.3d at 1381.

a. A Large Supply of Competing Fungible Product at a Time of Decreasing Demand Is Even More Injurious

The Commission essentially determined that all injury to the domestic industry was caused by a decline in demand, and there was no causal nexus between cumulated imports, which had already been found to be significant on both an absolute basis and relative to consumption and declines in the domestic industry's performance. *See, e.g.*, Views, PR187 at 54, CR279 at 73-74.

However, it is self-evident that a large volume of imports during a period of decreasing demand would be even more injurious than during a period of flat or decreasing demand. In focusing on what it believed to be the most important cause of injury the Commission fails to meaningfully grapple with the significant volume of imports that occurred in the context of decreasing demand. Focusing solely on one cause of injury does not necessarily sever the causal connection between imports and additional injury to the domestic industry. The failure to meaningfully engage with the role of imports while demand was decreasing is a misunderstanding of the causation standard.

The Commission's finding that demand drove the domestic industry's decreased performance and there was no causal connection to subject imports ignores material evidence on the record. The investigation below included substantial record evidence that demand was not the

sole cause of the injury to the domestic industry. The Views stated that demand decreased by 12.5 percent and the decreases in the performance of the domestic industry were commensurate with this decrease. PR187 at 50, CR279 at 67.

However, important financial metrics demonstrated that the industry's performance decreased by more than 12.5 percent, which indicated there were other contributing factors to the deteriorating health of the U.S. industry. For example, gross profit in the total market decreased by [    ] percent over the three-year period. Final Staff Report at C-4, PR187, CR273. Further, imports gained share in 2024 as compared to 2023, at the same time the domestic industry lost share. *See id.* at C-3. While demand decreased by 11.5 percent in interim 2024, the following factors all decreased by more than the decrease in demand: U.S. shipments by quantity, U.S. shipments by value, net sales by quantity, net sales by value, capital expenditures, and hours worked. *See id.* at C-4. During the period of decreasing demand in 2024, imports from Mexico did not just increase on a relative basis but actually increased on an absolute basis. *Id.* at C-3. Essentially, while the market was contracting, Mexico shipped in more wine bottles. The Commission does not directly address any of these facts.

Moreover, in 2021, at the beginning of the POI, U.S. producers had an end of period inventory of [    ] percent of their total shipments for the year. *Id.* at C-4. By the end of 2023, end of period inventories were [    ] percent of total shipments, an increase of [    ] percentage points, and more than a [    ] percent change in inventories on an absolute basis over the three-year period. *Id.* This number skyrocketed at the end of the interim 2024 period, with end of period inventories as more than [    ] U.S. shipments. *See id.* This cannot be explained away be merely concluding that changes were "commensurate" with changes in demand, especially when they were considerably greater in magnitude than any such change.

This was, by virtually every metric, an injured domestic industry, and the Commission ignored substantial record evidence that the injury was causally connected to subject imports. In this regard, the Views stated, "The declines in the industry's capacity over the three full years reflected declining demand, as the industry's practical capacity declined by less than the decline in apparent U.S. consumption." PR187 at 50, CR279 at 67. Again here, the reason behind the data demonstrates the fallacy in the Commission's conclusion. U.S. producers Ardagh and O-I both testified to curtailing production at their facilities and, in Ardagh's case, indefinitely curtailing all production at its Seattle facility, because of competition from subject imports. In 2023, Ardagh closed one of its three operating furnaces, and in 2024, it indefinitely curtailed production on the other two furnaces, effectively shuttering the Seattle plant. Hearing Tr. at 34, PR149. Ardagh's

[

]." *See* Prehearing Brief at Exhibit 7, PR141, CR217/225. Indeed, the Views mention the word "Seattle" once, to acknowledge Ardagh shut down two furnaces in Seattle in July 2024. PR187 at 30, CR279 at 41. The Views [


]. *See generally* PR187, CR279. Nor does the Commission provide any analysis as to why the direct testimony under penalty of perjury is not evidence of a causal connection.

A representative of O-I affirmatively stated it shut down one-third of its Tracy, California factory "because of low-cost imports." Hearing Tr. at 142, PR149. [

].

[      ] U.S. Producers' Questionnaire Response at II-2a, CR122.

Accordingly, the Commission finds no causal connection between imports and harm to the domestic industry because the "significant" volume of imports were present during a period of

27

decreasing demand.  The Commission than adds insult to injury by stating that the declines in the

domestic industry's capacity was a reflection of decreasing demand, without ever addressing the

questionnaire responses, testimony, or contemporaneous business documents that demonstrated

that such declines in capacity were – at a minimum – more than tangentially related to imports.

        b.    The Commission's Misapplication of the Causation Standard Infects
             its Underselling Analysis

The Commission's final determination misapplies this causation standard, particularly with

regard to its underselling conclusion. The Views state, "the purchase cost data show that the landed

duty-paid cost of subject imports generally exceeded the sales prices of the domestic like product,"

and "responding purchasers' responses concerning the relative pricing of subject imports and the

domestic product do not support the claim that subject imports were mostly lower-priced." PR187

at 42, CR279 at 56-57 (emphasis added). This is not consistent with *Nippon Steel*. [     ] percent

of subject imports in pricing products 1 through 5 undersold the domestic industry, and [     ]

percent of subject imports in pricing products 6 through 8 undersold the domestic industry. Final

Staff Report at V-33, V-35, PR187, CR273. The Views do not explain why [     ] percent and,

more significantly, [     ] percent, of subject imports underselling the domestic industry would be

considered "incidental, tangential, or trivial." *See Nippon Steel*, 345 F.3d at 1381.[7]

It would be illogical to assume – without any explanation - that imports that undersold the

domestic industry, for example, 40 percent of the time had no negative effects simply because they

undersell the domestic industry less than 50 percent of the time. Requiring subject imports to

---

[7] In evaluating the effect of imports on prices, the Commission must consider whether "there has
been significant price underselling by the imported merchandise as compared with the price of
domestic like products of the United States . . . ." See 19 U.S.C. § 1677(7)(C)(ii)(I) (emphasis
added). Notably, the statute does not require there to be "majority" or "primary" underselling, only
"significant" underselling. The Commission's failure to explain why anything less than 50 percent
is not "significant" and to cite any authority to support its position constitute a failure to provide a
reasoned explanation.

undersell the domestically produced product a majority of the time in order to have any causal relationship with the health of the domestic industry is, in the absence of reasoned discussion, unreasonable, unsupported by the statute, and is contrary to law.

        c.    <u>The Commission's Overly Simplistic Market Share Trends Analysis is Inconsistent with the Causation Standard</u>

The Views emphasize the change in market share over the three-year period as an alleged lack of impact of subject imports on the domestic industry. *See* PR187 at 53, CR279 at 72. Specifically, the Commission indicates a lack of causation because import market share was lower in 2023 than in 2021. *Id.*

The Commission's reliance on a simplistic trends analysis without explanation is arbitrary and capricious. As a simple example, under the Commission's approach, if a thief stole $10,000 one year, $10,000 the second year, and $9,500 the third year, this would be deemed to be <u>non-injurious</u> to the victim, because the amount stolen in the third year was less than in the first year. Similarly here, in the third year (2023), dumped and subsidized imports amounted to 22.2 percent of the market, with a value of $374.6 million. Final Staff Report at C-3, PR187, CR273. That these numbers are lower than in the first year of the POI does not, alone, make these imports non-injurious, especially since the Commission itself acknowledged that these constitute significant volumes of subject imports. The Commission's overreliance on the three-year trend analysis is too simplistic and fails to provide the reasoned analysis required under the law.

Moreover, the Commission's volume analysis in light of decreasing demand does not pass macroeconomic muster. Since the Commission found the volume – the supply – of subject imports was significant on both an absolute basis and relative to market share, and demand decreased over the POI, then even the most rudimentary economic analysis would indicate that the significant supply of fungible/interchangeable products in a period of decreasing demand would put

downward pressure on prices. Even assuming arguendo that there was no underselling, but rather as the Commission noted that imports were sold at comparable prices, is it reasonable to conclude (in the absence of any reasonable discussion) that a large supply of interchangeable goods, that compete significantly on price, have no effect on U.S. pricing levels during a period of decreasing demand?

And more than this, the record shows: demand decreased by [     ] percentage points in interim 2024, and subject import volume decreased by a [        ] 6.6 percentage points. *Id.* at C-3. Demand was falling, and imports were decreasing by less than the decrease in demand and, as a result, subject imports increased market share. In examining the effects of imports in the context of decreasing demand, classical economics would confirm additional supply lowers the price equilibrium point. The Commission not only utterly failed to address this basic concept of economics, it also actually reached a contradictory conclusion.

### 2.    The Commission Misapplied the Material Injury Standard

The Commission also misapplied the material injury standard in this investigation. The statute defines "material injury" as "harm {that} is not inconsequential, immaterial or unimportant." 19 U.S.C. § 1677(7)(A).

A few relevant facts are uncontested. First, the domestic industry lost sales of at least [     ] gross to subject imports. *See* Final Staff Report at V-41, PR187, CR273. This can be valued at approximately [            ].[8] Additionally, at a minimum, [     ] percent of all pricing products undersold the domestic like product, and [      ] percent of all imports undersold the domestic like product in pricing products 6-8. *See id.* at V-33, V-35. Furthermore, total underselling

---

[8] [

                                                                          ].

amounted to 371,919 gross. *See id.* This can be valued at approximately [                    ].[9] One of the [                                    ], reported it had forced U.S. producers to reduce prices in order to compete with lower-priced imports from China and Mexico, and this resulted in estimated price reductions of [                              ] and [

                    ]. *Id.* at V-42.

    The Commission does not provide any analysis or discussion as to why these uncontested facts do not amount to a "harm {that} is not inconsequential, immaterial or unimportant." *See* 19 U.S.C. § 1677(7)(A). In particular, the Commission does not explain why lost sales and underselling valued at more than a combined [          ] does not meet this threshold. While the Commission offers a faulty analysis as to why the deterioration of the overall health of the domestic industry is not attributable to subject imports, it does not provide any meaningful discussion as to why the uncontroverted evidence, by itself, and that directly ties subject imports to the harm to the domestic industry, does not meet the material injury standard, other than to merely say there were "few confirmed lost sales." Views, PR187 at 53, CR279 at 73. We respectfully request the Court remand this issue to the Commission for reconsideration.

        **3.    The Commission Failed to Examine Material Arguments and Evidence the Industry Entered the POI in an Injured State**

    The domestic industry entered the POI in an injured state due to subject imports. The Views acknowledge that Petitioner and O-I made this argument in the underlying investigation. *Id.*, PR187 at 54-55, CR279 at 74-75. As an initial matter, the domestic industry was [

                ]. *See* Final Staff Report at C-4, PR187, CR273. This cannot be a

---

[9] [                                                            ].

function of declining demand during the POI, because the domestic industry was [

]. *Id.*

The domestic industry argued this was an important consideration in examining whether there was a causal connection between subject imports and the domestic industry's poor health (especially in light of the Commission's heavy reliance on an arbitrary 3-year trend analysis). The evidence included in the record as to this issue included:

- Pre-POI 10-K Filings with the Securities and Exchange Commission that identified imports from China and Mexico as a competitive concern in the domestic market. *See* Petitioner's Post-Hearing Brief at Exhibit 16, PR155, CR252/254.

- Sworn testimony from both Ardagh and O-I representatives: "This hasn't been a problem for the last three years. This has been a problem for the 26 years I've been in the business," Hearing Tr. at 89, PR149, and "We began to see wine bottle import inroads from China about a decade ago," *Id.* at 21.

- Pre-POI [

]. *See* Petitioner's Post-Hearing Brief at Exhibit 17, PR155, CR252/254.

- An Ardagh newsletter that explicitly stated, "As the U.S. wine market continues to grow, so does the concerns about the number of subsidized imported glass bottles from China." *Id.* at Exhibit 1 p.22, Exhibit 19.

- Pre-POI public documentation regarding growing Chinese capacity. *Id.* at Exhibit 1 p.23, Exhibit 20.

- [                                                                                    ] began before the POI. *Id.* at Exhibit 1, p.24.

The Commission did not engage with any of this evidence. This alone under *Altx* should require a remand, 167 F. Supp.2d at 1360, but the Commission creates additional error. The Views indicate that the industry was not injured because subject imports pervasively oversold the domestic industry in the preliminary phase investigation. PR187 at 54-55, CR279 at 74-75. This is curious in light of what the Commission actually said in its preliminary determination:

While the pricing data on the record here indicate that subject imports were higher priced than the domestic like product, the record contains other evidence indicating

that subject imports were lower priced than the domestic product. Responding purchasers indicated in the lost sales responses that subject imports were priced lower than the domestic like product, at least at times during the POI. Petitioner also provided email correspondence with wineries that it claims show that subject imports were priced lower than the domestic industry's glass wine bottles and resulted in domestic industry lost sales. Petitioner's witnesses at the staff conference testified that subject imports were often priced substantially lower than domestically produced glass wine bottles. . . .

The result of the domestic industry's costs rising to a greater degree than its net unit sales value was that the domestic industry experienced a cost-price squeeze during the POI as it was unable to increase its prices sufficiently to cover its increased costs.

*Id.*, PR91 at 32-34, CR81 at 42-45.

However, this may be the most disingenuous part of the Commission's Impact analysis: it found the domestic industry was not injured prior to the start of the POI because there was no loss of market share from 2020 to 2021, prior to the POI. Views, PR187 at 54-55, CR279 at 74-75. That market share was actually higher in 2020 (pre-POI) than in 2021 (the first year of the POI) is used to argue that imports were not injurious before the POI. To restate this, subject imports being higher before the POI is incredulously being cited as support for the fact there was no injury pre-POI. Of course, the Commission previously found these pre-POI volumes to be significant on an absolute basis and relative to market share.

### 4.    Objectively Factually Incorrect Statements in the Commission's Impact Analysis

The Commission's impact analysis contains factually incorrect findings. As the first example, the Commission found that for "the quarterly price comparisons in interim 2024, subject imports from Mexico were higher priced than the domestic like product for products 1, 3, and 5 . . . ." *Id.*, PR187 at 54, n.286, CR279 at 73, n.286 (emphasis added). [                ]. The Commission's own Staff Report confirms that for the [                ] in pricing product 1, the U.S. price in 2024 was [        ], as compared to the [

33

]. Final Staff Report at V-12, PR187, CR273.

[                                                    ] concludes that, in pricing products 1 through 5, "subject imports from Mexico predominantly oversold the domestic like product in interim 2024." Views, PR187 at 54, CR279 at 73. This is objectively false as well. There were [

]. Final Staff Report at V-12 – V-16, PR187, CR273. Based on this data, Mexican imports undersold the domestic like product in [   ] percent of comparisons and [     ] percent by volume. *See id.* Objectively, this was not "predominant" overselling, either by instances or by volume. Here an objectively incorrect finding cannot be deemed to be supported by substantial evidence.

### C.    The Commission's Threat Analysis Was Not Supported By Substantial Evidence and Was Otherwise Contrary to Law

#### 1.    The Commission's Likely Volume of Subject Imports Finding Was Not Supported by Substantial Evidence and Was Otherwise Contrary to Law

The Commission found that cumulated subject import trends during the POI did not indicate a likelihood of a significant increase in cumulated subject imports in the imminent future absent relief.

This conclusion is remarkable as, by the Commission's own findings, subject import market share was in fact increasing at the end of the POI. As even the Views make clear, subject import share in the total market increased by 1.6 percentage points in interim 2024 as compared to the same period in 2023, from 21.9 percent to 23.5 percent. *See* PR187 at 59, CR279 at 80. This was true to an even greater extent in the merchant market where imports increased from [     ]

percentage points in interim 2023 to [      ] percentage points in interim 2024. *See id.*, PR187 at 59 n.305, CR279 at 80 n.305.

> Specifically, the Commission stated:
>
> The increase in subject imports in interim 2024 compared with interim 2023 reversed the downward trend in the volume of subject imports from 2021 to 2023. We do not find that the 3.6 percent increase in subject imports during the first quarter of 2024 indicates that substantially increased subject imports are likely given the long-term downward trend in subject imports over the previous three calendar years.

*Id.* PR187 at 59 n.307, CR279 at 81 n.307. The Commission found imports would not be likely to continue increasing, which they were, because of the "long-term downward trend," but the multi-year trend indicates that imports had been steadily gaining market share since 2022. In the total market, subject imports were 21.1 percent in 2022, 22.2 percent in 2023, and 23.5 percent in interim 2024. Final Staff Report at C-3, PR187, CR273. The same trend is evident in the merchant market, where subject imports increased from [      ] percent in 2022 to [      ] percent in 2023, and [      ] in interim 2024. *Id.* at C-5. The Commission attempts to justify its finding merely because imports had been higher in 2021. It provides no reasoned analysis for its conclusion that, because imports were increasing, and had been increasing since 2022, imports would not continue to increase.

In examining volume trends, the Commission did <u>not</u> address Plaintiff's argument that 2021, the base year, was affected by COVID-19 and an overstocking occurring throughout the United States. This cannot be overstated. Petitioner extensively briefed the aberrational nature of 2021, citing press reports, importers' questionnaires responses, and purchasers' questionnaire responses, and the issue was discussed in length at the hearing. Petitioner's Post-Hearing Brief at Exhibit 1 at 54-56, PR155, CR252/254; Hearing Tr. at 21, 25, 41, 65, PR149. As the Views make clear the Commission heavily relied on its "trends" analysis, comparing the first year of the POI

35

to the third year of the POI, its failure to address this argument and this evidence is impermissible and should require a remand.

The Commission attempts a legal jiujitsu maneuver, noting subject capacity was increasing in 2024 and was projected to increase further in 2025, production was expected to increase further, resulting in an increasing percentage of production relative to capacity (*i.e.*, capacity utilization), but then suggests this would make increased exports to the United States <u>less likely</u> to occur. Views, PR187 at 61 n.315, 62-63, CR279 at 83 n.315, 85. This could be true, but in the absence of explanation, these facts would logically suggest that increased imports are more likely to occur (in effect, increasing capacity and increasing production make increased imports <u>more likely</u>).

The Commission also looked at foreign production and indicated that the ongoing multi-year increase in exports made increased volumes less likely to occur. Foreign industries' exports to the United States were 2.8 million gross in 2023, and foreign producers themselves projected exports to be 3.3 million gross in 2024, and 3.4 million gross in 2025, yet the Views provided no discussion of this fact.[10] PR187 at 61, CR279 at 84 n.320. This is impermissible.

In determining whether there was a likelihood of increased imports the Commission never meaningfully engages with the facts that (1) imports had in fact been increasing over the previous three years; (2) foreign producers were bringing additional capacity online and confirmed increased projected production; and (3) foreign producers admitted that they were actually planning on increasing their exports in 2024 and 2025.

---

[10] The Commission's discussion of relative shares of exports to sales in the home market does not undermine that the foreign producers themselves confirmed they were planning to increase shipments to the United States in 2024 and 2025, just as they had been doing. *See* Views, PR187 at 62, CR279 at 84-85.

2.    **The Commission's Likely Price Effects Analysis in its Threat Determination is Not Supported by Substantial Evidence and Is Otherwise Contrary to Law**

For the reasons explained in the Price Effects section above, the Commission's determination that there were no likely price effects for purposes of threat of material injury is also not supported by substantial evidence and is otherwise contrary to law.

The Commission's errors include the decision that the domestic industry's inability to fully pass along costs was actually supportive of a determination of no threat of injury to the domestic industry. *See* Views, PR187 at 63, CR279 at 86. That the domestic industry could pass along some, but not all, of their costs is the definition of a cost-price squeeze. COGS/net sales increased over the three-year period. More problematic is the Commission's simplistic analysis that if one number is lower than another number, it is no longer supportive of injury or threat. For example, the Commission points to COGS/net sales being [     ] percent in interim 2024, which was [     ] percentage points lower than the same ratio in interim 2023. Final Staff Report at C-4, PR 187, CR 273. This does not indicate whether or not a very high COGS/net sales ratio of [     ] percent is evidence of threat; it only indicates that ratio was lower than at another point in time. To return to the thief analogy, if a thief would steal $10,000 in 2022, and $10,000 in 2023, but only stole $9,500 in 2024, does that indicate – in the absence of a reasoned analysis - that there is no threat in 2025 just due to the fact that $9,500 is lower than $10,000?  It does not. That one number is lower than another number, in the absence of any reasoned discussion, does not meet the legal obligation extant for Commission determinations.

### 3.    The Commission Failed to Address Relevant Evidence that Inventories Posed a Significant Threat to the Domestic Industry

The Views fail to address all relevant evidence that inventories contributed to a threat to the domestic industry, including that an inventory overhang in the market both increased costs for the domestic industry and depressed prices in market.

As to foreign inventories, they increased from [        ] gross in interim 2023 to [        ] gross in the same period in 2024. Final Staff Report at VII-19, PR187, CR273. These foreign inventories of wine bottles also grew as a ratio to subject production and shipments. *Id.* at VII-20.

As to importer inventories of subject merchandise in the United States, they increased on a relative basis as well. The ratio of inventories of subject imports to import shipments increased throughout the POI. This ratio was [    ] percent in 2021, [    ] percent in 2022, [    ] percent in 2023, and [    ] percent in interim 2024. *Id.* at VII-28. The Views do discuss absolute inventory levels. *See* PR187 at 60, CR279 at 82 n.311. However, the Commission did not put this data in context and did not examine the relevant ratios, which is especially surprising given its previous findings regarding the importance of decreasing demand. The market had contracted, and import inventories were larger on a relative basis. Yet this goes undiscussed.

U.S. producers' ratio of inventories to shipments also increased throughout the POI, with inventory levels growing from [    ] percent in interim 2023, to a POI high of [    ] percent in interim 2024. *Id.* at III-19. Total U.S. inventories at the end of March 2024 were [        ] gross, which was [   ] percent higher than in January 2021. Petitioner's Prehearing Brief at Exhibit 5, PR141, CR217/225.

As the witness from O-I testified, "After the pandemic importers, distributors and customers stockpiled the lower priced subject imports which resulted in significant inventory

overhang of the wine bottles in the US {sic} market during the 2022 and the 2023 period. Our customers used these low-price offers to drive down our pricing." Hearing Tr. at 22, PR149.

The inventory overhang effects both the <u>cost</u> and the <u>price</u> sides of the cost-price squeeze. As addressed above, a witness from O-I testified to that large inventory buildup due to subject imports increases the costs and suppresses the prices of the prices of the domestic industry. *Id.* at 134. Furthermore, the levels of inventories are compelling evidence of threat of material injury. *See* Hearing Tr. at 34, PR149. However, the Commission again turned a blind eye to the increasing inventories on a relative basis and impermissibly failed to analyze evidence contradicting the Commission's own conclusion. *Altx, Inc. v. United States*, 25 CIT 1100, 167 F. Supp.2d 1353, 1360 (2001).

### 4. The Views Did Not Address the Likelihood of Continued Closures and Curtailments of Domestic Production

As discussed above, the Views utterly fail to address the effective closure of Ardagh's Seattle manufacturing facility, especially the [

]. Petitioner's Prehearing Brief at Exhibit 9, PR141, CR217/225.

The closure of Seattle was a catastrophic event for the domestic industry and Plaintiff extensively briefed the importance of the closure of the plant in its prehearing and post-hearing briefs, and that issue was also discussed at length at the hearing. *See generally* Petitioner's Prehearing Brief at 77-79, PR141, CR217/225; Petitioner's Post-Hearing Brief at 11-14, PR155, CR252/254; Hearing Tr. at, *e.g.*, 34-38, 137, PR149. Indeed, the word "Seattle" is found more than 35 times in the hearing transcript, *see generally* Hearing Tr., PR149, but it appears on one cursory occasion in the Views: "In July 2024, Ardagh shut down two additional furnaces in Seattle." PR187 at 30, CR279 at 41.

The Commission never directly addresses that a major plant was curtailed and jobs were lost, despite sworn testimony that the closure was due to subject imports and [

]. The decision to deny relief to the domestic industry does not provide any discussion or analysis of this evidence, one of the most significant manifestations of harm and threat of harm to the domestic industry. For this reason, too, a remand is appropriate.

5.    **The Commission's Statement That There Was No Evidence of Any Change in Conditions of Competition is Objectively False**

The Commission states, "{t}here is no evidence of any change in conditions of competition that would cause cumulated subject imports to become injurious in the imminent future." Views, PR187 at 65, CR279 at 88. It is factually untrue that no such evidence was introduced. The record included evidence of the following:

- The relevant change that a major Chilean producer, which had paused exports due to a fire, had resolved its production problems. The CEO was publicly quoted as saying that the company was planning to increase both production and exports in 2024. Petitioner's Prehearing Brief, PR141, CR217/225 at 72.

- The closure of the Seattle plant was a new condition of competition that affected U.S. capacity and made the industry more vulnerable to import competition. *Id.* at 77-78.

- There were announced capacity increases by both Mexican and Chilean producers. *Id.* at 76.

- There was a recent surge in Chinese imports that triggered an affirmative critical circumstances determination in the companion Department of Commerce investigation. *Certain Glass Wine Bottles from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 89 Fed. Reg. 68,395 (Aug. 26, 2024). The Commission's own Final Staff Report confirmed a three-month comparison of pre-and post-petition Chinese imports demonstrates an increase of [     ] percent. Petitioner's Prehearing Brief, PR141, CR217/225 at 79.

- There was an expected pace of imports in light of an inventory overhang that posed a threat to the domestic industry. "That is both a{n} injury factor and a threat factor, but, right now, imports are coming in at a pace greater than any single year of the

POI though the first half of the year based on public data. So we think that is injuring the industry currently during the POI, post-POI, and threatening the future and that inventories, we're very glad you asked, are a huge problem, and imports coming in at high volumes with arranged and actual imports with this current overhang is injuring the industry now and threatening the industry in the future." Hearing Tr. at 135, PR149.

- An important change in the conditions of competition was the "snowballing" effect of lower negotiated contracts coupled with plant closures. *Id.* at 151-52.

The Commission may disagree with the evidence, but it is factually incorrect to state there was no evidence introduced as to recent changes in competition in the market, when in fact evidence had been submitted regarding a change in a Chilean company's recovery from a fire, information about new production facilities coming online in subject countries, vulnerability connected with plant closures, a recent surge in Chinese imports, and sworn testimony regarding developments indicative of an increased threat due to imports. The Commission's blanket statement that no such evidence even existed is – at best – a conclusion without any analysis.  In essence, the Commission was explicitly stating that it was denying even the existence of the contradictory evidence from which conflicting inferences could be drawn.  This is impermissible.  *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994).

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, we respectfully request the Court remand the Commission's price, impact, and threat determinations to the agency for further consideration.

Respectfully submitted,

<u>/s/ Daniel B. Pickard</u>
Daniel B. Pickard, Esq.
Claire M. Webster, Esq.

BUCHANAN INGERSOLL & ROONEY PC
1700 K Street, NW
Washington, D.C. 20006
(202) 452-7900

*Counsel to U.S. Glass Producers Coalition*

42

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to sections 2(B)(1) and (2) of the Standard Chambers Procedures of this Court, that this brief contains no more than 13,523 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>/s/ Claire M. Webster</u>