*PUBLIC VERSION*

---

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

---

Court No. 24-00199

---

**U.S. GLASS PRODUCERS COALITION,**

*Plaintiff,*

v.

**UNITED STATES,**

*Defendant,*

and

**BERLIN PACKAGING L.L.C., TRICORBRAUN INC.,
ENCORE GLASS, INC.,**

*Defendant-Intervenors.*

---

### DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

---

JASON F. MILLER
Attorney-Advisor
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-2746
Fax: (202) 205-3111
jason.f.miller@usitc.gov

ANDREA C. CASSON
Assistant General Counsel
  for Litigation
Telephone: (202) 205-3105

MICHAEL K. HALDENSTEIN
Attorney-Advisor
Telephone: (202) 205-3041
michael.haldenstein@usitc.gov

**DATED: JULY 25, 2025**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iv

I.    STATEMENT PURSUANT TO RULE 56.2...................................................1

    A.    Administrative Determination Sought to be Reviewed ............................1

    B.    Questions Presented and Summary of Argument ....................................1

        1.    Are the Commission's Price Effects Findings Supported by
            Substantial Evidence and in Accordance with Law?....................................1

        2.    Is the Commission's Adverse Impact Finding Supported by
            Substantial Evidence and in Accordance with Law?....................................3

        3.    Is the Commission's Threat Finding Supported by Substantial
            Evidence and in Accordance with Law?........................................................4

II.   STATEMENT OF FACTS ............................................................................5

    A.    The Commission's Preliminary Determination ......................................5

    B.    The Commission's Final Phase Questionnaires......................................6

    C.    The Commission's Final Determination ..................................................7

III.  STANDARD OF REVIEW ..........................................................................14

IV.   ARGUMENT ..............................................................................................16

    A.    The Commission's Price Effects Findings are Supported by
        Substantial and in Accordance with Law.................................................17

        1.    The Commission's Price Effects Findings Should Be
            Sustained ........................................................................................................17

        2.    Plaintiff's Underselling Arguments Fail....................................................21

            a.    Plaintiff's Price Comparison Argument Fails................................21

            b.    Plaintiff's Minority Underselling Arguments Fail........................23

            c.    Plaintiff's "Contemporaneous Business Documentation"
               Argument Fails...........................................................................................24

            d.    Plaintiff's Lost Sales Argument Fails ...........................................25

**TABLE OF CONTENTS (cont'd)**

3.      Plaintiff's Price Suppression Arguments Fail..............................................26

      a.      Uncontested Substantial Evidence Supports the Commission's Suppression Finding........................................................................26

      b.      Plaintiff's Attempts to Fault the Commission's Suppression Analysis Fail ............................................................................27

      c.      Plaintiff's "Inventory Overhang" Argument Fails........................29

4.      Plaintiff's Market Share Arguments Fail ..................................................31

5.      Plaintiff's Remaining Price Effects Arguments Fail ................................33

B.      The Commission's Significant Adverse Impact Finding Is Supported by Substantial Evidence and in Accordance with Law............................................34

1.      The Commission's Significant Adverse Impact Finding Should Be Sustained........................................................................................34

2.      Plaintiff's Impact Arguments Fail .............................................................36

      a.      Plaintiff's Demand Arguments Fail................................................36

      b.      Plaintiff's Capacity Argument Fails ..............................................37

      c.      Plaintiff's Argument Based on End of Period Market Share Fails........................................................................................38

      d.      Plaintiff's Lost Sales Argument Fails ...........................................40

      e.      Plaintiff's Argument that Imports Injured the Industry at the Start of the POI Fails...........................................................41

C.      The Commission's Threat Finding Is Supported by Substantial Evidence and In Accordance With Law ......................................................42

1.      Plaintiff's Likely Volume Arguments Fail ................................................42

2.      Plaintiff's Likely Price Effects Arguments Fail........................................44

3.      Plaintiff's Likely Impact Arguments Fail .................................................44

V.      **CONCLUSION** ..............................................................................................**45**

## TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Altx Inc. v. United States*,
  26 CIT 709 (2002), *aff'd*, 370 F.3d 1008 (Fed. Cir. 2004).................................................30, 31

*Am. Lamb v. United States*,
  785 F.2d 994 (Fed. Cir. 1986)...........................................................................................5

*Chemours Co. FC, LLC v. United States*,
  492 F. Supp. 3d 1333 (Ct. Int'l Trade 2021) ......................................................................15

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966)...........................................................................................................15

*Diamond Sawblades Mfrs. Coal. v. United States*,
  612 F.3d 1348 (Fed. Cir. 2010)..........................................................................................22

*Full Member Subgrp. of Am. Inst. of Steel Constr., LLC v. United States*,
  547 F. Supp. 3d 1211, 1228 (Ct. Int'l Trade 2021) ...........................................................40

*Goss Graphics Sys., Inc. v. United States*,
  22 CIT 983, 33 F. Supp. 2d 1082 (1998), *aff'd*, 216 F.3d 1357
  (Fed. Cir. 2000).................................................................................................................15

*JMC Steel Grp. v. United States*,
  70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015) ..................................................................16, 22

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)...........................................................................................................39

*Mexichem Flour Inc., v. United States*,
  179 F. Supp. 3d 1238 (Ct. Int'l Trade 2016) ......................................................................22

*Mittal Steel Point Lisas Ltd. v. United States*,
  542 F.3d 867 (Fed. Cir. 2008)............................................................................................36

*Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*,
  345 F.3d 1379 (Fed. Cir. 2003)..........................................................................................36

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006)....................................................................................15, 36

*Nucor Corp. v. United States*,
  28 CIT 188, 318 F. Supp. 2d 1207 (2004).....................................................16, 25, 26, 41, 45

*Nucor Corp. v. United States*,
  32 CIT 1380 (2008), *aff'd*, 601 F.3d 1291 (Fed. Cir. 2010)..................................................26

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                 **Page(s)**

*Pulsifer v. United States,*
    601 U.S. 124 (2024)................................................................................39

*Shandong TTCA Biochem. Co., Ltd. v. United States,*
    35 CIT 545, 774 F. Supp. 2d 1317 (2011) ..........................................16

*T.B. Wood's Inc. v. United States,*
    355 F. Supp. 3d 1265 (2018) ...............................................................39

*Taiwan Semiconductor Indus. Ass'n v. U.S. Int'l Trade Comm'n,*
    266 F.3d 1339 (Fed. Cir. 2001)...........................................................36

*Timken U.S. Corp. v. United States,*
    421 F.3d 1350 (Fed. Cir. 2005)...........................................................16

*U.S. Steel Corp. v. United States,*
    36 CIT 1172, 856 F. Supp. 2d 1318 (2012) ........................................41

*U.S. Steel Grp. v. United States,*
    96 F.3d 1352 (Fed. Cir. 1996).............................................................15

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951)......................................................................15, 38

*USEC Inc. v. United States,*
    34 F. App'x 725 (Fed. Cir. 2002) .......................................................16

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)..................................................................14, 15

19 U.S.C. § 1671d(b) ..................................................................................39

19 U.S.C. § 1673d(b) ..................................................................................39

19 U.S.C. § 1677(7)(C)(ii)...........................................................................34

19 U.S.C. § 1677(7)(C)(ii)(I).......................................................................17

19 U.S.C. § 1677(7)(C)(ii)(II)..........................................................17, 20, 26

19 U.S.C. § 1677(7)(C)(iv)(II)........................................................................8

19 U.S.C. § 1677(7)(G)(iii)............................................................................8

**TABLE OF AUTHORITIES (cont'd)**

**Statutes (cont'd)**                                                                                    **Page(s)**

28 U.S.C. § 2637(d) ......................................................................................................22

28 U.S.C. § 2639(a)(1).................................................................................................15

**Legislative Materials**

Statement of Administrative Action to the Uruguay Round Agreements Act,
    H.R. Rep. No. 103- 316, vol. I (1994) ...................................................................16

**U.S. International Trade Commission Publications**

*Glass Wine Bottles from China and Mexico*,
    Inv. Nos. 731-TA-1662-1663 (Final), USITC Pub. 5588 (Feb. 2025) ...................33

Defendant U.S. International Trade Commission ("Commission") hereby opposes the motion for judgment upon the agency record filed by the U.S. Glass Producers Coalition ("Plaintiff" or "Coalition").  The Commission respectfully asks the Court to affirm the Commission's final negative determination regarding glass wine bottles from China, as it is supported by substantial evidence and otherwise in accordance with law.

## I.    STATEMENT PURSUANT TO RULE 56.2

### A.    Administrative Determination Sought to be Reviewed

Plaintiff seeks review of the Commission's final negative determination in the countervailing duty investigation of glass wine bottles from China, notice of which was published at 89 Fed. Reg. 83,515 (Oct. 16, 2024) (PD188).[1]  The public version of the Commission's Views and Staff Report for this investigation is contained in *Glass Wine Bottles from China*, Inv. No. 731-TA-703 (Final), USITC Pub. 5550 (Oct. 2024) (PD187).

### B.    Questions Presented and Summary of Argument

#### 1.    Are the Commission's Price Effects Findings Supported by Substantial Evidence and in Accordance with Law?

Yes.  The record demonstrated that overselling predominated by every measure, that domestic prices nearly universally increased, and that any price suppression was neither significant nor caused by subject imports.  This record more than sufficed to support the

---

[1] Citations to the public record are indicated by "PD," referring to list number 1 on the index of the administrative record, and citations to the confidential record are indicated by "CD," referring to list number 2 on the index of the administrative record.  Citations to the Commission's confidential Views ("Views") are to CD279 and to the confidential Staff Report ("CR") are to CD268.

Commission's underselling, depression, and suppression findings, as well as its ultimate finding that subject imports did not have significant adverse price effects.

The Coalition did not exhaust the level of trade argument it raises on appeal to challenge the Commission's price comparisons for products 1-5. Should the Court nevertheless countenance this argument, it fails. As this Court has recognized, the Commission's typical underselling methodology, which it employed here in its price comparisons for product 1-5, is reasonable and does not entail comparisons at different levels of trade. In any event, Plaintiff's preferred underselling methodology, employed for the the product 6-8 comparisons, also showed overselling.

Equally misplaced is Plaintiff's contention that the Commission's declination to collect import purchase cost data for products 1-5 (*i.e.*, the case-packed products) was unreasonable. The Coalition itself indicated that only bulk-packed products, not case-packed products, are imported. Plaintiff fails to explain why it was unreasonable for the Commission to have declined to collect import purchase costs for products it itself indicated were not imported.

Plaintiff's argument that the Commission acted both unreasonably and unlawfully in declining to consider the minority level of underselling on the record "significant" is likewise inapt. The Coalition fails to demonstrate why the Commission's underselling finding was in any way unreasonable or contrary to the statute.

Similarly unavailing is the Coalition's claim that the Commission ignored the contemporaneous business documentation on the record. The Commission recognized and discussed this evidence. Plaintiff's argument boils down to noting that the Commission did not expressly cite each piece of the business documentary evidence. But, as this the Court has recognized, the agency was not required to have done so to have considered this evidence.

Even to the extent that the "frequency" of the lost sales reporting, as the Coalition calls it, constitutes evidence contrary to the Commission's underselling finding, that would not undermine the weighty evidence relied on by the Commission indicating that underselling was not significant.  The Coalition's claim that the Commission ignored its frequency argument is inapt.  The Commission expressly discussed the frequency data and in any case the Commission need not address every party argument.

Plaintiff contests none of the key evidence supporting the Commission's price suppression finding, and the arguments it does raise are misplaced.  These arguments are based on misunderstandings of the Commission's suppression analysis, as well as of the facts and the law.

Similarly inapt are Plaintiff's market share arguments.  The Commission's market share analysis was not incorrect, materially or otherwise, contrary to what Plaintiff contends.  The Coalition's remaining price effects arguments also fail.

### 2.    Is the Commission's Adverse Impact Finding Supported by Substantial Evidence and in Accordance with Law?

Yes.  The record did not indicate a causal nexus between subject imports and the deterioration in the domestic industry's performance over the full years of the period of investigation ("POI").  These imports were leaving the market as the industry's performance weakened over the full years of the period, and those that remained generally significantly oversold the industry.  Nor did the record indicate a nexus between subject imports and any injury over the January-March 2023 and January-March 2024 ("interim") periods of the POI.  The increasing presence of subject imports over the interim periods did not prevent the industry from increasing its prices by more than its costs and significantly improving its financial performance by nearly every measure.  Accordingly, substantial record evidence supports the

Commission's finding that subject imports did not significantly adversely impact the domestic industry during the POI.

Plaintiff's demand arguments are unavailing. As the record did not indicate that subject imports were injuring the industry, declining demand during the POI could not have magnified their injury, contrary to Plaintiff's claim. The Coalition's observation that certain of the industry's performance indicia not directly related to output or sales volume declined by more than apparent U.S. consumption does not undermine the Commission's findings. Moreover, even if declining demand could not fully explain the declines in certain of the industry's performance indicators, this would not somehow establish that it was subject imports that accounted for the remainder of the declines in those indicators.

Plaintiff's capacity and start-of-the-POI arguments are both simply requests for the Court to reweigh the evidence on these issues. Equally failing is Plaintiff's attack on the Commission's use of a correlative trend analysis to assess causation. As previously found by this Court, the statute nowhere mandates the alternative causation methodology Plaintiff prefers, and the Coalition does not demonstrate that the Commission's correlative trend methodology was unreasonable. Plaintiff's argument that the Commission's impact analysis included incorrect statements also fails.

### 3. Is the Commission's Threat Finding Supported by Substantial Evidence and in Accordance with Law?

Yes. The record did not indicate a likelihood of substantially increased subject imports in the imminent future, or that such imports would have significant price effects or a significant adverse impact in the imminent future. Accordingly, substantial record evidence supports the Commission's finding that these imports did not threaten material injury in the imminent future.

Plaintiff's argument that the Commission should have found a likelihood of substantially increased imports based on the slight gain in subject import market share over the three-month interim periods is unavailing. The Commission expressly acknowledged this interim period increase but reasonably did not find it indicative of substantially increased future imports given the long-term downward trend in these imports from 2021 to 2023. The Coalition's claim that the Commission should have focused on 2022-23 instead of 2021-23 in assessing the long-term trend in imports due to 2021's supposedly "aberrational" nature is misplaced, and, in any event, 2022-23 data would also have shown a decline in imports. Plaintiff's remaining likely volume arguments fail, as do its likely price effects and likely impact arguments, which largely reprise its failing arguments from the present material injury context.

## II.    STATEMENT OF FACTS

### A.    The Commission's Preliminary Determination

On December 29, 2023, the Coalition filed petitions with the Commission and the Department of Commerce ("Commerce") alleging that an industry in the United States is materially injured or threatened with material injury by reason of subsidized imports of glass wine bottles from China and dumped imports of glass wine bottles from China, Chile, and Mexico. CD1. In February 2024, applying the low bar set out by *American Lamb v. United States*, 785 F.2d 994, 1001-04 (Fed. Cir. 1986), the Commission determined preliminarily that there was not "clear and convincing evidence of the absence of" a reasonable indication of injury by reason of these imports. *See*, *e.g.*, Confidential Preliminary Views ("Preliminary Views") (CD81) at 31-35 (notwithstanding that 96.7 percent of the reported subject import sales volume oversold the domestic like product, the Commission could not conclude under *American Lamb* that subject imports had not had significant price effects). *See also* Preliminary Views at 39.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

### B.  The Commission's Final Phase Questionnaires

In its comments on the draft final phase questionnaires, the Coalition argued that the pricing data collected by the Commission in the preliminary phase captured domestic pricing to distributors but subject import pricing to end users (*i.e.*, wineries).  This claimed level of trade difference in the domestic and subject import pricing data, in the Coalition's view, rendered the Commission's comparison of domestic and subject import prices in its preliminary phase underselling analysis apples-to-oranges.  To make an apples-to-apples price comparison in the final phase, the Coalition argued, the Commission should compare domestic pricing data – which, as discussed, it alleged captured the prices paid by distributors for the domestic like product – to subject import purchase cost data, which, it alleged, would capture the prices paid by distributors for subject imports, as these distributors directly import subject merchandise themselves.[2]  Based on these assertions, the Coalition requested that the Commission collect subject import purchase costs and compare them to domestic prices in its final phase underselling analysis.  *See* Coalition Questionnaire Comments (PD106) at 2-3.

Even though the preliminary phase record contradicted the Coalition's reasoning for why collecting subject import purchase cost data was supposedly necessary,[3] the Commission

---

[2] Subject import purchase costs, which Plaintiff calls "acquisition costs" – Plaintiff's Brief ("PlBr.") at 5 – are the landed, duty-paid ("LDP") costs of directly importing subject merchandise oneself (as opposed to buying subject merchandise from a separate U.S.-based importer).  *See* Blank U.S. Importer Questionnaire (PD110) at III-3a.  They are exclusive of any additional costs of importation beyond LDP costs.

[3] Contrary to the Coalition's reasoning for why collecting subject import purchase data was supposedly necessary – *i.e.*, that the pricing data captured domestic and subject import sales prices at different levels of trade – the preliminary phase record indicated that the [ ███ ████████ ] of domestic and subject import sales were at the same level of trade, that is, the end user (*i.e.*, winery) level.  Specifically, in each year of the preliminary phase POI, at least [ ███ ] percent of the domestic industry's commercial U.S. shipments were to end users, as were nearly

*(cont'd on next page)*

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

nonetheless agreed to collect them.  Thus, in its final phase importer questionnaire, in addition to

requesting its typical pricing data for five pricing products – products 1-5 – corresponding to

various types of in-scope glass wine bottles in case packaging (*i.e.*, in 12-bottle boxes), the

Commission also requested import purchase cost data for three pricing products – products 6-8 –

corresponding to various types of in-scope glass wine bottles in bulk packaging (*i.e.*, on pallets).[4]

*See* Blank Importer Questionnaire (PD110) at Part III.  For purposes of comparison with the

import purchase costs collected for these bulk-packed pricing products, the Commission in its

final phase U.S. producer questionnaire collected domestic sales prices for these same bulked-

packed products.  *See* Blank U.S. Producer Questionnaire (PD110) at Part IV.

### C.    The Commission's Final Determination

In October 2024, the Commission unanimously determined that an industry in the United

States was not materially injured or threatened with material injury by reason of glass wine

bottles from China found by Commerce to be subsidized by the government of China.[5]  Views at

3.  As the Coalition urged, the Commission defined a single domestic like product coextensive

with the scope, defined the domestic industry to include all U.S. producers of the domestic like

product, and examined imports of glass wine bottles from China, Chile, and Mexico on a

---

[ ██ ] percent of the commercial U.S. shipments of subject imports from China, Chile, and
Mexico.  Preliminary Phase Staff Report (CD79) at Table II-1.

[4] The Coalition had indicated that distributors directly import glass wine bottles in bulk
rather than case packs.  *See* Coalition Questionnaire Comments (PD106) at 1, 5.

[5] While the Coalition filed its petitions for antidumping and countervailing duty
investigations on the same day, December 29, 2023, the schedules for these investigations
became staggered when Commerce postponed its final antidumping duty determinations but did
not likewise postpone its final countervailing duty determination, thereby necessitating an earlier
Commission determination in the countervailing duty investigation on imports from China (the
"leading investigation") than in the antidumping duty investigations on imports from China,
Chile, and Mexico (the "trailing investigations").  *See* Views at 3-4.

cumulated basis.  Views at 7-30; 19 U.S.C. § 1677(7)(G)(iii) (concerning cumulation in staggered leading and trailing investigations).

As the domestic industry captively consumed a portion of its glass wine bottle production in the manufacture of a downstream article, bottled wine, the Commission assessed whether the statutory captive production provision applied to this investigation.  The Commission determined that the second statutory criterion for the provision's application was not satisfied because the domestic like product was not the "predominant material input" for the downstream article.  Views at 35-38; 19 U.S.C. § 1677(7)(C)(iv)(II).  As the provision did not apply, the Commission focused its analysis on the overall market for glass wine bottles, rather than the merchant market.  Views at 38.

Turning to the conditions of competition, the Commission first addressed demand during the January 2021-March 2024 POI.  It noted that apparent U.S. consumption of glass wine bottles was elevated in 2021 – coincident with increased bottled wine consumption during the COVID-19 pandemic – but then declined thereafter.  Apparent U.S. consumption declined by 12.5 percent over full years of the POI and was 13.0 percent lower in interim 2024 than in interim 2023.  Views at 38-40.

Addressing supply, the Commission found that the domestic industry was the largest source of supply of glass wine bottles to the U.S. market throughout the POI.  Cumulated subject imports were the second-largest source of supply during most of the POI but were the third-largest source in 2022.  Nonsubject imports were the third-largest source of supply during most of the POI but were the second-largest source in 2022.  Views at 40-44.

Addressing substitutability and the importance of price, the Commission determined that there was a moderate-to-high degree of substitutability between domestically produced and

subject imported glass wine bottles, and that price was an important factor in glass wine bottle purchasing decisions, among other important factors.  Views at 44-45.

Turning to volume, the Commission noted that cumulated subject imports had decreased over the full years of the POI, including by 20.6 percent in absolute terms, but were somewhat greater in interim 2024 than in interim 2023.  The Commission found that the volume of cumulated subject imports was significant in absolute terms and relative to apparent U.S. consumption but that, as it would explain, this volume had neither significant adverse price effects nor a significant adverse impact on the domestic industry.  Views at 47-49.

Turning to price effects, the Commission first assessed whether subject imports had undersold the domestic like product to a significant degree.  It noted that it had collected quarterly pricing data from subject importers and domestic producers for five pricing products (products 1-5) in case packaging.  These data showed that cumulated subject imports oversold the domestic like product in the overwhelming majority of quarterly comparisons accounting for the overwhelming majority of the reported volume of cumulated subject import sales.  Views at 50-51.

The Commission also noted that it had collected quarterly import purchase cost data for three pricing products (products 6-8) in bulk packaging, which it had compared to quarterly domestic pricing data for these same bulk-packed products.  These data showed that the purchase costs for subject imports were above the sales prices for the domestic like product in most quarterly comparisons accounting for most of the reported volume of cumulated subject imports.  Views at 51-52.

As import purchase costs only capture LDP costs, which may not reflect the total costs of importation, the Commission also collected information concerning any additional costs of

importing glass wine bottles.  The Commission observed that seven of 10 importers reported incurring additional costs beyond LDP costs by importing glass wine bottles, with these additional costs ranging to up to 15.0 percent of LDP value.  Views at 52-53.

Summarizing the foregoing, the Commission stated that the pricing data showed that the prices for subject imports were predominantly higher than the prices for the domestic like product and that the cost data showed that the costs of importing subject merchandise were generally greater than the prices for the domestic like product, even before import costs additional to LDP costs were factored in.  Views at 54.

The Commission was unpersuaded by the domestic parties' argument that the overselling shown for products 1-5 was due to an improper comparison of import and domestic prices at different levels of trade and should therefore be disregarded.  Contrary to the domestic parties' contention that the subject import pricing being compared reflected sales to winery end users while the domestic pricing being compared reflected sales to distributors, the record showed that domestic and subject import sales were both primarily to wineries.  Moreover, the pricing data were consistent with the U.S. shipment data on the record, which showed that the average unit values ("AUVs") for subject import shipments were higher than the AUVs for domestic like product shipments.  In any event, as the Commission noted, even if it were to disregard the pricing data for products 1-5 in favor of the cost data for products 6-8 – as the domestic parties urged – this would still not support a finding of significant underselling, as these import purchase costs were generally above the domestic prices for products 6-8.  Views at 54-56.

The Commission also considered the lost sales information on the record.  Of 37 responding purchasers, only eight indicated that they had bought subject imports over the domestic like product based on their lower prices.  The volume of subject merchandise

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

purchased over the domestic like product based on price reported by these firms was [ ▮ ],

equivalent to [ ▮ ] percent of the reported purchases and imports of subject merchandise over

the POI, [ ▮ ] percent of the U.S. producers' commercial shipments over the period, and less

than [ ▮ ] percent of apparent U.S. consumption during the POI.  Views 53-54 & n.216.

The Commission acknowledged and discussed the contemporaneous business

documentation submitted by the domestic parties in support of their claim that underselling was

significant.  However, as it explained, these documents did not detract from the other record

evidence, including the pricing data, the purchase cost data, the shipment AUV data, and the lost

sales information, all of which indicated that underselling was not significant.  Views at 57-58 &

nn.227-228.

Given that both subject import prices and purchase costs were predominately higher than

domestic prices, that subject import AUVs consistently exceeded domestic AUVs, and that the

volume of sales confirmed lost by the domestic industry to subject imports based on price was

[ ▮ ], the Commission found that subject imports had not undersold the domestic like product

to a significant degree.  Views at 59.

The Commission likewise found that subject imports had not depressed domestic prices

to a significant degree.  As it noted, domestic prices increased over the POI for all pricing

products for which data were available except for product five, one of the lowest sales-volume

pricing products.  Moreover, only one of 37 responding purchasers had indicated that domestic

producers had lowered their prices to compete with subject imports.  Views at 59-61.

Nor did the Commission find evidence that subject imports had suppressed domestic

prices to a significant degree.  Notwithstanding declining apparent U.S. consumption over the

POI, the domestic industry was still able to increase its prices for most pricing products.

Moreover, as the Commission observed, the domestic industry's cost of goods sold ("COGS")-to-net-sales ratio improved over the interim periods and, while this ratio slightly increased over the full years of the POI, this increase did not correlate with cumulated subject imports, which had decreased over these years by both volume and market share. Additionally, the slight increase in the industry's COGS-to-net-sales ratio over the full years of the period could be explained by declining demand. Finally, while the domestic parties had argued that an "inventory overhang" had suppressed domestic prices, the Commission noted, among other things, that inventories of subject merchandise had declined over the POI. Thus, the Commission found that subject imports had not suppressed domestic prices to a significant degree. Views at 61-65.

Having found no significant underselling, price depression, or price suppression, the Commission concluded that cumulated subject imports had not had significant adverse price effects on the domestic industry. Views at 65.

Turning to its impact assessment, the Commission did not find a causal nexus between cumulated subject imports and the declines in the domestic industry's performance indicators. Over the full years of the POI, the declines in the industry's performance indicators correlated with decreasing, not increasing, subject imports. Moreover, these imports were predominately overselling the industry. Views at 72-73.

With respect to the interim periods, while cumulated subject import market share increased in interim 2024 relative to interim 2023, the record indicated that this was not driven by underselling. Moreover, as the Commission noted, the increase in cumulated subject import market share over the interim periods did not prevent the domestic industry from increasing its

prices by more than its costs, enabling it to improve its financial performance by nearly every measure.  Views 73-74.

The Commission observed that the declines in several of the domestic industry's performance indicators over the POI correlated with declining demand trends.  It noted, for example, that the declines in the industry's capacity, production, capacity utilization, sales, and shipments were generally commensurate with the 12.5 percent decline in apparent U.S. consumption from 2021 to 2023.  Given this, as well as the information previously discussed, the Commission found that subject imports did not have a significant adverse impact on the domestic industry.  Views at 67, 74.

The Commission was unpersuaded by the domestic parties' argument that the industry had entered the final phase POI in an injured condition due to subject imports.  Contrary to this argument, the record for the preliminary phase showed that subject imports had both pervasively oversold the domestic like product and captured no market share from the domestic industry during the 2020-21 period, immediately prior to the start of the final phase POI.  Views at 74-75.

Nor was the Commission persuaded by the domestic parties' argument that the industry's shutdowns and curtailments during the POI evidenced material injury by reason of subject imports.  The timing and magnitude of the industry's reductions in capacity, the Commission found, indicated that they were caused by the declines in apparent U.S. consumption, not subject imports.  Views at 75-76.

Finally, based on its examination of the relevant statutory factors, the Commission determined that subject imports did not threaten material injury to the domestic industry in the imminent future.  Regarding likely volume, the Commission found that the subject import trends during the POI did not indicate a likelihood of a significantly increased imports.  The

Commission recognized that subject imports had ticked up in the three months of interim 2024 but explained that it did not consider this indicative given the long-term downward trend in these imports, which had declined over the prior 36 months, from 2021 to 2023.  Views at 80-81.

Other evidence further indicated that no significant imminent increase in subject imports was likely.  This included: the declines in the subject importers' inventories during the POI; the declines in these importers' arranged future subject imports; the declines in the subject producers' capacity and production; and the high capacity utilization rate maintained by these subject producers.  Accordingly, the Commission did not find a likelihood of substantially increased cumulated subject imports in the imminent future.  Views at 80-85.

Regarding likely price effects, given the absence of significant price effects during the POI and of any evidence that subject import pricing patterns would imminently change, the Commission found that the lack of significant price effects observed during the POI would likely continue into the imminent future.  Views at 85-87.

Regarding likely impact, the Commission as an initial matter disagreed with the Coalition that the domestic industry was in a vulnerable condition, noting that it had returned to profitability in interim 2024.  Recalling that subject imports were not materially injurious during the POI and discerning no change in the conditions of competition that would cause them to suddenly become so, the Commission determined that cumulated subject imports were not likely to have a significant adverse impact on the domestic industry in the imminent future.  Views at 87-89.

## III.     STANDARD OF REVIEW

Under the Tariff Act of 1930, this Court must uphold the Commission's determinations, findings, and conclusions unless they are "unsupported by substantial evidence on the record, or

otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Chemours Co. FC, LLC v. United States*, 492 F. Supp. 3d 1333, 1335 (Ct. Int'l Trade 2021). The Commission's determinations are presumed to be correct, and the burden is on the party challenging the determination to demonstrate otherwise. 28 U.S.C. § 2639(a)(1).

The Supreme Court has defined "substantial evidence" as being "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Thus, under the substantial evidence standard, a Court may not, "even as to matters not requiring expertise … displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera*, 340 U.S. at 488.

The Commission is the trier of fact in injury investigations. As such, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996); *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350 (Fed. Cir. 2006). Accordingly, the Commission has "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis." *Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1100 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000).

Furthermore, since the Commission "'is presumed to have considered all of the evidence on the record,'" it is "'not required to explicitly address every piece of evidence presented by the parties'" during an investigation. *Nucor Corp. v. United States*, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004) (quoting *USEC Inc. v. United States*, 34 F. App'x 725, 731 (Fed. Cir. 2002)), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005). Instead, the Commission need only address the "issues material to {its} determination" so that the "path of the agency may reasonably be discerned." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103- 316, vol. I at 892 (1994) ("SAA") (quotations omitted); *see also Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354–57 (Fed. Cir. 2005).

"When evaluating challenges to the ITC's choice of methodology," the Court has explained, "the court will affirm the chosen methodology as long as it is reasonable." *JMC Steel Grp. v. United States*, 70 F. Supp. 3d 1309, 1316-17 & n.4 (Ct. Int'l Trade 2015) (citing *Shandong TTCA Biochem. Co., Ltd. v. United States*, 35 CIT 545, 556, 774 F. Supp. 2d 1317, 1327 (2011)).

## IV.    ARGUMENT

As an initial matter, we note that throughout its brief Plaintiff focuses on the merchant glass wine bottle market. *See*, *e.g.*, PlBr. at 10, 14, 20 n.5, 34, and 35. However, as the Commission correctly found, and which Plaintiff does not contest, one of the criteria under the captive production provision for doing so was not satisfied in this investigation. Views at 38. Accordingly, the Coalition's emphasis on data for the merchant market is unwarranted, and the Court should decline its invitation to likewise erroneously focus on these data in its review.[6]

---

[6] In any event, the merchant market data do not substantially differ from the overall market data. *Compare* CR Table C-1 *with* CR Table C-2.

A.    **The Commission's Price Effects Findings are Supported by Substantial Evidence and in Accordance with Law**

1.    **The Commission's Price Effects Findings Should Be Sustained**

To assess the price effects of the subject imports, the Commission, in accordance with its statutory mandate, evaluated: (I) whether there had been "significant price underselling" by these imports; and (II) whether these imports had "depress{ed} prices to a significant degree or prevent{ed} price increases, which otherwise would have occurred, to a significant degree." 19 U.S.C. § 1677(7)(C)(ii)(I)-(II). The results of that evaluation conclusively establish the reasonableness of the Commission's price effects findings.

With respect to whether subject imports had significantly undersold the domestic like product during the POI, every measure – including the one Plaintiff prefers – indicated that they had not. The pricing data showed that cumulated subject imports almost universally oversold the domestic like product during the POI, in 134 of 143 quarterly comparisons accounting for 88.8 percent of the reported volume of cumulated subject import sales. Subject imports oversold the domestic like product at high margins, averaging 43.8 percent and ranging to up to 146.2 percent. Views at 51; CR at Table V-14.

The Coalition's preferred cost data similarly showed that subject import purchase costs were predominately higher than domestic prices during the POI, in 45 of 80 quarterly comparisons accounting for 55.7 percent of cumulated subject imports. The price/cost margins, like the overselling margins, were high, averaging 27.0 percent and ranging to up to 170.7 percent. Moreover, the predominant overselling at high margins shown by the cost data did not even factor in the import costs additional to LDP costs that were reported, which ranged to up to 15.0 percent of LDP value. Views at 52-53; CR at Table V-17.

17

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

Consistent with both the pricing and cost data, the shipment data showed that the AUVs of subject imports exceeded the AUVs of the domestic like product throughout the POI. Views at 56; CR Table C-1.

Moreover, the quantity of subject imported glass wine bottles that purchasers had confirmed buying over the domestic like product based on price, [ ███ ] gross, was [ ██████ ]. This volume of confirmed lost sales was equivalent to [ ███ ] percent of the reported purchases and imports of subject merchandise over the POI, and [ ██ ] percent of the U.S. producers' commercial shipments over the period. Views at 53-54; CR at Tables V-20-21.

Faced with this record – including predominant overselling by every measure on both a quarterly and volume basis at high margins and [ ██████ ] price-based lost sales – the Commission reasonably concluded that subject imports had not undersold the domestic like product to a significant degree. Views at 59.

The evidence was equally compelling that subject imports had not depressed prices for the domestic like product to a significant degree. Among other things, the prices for the domestically produced pricing products had nearly universally increased over the POI. Views at 59; CR at Tables V-5-12.

Finally, with respect to whether subject imports had prevented price increases that otherwise would have occurred to a significant degree, substantial record evidence demonstrated that they had not caused such significant price suppression. The domestic industry's COGS-to-net-sales ratio had decreased over the interim periods and, while it had inched up over the full years of the POI, by 1.9 percentage points, the record reflected that it was not subject imports

which had caused it to do so.[7]  Views at 61; CR at Table VI-1.  The increase in the industry's ratio correlated with decreasing, not increasing, competition by subject imports, which had declined from 2021 to 2023 by both volume and share.[8]  Views at 65; CR at Tables IV-2 and C-1.  This corroborated the Commission's finding that it was not subject imports which had suppressed domestic prices to even the slight degree indicated by the record.

Other evidence further supported the Commission's finding that it was not subject imports which had led to any suppression of domestic prices.  Subject import prices and purchase costs generally were significantly higher than domestic prices, CR at Tables V-14 and V-17, inconsistent with the Coalition's assertion that it was subject imports that had prevented the domestic industry from raising its prices commensurately with its costs.  Moreover, the domestic industry's slight cost/price squeeze between 2021 and 2023 correlated with a 12.5 percent decline in apparent U.S. consumption.[9]  CR at Table C-1.  Accordingly, the record indicated that, rather than subject imports, it was the decline in demand for glass wine bottles that had

---

[7] When an industry's prices (*i.e.*, the net sales denominator of its COGS-to-net-sales ratio) rise by less than its costs (*i.e.*, the COGS numerator of its ratio), its COGS-to-net-sales ratio increases.  Thus, the Commission typically assesses whether and to what extent an industry's COGS-to-net-sales ratio has increased during a POI in evaluating whether and to what extent it was prevented from achieving price increases that may otherwise have occurred, that is, price increases sufficient to cover its rising costs.

[8] Moreover, as the Commission noted, the increase in subject imports both by volume and share over the interim periods correlated with an improvement in the industry's COGS-to-net-sales ratio.  Views at 65; CR at Table C-1.  If subject imports were indeed suppressing domestic prices, one would expect an intensification in subject import competition to coincide with a worsening, not an improvement, in the domestic industry's ability to raise its prices commensurately with its costs.

[9] A "cost/price squeeze" refers to costs increasing by more than pricing (*i.e.*, an increase in the COGS-to-net-sales ratio), narrowing – or "squeezing" – the margin between costs and prices.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

prevented the industry from fully passing through its cost increases for these products.  Views at 69-70.

Additionally, the record showed that the increase in the overall industry's COGS-to-net-sales ratio from 2021 to 2023 was driven by the increase in the ratio for only one of the three U.S. producers, [ ▮ ], as only [ ▮ ] company-specific ratio increased during that time.  However, during the 2021 to 2023 period, [ ▮ ] lost market share not to subject imports – which had registered a decline in their market share over the full years of the POI – but rather to another U.S. producer, [ ▮ ].  Views at 63 n.248; CR at Tables IV-17, VI-5.  Accordingly, the record belied that competition from subject sources explained the increase in [ ▮ ] ratio and, in turn, in the ratio for the industry overall.

Separate and apart from the fact that the record indicated no causal connection between subject imports and the industry's cost/price squeeze between 2021 and 2023, the record also indicated that this cost/price squeeze was insignificant.  Among other things, the domestic industry's price increases from 2021 to 2023 more than covered the increases in its raw material, energy, and direct labor costs between those years, hardly indicating that the industry was prevented from achieving price increases that otherwise would have occurred "to a significant degree."  19 U.S.C. § 1677(7)(C)(ii)(II); Views at 63-64; CR at Table VI-1.  Given all the above, the Commission reasonably found that subject imports had not suppressed domestic prices to a significant degree.

In sum, the record showed that overselling predominated by every measure, that domestic prices nearly universally increased, and that any price suppression was neither significant nor caused by subject imports.  This evidence more than suffices to meet the substantial evidence standard.  The Commission's price effects findings should therefore be sustained.

## 2.    Plaintiff's Underselling Arguments Fail

### a.    Plaintiff's Price Comparison Argument Fails

Plaintiff argues that the price comparisons for products 1-5 were methodologically flawed because they supposedly entailed comparing domestic and subject import prices at different levels of trade.  PlBr. at 15-17.

In addition to being incorrect, the level of trade argument Plaintiff advances on appeal differs from the one it advanced administratively.  Before the Commission, the Coalition argued that the domestic prices being compared for products 1-5 reflected distributor pricing while the subject import prices being compared reflected winery end user pricing.[10]  On appeal, the Coalition's level of trade argument is different.  The Coalition now acknowledges that the domestic and subject import prices compared for products 1-5 both reflected prices offered to wineries but argues that these prices should nonetheless be considered at different levels of trade because the domestic pricing supposedly reflected prices offered "directly" to wineries while the import pricing supposedly reflected prices offered to wineries "after {the imports} had first been sold to a distributor."  PlBr. at 16-17.  As the Coalition has raised this level of trade argument for the first time on appeal, it should be rejected under well-established exhaustion principles.[11]  *See*,

---

[10] *See, e.g.*, Coalition's Prehearing Brief (CD217) at 42 (criticizing the 1-5 comparisons as "conflat{ing} two different levels of trade" because they supposedly involved a comparison of "*U.S. prices to distributors*" and "*{import} prices out from distributors to end customers*") (emphasis supplied); Exhibit 1 to Coalition's Posthearing Brief (CD252) at 71 ("the domestic industry ships a significant volume to distributors . . . this creates a level of trade issue for comparisons of domestic and subject prices").

[11] Anticipating this rebuttal, Plaintiff asserts that it did in fact raise the level of trade argument articulated in its brief to the Court to the Commission, but that the Commission simply misunderstood it.  PlBr. at 16.  The Commission did not misunderstand the Coalition.  Before the Commission, the Coalition raised the "domestic prices are distributor prices" version of the argument, not the "domestic prices are direct end user prices" version.  Indeed, Plaintiff's own brief illustrates this.  *See* PlBr. at 5 (making clear that at the administrative level, the Coalition

*(cont'd on next page)*

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*e.g.*, 28 U.S.C. § 2637(d); *Diamond Sawblades Mfrs. Coal. v. United States*, 612 F.3d 1348, 1362 (Fed. Cir. 2010).

In any event, Plaintiff's argument fails on the merits.  Adhering to its typical underselling methodology, for products 1-5, the Commission collected quarterly pricing data from both subject importers and domestic producers for their first sales in the United States to unrelated firms and then compared these data. Views at 50; CR at V-9.  Because the sales data collected from importers and the sales data collected from domestic producers for products 1-5 both reflect prices to a first unrelated customer in the United States, these data are directly comparable. Indeed, in upholding the Commission's "typical underselling methodology," *i.e.*, the one employed here for products 1-5, the Court has expressly acknowledged that this approach entails an "apples-to-apples comparison" of domestic and subject import prices and has rejected the argument that it involves comparisons at different levels of trade.  *Mexichem Fluor Inc. v. United States*, 179 F. Supp. 3d 1238, 1246-47 (Ct. Int'l Trade 2016).  "{T}he court will affirm the {Commission's} chosen methodology as long as it is reasonable." *JMC Steel Grp.*, 70 F. Supp. 3d at 1316-17 & n.4.  Plaintiff fails to demonstrate why the Commission's use of its normal and judicially approved underselling methodology was unreasonable.

Even if the Court were to agree with the Coalition that the products 1-5 comparisons were, somehow, flawed, other substantial evidence independent of the products 1-5 comparisons supports the Commission's underselling finding.  For example, the comparisons for products 6-8, which the Coalition itself considers the appropriate method for assessing underselling, likewise showed predominant overselling.  Similarly, the AUVs for shipments of wine bottles in case

characterized the supposed level of trade issue as that the pricing data captured domestic sales from U.S. producers to distributors and subject import sales [ █████████████ ]).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

packs to wineries showed higher values for subject imports.  CR at Tables V-17, D-4-7 and D-28-31.  Finally, the Commission noted that the pricing data collected during the preliminary phase showed 96.7 percent overselling. Views at 75 n.289.

Also unavailing is Plaintiff's suggestion that the Commission's declination to collect subject import purchase cost data for pricing products 1-5 (*i.e.*, the case-packed products) in addition to its collection of such data for products 6-8 (*i.e.*, the bulk-packed products) was somehow unreasonable.  PlBr. at 16-17.  As discussed, import purchase costs refer to the costs of importing merchandise.  The Coalition itself suggested that importers import in bulk, rather than in case packs.  *See* Coalition Questionnaire Comments (PD106) at 1, 5 (noting that "importers import large volumes of subject glass wine bottles in bulk packaging," and that glass wine bottles are imported into the United States "in bulk form" and are only "subsequently. . .de-palletized and packed in cases for commercial shipments").  The Coalition fails to explain why it was unreasonable for the Commission to have declined to collect import purchase costs for products that it itself indicated were not imported.

### b.  Plaintiff's Minority Underselling Arguments Fail

Plaintiff contends that the Commission's declination to consider the minority level of underselling on the record "significant" was unreasonable and unlawful.  PlBr. at 28-29 & n.7.[12] The Coalition speculates that, while the underselling during the POI did not predominate on either a quarterly or volume basis, it could still have had negative effects and should therefore have been considered significant.  As discussed elsewhere, however, such minority underselling led to [ ▮ ] confirmed lost sales; did not lead to a gain in market share by subject imports;

---

[12] While Plaintiff makes this argument in the context of its adverse impact discussion, we rebut it here because the significance of underselling is most pertinent to price effects.

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

did not prevent the domestic from nearly universally raising its prices; and did not cause the

industry's [ ▆▆▆ ] cost/price squeeze, which was consistent with declining demand.

Accordingly, the Coalition has not demonstrated that there was any reason to consider the

minority level of underselling here nonetheless significant. Thus, it has not shown the

Commission's underselling finding to be in any way unreasonable.

Nor has it shown it to be unlawful. PlBr. at 28 n.7 & 29. While Plaintiff is correct that

the statute does not preclude the Commission from finding low levels of underselling significant,

neither does it compel it to do so. To the contrary, that the statute does not impose a cutoff for

significant underselling on the Commission speaks to the discretion that Congress has afforded

the agency in assessing this issue.

### c.  Plaintiff's "Contemporaneous Business Documentation" Argument Fails

Contrary to the Coalition's assertion, PlBr. at 17-19, the Commission in its underselling

analysis did not ignore the "contemporaneous business documentation" on the record. *See*

Views at 57 n.227 (expressly recognizing this evidence). Moreover, the Commission went

further, providing extensive analysis with respect to certain of the business documentation that

the domestic parties had particularly emphasized. For example, regarding the email from

distributor TricorBraun that the Coalition had emphasized, the Commission acknowledged that

this email stated that [ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ]. However, as the Commission explained, not only did

this e-mail fail to identify whether [ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ], [ ▆▆▆▆

▆▆ ] had purchased significant and increasing volumes of domestic glass wine bottles during

the POI, with over [ ▆▆ ] percent of its purchases in 2023 coming from domestic sources and

such domestic purchases increasing by [ ▆▆ ] percent from 2021 to 2023. Views at 58 n.228.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

In other words, this email did not establish subject import underselling, and other evidence on the record indicated that, far from subject imports taking [ ▮▮▮▮ ] sales to [ ▮▮▮▮▮ ] based on price, the domestic industry was making substantial, and substantially increasing, sales to this customer.

As the Commission both recognized the contemporaneous business documentation on the record and analyzed significant examples of it, the agency clearly considered the evidence Plaintiff claims it ignored.  The Coalition's argument boils down to noting that the Commission did not expressly name-check every piece of the business documentary evidence on the record.  But the Commission was not required to have done so to have considered this evidence.  The Commission "is presumed to have considered all of the evidence on the record," and is "'not required to explicitly address every piece of evidence presented by the parties."  *Nucor Corp.*, 28 CIT at 234, 318 F. Supp. 2d at 1247.

### d.  Plaintiff's Lost Sales Argument Fails

The Coalition argues that the "frequency" of the lost sales reporting detracts from the Commission's finding that subject imports did not significantly undersell the domestic like product.  Specifically, Plaintiff highlights that "more than one out of every five" of the responding purchasers reported buying subject imports over the domestic like product based on price.  PlBr. at 19-20.  *Id.*  Putting aside the issue of whether this is even contrary evidence,[13] in emphasizing the "frequency" of the lost sales reporting – *i.e.*, the number of purchasers responding that they bought subject imports over the domestic like product based on price –

---

[13] Another and potentially more accurate way of saying that more than one out of every five of the responding purchasers reported buying subject imports over the domestic like product based on price is that around four out of every five of the responding purchasers reported that they did *not* buy subject imports over the domestic like product based on price.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

Plaintiff overlooks that the quantity of sales confirmed lost by these purchasers was [ ▮ ].  As discussed, this quantity, [ ▮ ] gross, was equivalent to [ ▮ ] percent of the reported purchases and imports of subject merchandise over the POI and [ ▮ ] percent of the U.S. producers' commercial shipments over the period.  CR at Tables V-20-21 and C-1.  Plaintiff's "frequency" argument also overlooks the other substantial evidence on the record indicating that underselling was not significant, including the pricing data, the purchase cost data, and the shipment AUV data.  Thus, even if the "frequency" of the lost sales the Coalition emphasizes could be said to support an underselling finding, that would not undermine the weighty evidence relied on by the Commission indicating that any underselling was not significant.

Regarding Plaintiff's claim that the Commission failed to address its "frequency" argument, the Commission expressly discussed the number of purchasers that reported buying subject imports over the domestic like product based on price.  Views at 53.  In any case, the Commission need not address every argument presented by the parties.  *Nucor Corp.*, 28 CIT at 234, 318 F. Supp. 2d at 1247.  *See also Nucor Corp. v. United States*, 32 CIT 1380, 1384, 594 F. Supp. 2d 1320, 1332 (2008), *aff'd*, 601 F.3d 1291 (Fed. Cir. 2010).

### 3.  Plaintiff's Price Suppression Arguments Fail

#### a.  Uncontested Substantial Evidence Supports the Commission's Suppression Finding

Plaintiff contests none of the key evidence supporting the Commission's price suppression finding.  First, the Coalition does not contest that the industry's COGS-to-net-sales ratio decreased over the interim periods and that its increase over the full years was only [ ▮ ] percentage points.  CR at Table VI-1.  This corroborates that domestic prices were not suppressed "to a significant degree."  19 U.S.C. § 1677(7)(C)(ii)(II).  Second, Plaintiff does not contest that the increase in the ratio over the full years of the period correlated with a decrease in

subject imports, which declined between 2021 and 2023 by both volume and share.  CR at Tables IV-2, C-1.  As subject imports were leaving the market during the time in which the industry was unable to increase its prices fully commensurately with its costs, this corroborates that it was not subject imports that had prevented the industry from doing so.  Third, the Coalition does not contest that even its preferred cost/price comparisons for products 6-8, as well as other evidence, showed that subject imports oversold the domestic industry by high margins, ranging to up to 170.7 percent.  CR at Table V-17.  This corroborates that it was not subject import prices that had prevented the domestic industry from increasing its prices commensurately with its costs.  Fourth, Plaintiff does not contest that the increase in the industry's ratio over the full years correlated with declining demand.  CR at Table C-1.  This corroborates that it was the decline in customer demand for the industry's products, rather than subject imports, that had prevented the industry from fully passing through its cost increases to these customers.

The above uncontested evidence corroborating that price suppression was neither significant nor caused by subject imports constitutes substantial evidence supporting the Commission's suppression finding.

### b. Plaintiff's Attempts to Fault the Commission's Suppression Analysis Fail

Plaintiff first attempts to fault the Commission's assessment that the divergent trends in the individual domestic producer's COGS-to-net-sales ratios suggested that their cost/price squeeze was due to factors other than subject imports.  PlBr. at 20-21; Views at 61 n.244.  The Coalition appears to misapprehend the Commission's analysis.  The Commission was not purporting that any "legal authority" requires an increase in each of the individual domestic producers' COGS-to-net-sales ratios for an affirmative price suppression finding.  PlBr. at 20.

Rather, it was simply making the commonsense observation that, as a factual matter, where an industry-wide factor such as subject import competition is driving price suppression within an industry, one would generally expect to see directionally similar trends in the suppression of the individual domestic producers' prices. The Commission also pointed out that the only domestic producer that experienced an increase in its COGS-to-net-sales ratio lost share to another domestic producer and not to subject imports, suggesting that subject imports were not the source of any downward pressure on its prices. Views at 63 n.248.

      Plaintiff next attempts to fault the Commission's observation that the cost increases that could not be passed through during the 2021 to 2023 period were increases in other factory costs, which in turn were caused by declines in demand. PlBr. at 21; Views at 64. It asserts that it matters not the type of cost that was increasing; if the domestic industry was unable to cover its cost increases, of whatever type, then the domestic industry's prices were suppressed. The Coalition again misunderstands the Commission. The agency's other factory costs observation was not a denial that the industry was, to a slight degree, in a cost/price squeeze. Rather, in making this observation, this Commission was noting that, because it was increases in other factory costs that could not be passed through, this suggested that it was not subject imports that had *caused* this slight cause/price squeeze. Other factory costs increased because apparent U.S. consumption (*i.e.*, demand) decreased – by 12.5 percent – which in turn decreased production and thereby spread other factory costs over fewer units. Where, as here, an industry's cost increases reflect that its customers' demand for its product is declining, one would not

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

necessarily expect the industry to be able to pass through such cost increases in its prices to these customers, irrespective of subject import competition.[14]

Finally, Plaintiff questions the Commission's observation that if non-recurring cost items are removed, the domestic industry's COGS-to-net-sales ratio registers a decline rather than an increase between 2021 and 2023.  PlBr. at 21-22; Views at 63 n.247.  Certainly, it was salient for the Commission to note that if these non-recurring costs (such as costs associated with [        ], and [        ]) are removed, the industry's COGS-to-net-sales ratio goes from increasing to decreasing over the full years of the period.  Plaintiff fails to explain why a domestic producer should be expected to pass through one-off cost increases that do not impact its domestic competitors.[15]  As these kinds of non-recurring, producer-specific cost increases would seem particularly unlikely to be passed through, irrespective of subject import competition, it was reasonable for the Commission to consider the trend in the COGS-to-net-sales ratio absent these one-off events.

### c. Plaintiff's "Inventory Overhang" Argument Fails

Contrary to Plaintiff's argument, PlBr. at 22-24, the Commission reasonably rejected the Coalition's claim that an "inventory overhang" suppressed the domestic industry's prices.  Views at 64-65.  The evidence showed that U.S. importers' inventories of subject merchandise declined throughout the POI, including during the full years of the period when the industry's COG-to-net-sales ratio increased.  Views at 64; CR at Table VII-17.  Accordingly, there was no buildup

---

[14] Plaintiff asserts that the increase in other factory costs was due to subject imports rather than declining demand, PlBr. at 21-22, but fails to mention the 12.5 percent decline in apparent U.S. consumption that correlated with the increase in other factory costs.

[15] Indeed, if it attempted to do so, business would likely immediately shift to these domestic competitors, who would not need to similarly increase their prices.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

in competition by such inventories that could explain the domestic industry's slight inability to fully pass through its cost increases between those years. Attempting to get around this, Plaintiff claims that the Commission ignored that inventories of subject merchandise did increase, if considered relative to U.S. shipments of such merchandise. PlBr. at 23-24. Plaintiff's argument inaccurately presupposes that the increase in the ratio of subject inventories to subject shipments was driven by an increase in its numerator, subject inventories. To the contrary, the ratio increased because its denominator, subject shipments, decreased as subject imports fled the market from 2021 to 2023. CR at Tables IV-2, VII-17, C-1. As the increase in this ratio reflects decreasing shipments rather than increasing inventories, it does not reflect that subject inventories somehow increased, contrary to what Plaintiff suggests. Instead, the increase in this ratio reflects that subject imports were leaving the market from 2021 to 2023, only further confirming that these imports were not responsible for the industry's cost/price squeeze between those years.

　　　　Regarding the argument that subject import competition had increased domestic producers' inventories, leading these producers to forego price increases to offload them, the Commission noted that domestic producer Ardagh's inventories [          ]. Views at 64. And, while the other two domestic producers, Gallo and O-I Glass, [                                        ], their COGS-to-net-sales ratios [                        ]. Thus, there was no evidence that domestic producer inventories resulted in price suppression for any member of the domestic industry, let alone the domestic industry as a whole. The Coalition argues that the Commission impermissibly assessed individual producer inventory trends in lieu of the inventory trend for the industry as a whole, as statutorily required. PlBr. at 23. It is reasonable for the Commission to look at individual

producer factors for context and to address arguments raised by the parties.  *See Altx Inc. v. United States*, 26 CIT 709, 730 (2002) (the Commission's statutory directive to analyze the industry as a whole "is not a license to ignore information that would give context and meaning to the data it is analyzing in assessing the domestic industry's performance.  Indeed, {it} compels an evaluation of all material factors raised by the parties that would render a more accurate reading of the health of the industry"), *aff'd*, 370 F.3d 1008, 1120 (Fed. Cir. 2004).  Furthermore, the Commission's examination of the inventory trends for *all* members of the industry constituted an evaluation of the industry as a whole.

### 4.  Plaintiff's Market Share Arguments Fail

In the Coalition's view, the Commission should have found that subject imports had significant adverse price effects on the domestic industry because, allegedly, their lower prices led the industry to lose market share.  The Coalition appears to base this argument on the mistaken view that underselling by subject imports intensified later in the POI, leading the domestic industry to lose 1.1 percentage points of market share to these imports in 2023 and 1.5 points of share to them in interim 2024.  PlBr. at 8-9, 13-15.  Putting aside the question of whether these market share shifts – even if they were based on price – would suffice for a finding of "significant" price effects, the record did not reflect that the later-in-the-POI market share gains by subject imports were due to underselling, as the Commission explained.  Specifically, as the Commission stated regarding the comparisons of subject import purchase costs to domestic prices for products 6-8 (*i.e.*, the only comparisons that the Plaintiff considers probative in assessing underselling):

> Although Domestic Parties argue the purchase cost data show that
> imports from subject sources were increasingly imported at lower
> costs than the domestic product during the latter portion of the POI,
> corresponding to market share gains by subject imports at the

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

> expense of domestic producers, the record indicates that the subject
> imports that gained market share during the latter portion of the POI
> were from Mexico, none of which were purchased at lower cost
> during that period.

Views at 56-57.  As the small amount of market share that did shift from the domestic industry to subject imports later in the POI went to those that, by the Plaintiff's own preferred metric, were not lower priced than the domestic like product, Plaintiff has no legitimate grounds to argue that the Commission erred in not finding adverse price effects in the form of a significant price-based market share shift.

Both attempts by the Coalition to impugn the Commission's above-quoted market share shift analysis as "materially. . . factually incorrect" fail.  PlBr. at 13-15.  First, the Coalition tries to characterize the Commission's statement that imports from Mexico gained share as false because imports from China also gained share.  *Id*. at 14.  But the Commission's true statement that Mexican imports gained share does not equate to the false statement that Chinese imports did not.  Indeed, the Commission expressly acknowledged that Chinese imports also gained share.  Views at 73 n.285 ("Subject imports from China also gained 0.6 percentage points of market share in the interim period comparison, yet the price comparisons show no underselling by subject imports from China.").  The Commission's focus on gains by Mexican imports simply reflected that it was reasonably focusing its market share shift analysis on those gains by subject imports that accounted for most of the market share that shifted from the domestic industry.  CR at Table C-1.[16]  Even the Coalition implicitly recognizes that the Commission's focus on Mexican imports in no way undermined its analysis, as the most Plaintiff can bring itself to

---

[16] The market share gains by Chinese imports were [ ███████████ ] than those by Mexican imports (which were themselves [ ███ ]) and thus, at best, the gains by Chinese imports accounted for a [ ████████ ] percentage of the market share that shifted from the domestic industry than did the gains by Mexican imports.  CR at Table C-1.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

assert is that, in its view, the statement that subject imports from Mexico gained market share is not "strictly" true.  PlBr. at 14.[17]

The Coalition then pivots to argue that the pricing data – as opposed to the purchase cost data referenced by the Commission – demonstrate that the market share gains by Mexican imports later in the POI correlated with underselling by these imports.  PlBr. at 14-15.  Its argument is both unavailing and contradictory.  It is unavailing because these pricing data in fact show that imports from Mexico predominately oversold the domestic like product later in the POI.[18]  It is contradictory because Plaintiff itself has claimed that the pricing data are not a reliable metric for assessing underselling.[19]

### 5.    Plaintiff's Remaining Price Effects Arguments Fail

Contrary to Plaintiff's apparent view, the Commission's conditions of competition findings did not compel an affirmative significant price effects finding.  PlBr. at 8, 13 (implying that the Commission's substitutability and importance of price findings in its conditions of

---

[17] Plaintiff's characterization of the Commission's statement that none of the Mexican imports gaining share later in the POI were purchased at lower cost as false is contradicted by its almost immediate concession thereafter that this statement is in fact true.  PlBr. at 14.  *See also* CR at Tables V-10-12.

[18] For the last five quarters of the POI – *i.e.*, the quarters corresponding to the January 2023-March 2024 period during which Plaintiff asserts that Mexican imports gained market share from the domestic industry by underselling it – the pricing data in fact show that Mexican imports predominately oversold the domestic like product, in [ ▮▮▮▮ ] – or [ ▮▮ ] percent – of the quarterly comparisons accounting for [ ▮▮ ] percent of the reported Mexican import sales volume.  *Derived from* CR at Tables V-5-9.

[19] While Plaintiff notes in its impact discussion that the Commission's characterization of the pricing data for Mexican imports in interim 2024 was incorrect, PlBr. at 33-34, the Commission considered the data discrepancy in its trailing views.  *Glass Wine Bottles from China and Mexico*, Inv. Nos. 731-TA-1662-1663 (Final) USITC Pub. 5588 (Final) (Feb. 2025) at 38 n.157.  The Commission explained that, notwithstanding its earlier misstatement, the evidence cited by the Coalition did not show that underselling accounted for the slightly increased market share of cumulated subject imports in interim 2024 compared to interim 2023.

competition analysis precluded its negative price effects finding). The basis for the Coalition's apparent view is unclear. Whatever it may be, the statute nowhere compels an automatic significant price effects determination based on the conditions of competition findings Plaintiff mentions. Indeed, the Coalition's approach to price effects would contradict the statute, as it would sidestep completely the required consideration of underselling, depression, and suppression. 19 U.S.C. § 1677(7)(C)(ii).

Rather than jumping to a price effects conclusion based on its conditions of competition analysis, as it appears the Coalition would have preferred, the Commission instead reasonably grounded its price effects finding on an examination of the statutory factors and record data pertinent to this issue. Views at 49-65. As discussed, these revealed no evidence of significant price effects by subject imports.

Later in its brief, PlBr. at 29-30, Plaintiff argues that macroeconomic theory compelled a finding that subject imports must have been causing significant price effects, and in particular price depression (what the Coalition refers to as a lowering of the "price equilibrium point"). Rather than conjecturing about theory, the Commission looked at the record facts, which did not indicate significant price effects of any kind, and certainly not significant depression, as domestic prices had nearly universally increased.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**B.    The Commission's Significant Adverse Impact Finding Is Supported by Substantial Evidence and in Accordance with Law**

**1.    The Commission's Significant Adverse Impact Finding Should be Sustained**

Substantial record evidence supports the Commission's finding that subject imports did not significantly adversely impact the domestic industry.  Views at 76.

As the evidence showed, when the domestic industry's performance deteriorated from 2021 to 2023, subject imports were leaving the market and those that remained predominantly oversold the domestic like product.  Views at 72-73; CR at Tables IV-2, V-16 & C-1. Accordingly, the record did not indicate that the 2021-2023 deterioration in the industry's performance was caused by subject imports.  Instead, the record indicated that the declines in several of the industry's performance metrics between 2021-2023 were consistent with the weakening in demand between those years.  As the Commission observed, and as the data show, the declines in the industry's capacity, production, capacity utilization, sales, and shipments were all generally commensurate with the 12.5 percent decline in apparent U.S. consumption between 2021 and 2023.  Views at 67; CR at Table C-1.  Moreover, while the domestic industry was to a minor degree unable to fully cover its cost increases between 2021 and 2023, for reasons previously discussed, *supra* at 26-27, the record indicated that this likewise was not due to subject imports, but rather declining demand.  Views at 72-73; CR at Tables IV-2, V-14, V-17, V-21, VI-5 & C-1.

Although subject import market share increased in interim 2024 relative to interim 2023, this did not prevent the domestic industry from fully covering its costs, in turn enabling it to improve its financial performance by nearly every measure.  Views at 73-74; CR at Table C-1. For example, the domestic industry improved its unit net income by [     ] percent over the interim periods, its net income by [     ] percent, its unit operating income by [     ] percent,

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

and its operating income by [ ███ ] percent.  CR at Table C-1.  Thus, the record did not indicate that subject imports materially injured the domestic industry over the interim periods.

In sum, the 2021-2023 data support the Commission's negative determination, as they show no causal nexus between the deterioration in the domestic industry's performance over the full years of the POI and subject imports, which were both dwindling and predominantly overselling the industry.  The interim period data likewise support the Commission's negative determination, as they show that the increasing presence of subject imports over the interim periods did not prevent the domestic industry from breaking free of its cost/price squeeze and significantly improving its financial performance by nearly every measure.  Based on the facts in the record, the Commission reasonably found that subject imports did not significantly adversely impact the domestic industry during the POI.  Views at 76.

### 2.    Plaintiff's Impact Arguments Fail

As an initial matter, contrary to Plaintiff's claim that the Commission somehow "misapplied" the causation standard, PlBr. at 24-25, the agency clearly applied the correct standard – that is, whether the subject imports were contributing more than tangentially or minimally to injury.  *See Nippon Steel,* 458 F.3d at 1357; *Nippon Steel Corp. v. U.S. Int'l Trade Comm'n,* 345 F.3d 1379, 1381 (Fed. Cir. 2003)*; Taiwan Semiconductor Indus. Ass'n v. U.S. Int'l Trade Comm'n,* 266 F.3d 1339, 1345 (Fed. Cir. 2001); *Mittal Steel Point Lisas Ltd. v. United States,* 542 F.3d 867, 873 (Fed. Cir. 2008).  In, reasonably, finding no causal nexus between imports and injury – Views at 72-73 – the Commission clearly found that these imports were not

contributing more than tangentially or minimally to that injury. In other words, the Commission applied the legally correct causation standard and determined it unmet.

### a.    Plaintiff's Demand Arguments Fail

In claiming it "self-evident" that the decline in demand during the POI magnified the supposedly injurious effects of the subject imports, PlBr. at 25, Plaintiff relies on the unsupported premise that there were materially injurious effects of these imports to magnify. As discussed, the record demonstrated that there were not. Consequently, Plaintiff's claim that the Commission ignored the compounding effect of downward demand on the subject imports' injuriousness is unavailing.

The Coalition also emphasizes that certain of the industry's performance indicia declined by more than apparent U.S. consumption. PlBr. at 26. However, the Commission did not "essentially determine{} that all injury to the domestic industry was caused by a decline in demand," as the Coalition asserts. *Id*. at 25. Rather, the Commission found that declines in certain of the industry's performance indicators were "consistent" or "generally commensurate" with the decline in apparent U.S. consumption. Views at 67, 74. The Coalition's observation that declines in certain *other* of the industry's performance indicators were more pronounced than the decline in consumption is not inconsistent with these findings, contrary to what Plaintiff appears to believe. PlBr. at 26. Moreover, Plaintiff compares the percentage change in non-trade industry indicators, such as hours worked and capital expenditures, to the change in apparent U.S. consumption when these are not comparable. *Id*. In any event, even if the decline in demand did not fully explain the declines in certain of the industry's performance indicators, this would not somehow establish that it was subject imports that accounted for remainder of these declines. Consequently, even if Plaintiff is correct that changes in apparent U.S.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

consumption do not explain all declines in the domestic industry's indicators, this would still not establish that subject imports caused any injury, material or otherwise.

### b.    Plaintiff's Capacity Argument Fails

The Commission addressed the Coalition's argument, reiterated on appeal, that the shutdowns and curtailments reported by the industry corroborated material injury by reason of subject imports.  Views at 75; PlBr. at 27-28.  In doing so, the agency acknowledged the evidence that the Coalition had submitted in support of its argument, including [ ███████████ ████████████████████████ ] that Plaintiff incorrectly claims the Commission ignored.  PlBr. at 27; Views at 75 n.290 (noting these "internal documents").[20]  The Commission considered this evidence but reasonably determined that the timing and magnitude of the reductions in the industry's capacity, inclusive of its shutdowns and curtailments, were consistent with the declines in apparent U.S. consumption over the period.  Views at 75.  As it noted, the declines in capacity over the POI were less pronounced than the declines in apparent U.S. consumption.  Views at 75 n.291.[21]  Thus, these capacity declines, inclusive of shutdowns and curtailments, could be entirely explained by declining demand.

In sum, the Commission weighed the evidence on the record and reasonably determined that the reductions in the industry's capacity reflected declining demand rather than subject

---

[20] Also unavailing is Plaintiff's claim that the Commission ignored questionnaire responses and testimony that the Coalition had highlighted regarding the industry's shutdowns and curtailments.  PlBr. at 28.  To the contrary, the Commission acknowledged and expressly cited to the pages of the Coalition's prehearing and posthearing administrative briefs discussing these questionnaire answers and testimony.  See Views at 75 n.290.

[21] Specifically, the industry's capacity declined by 9.1 percent from 2021-23 while apparent U.S. consumption declined by more, 12.5 percent.  Likewise, the industry's capacity declined by 11.5 percent in interim 2024 relative to interim 2023, while apparent U.S. consumption declined by more, 13.0 percent.  CR at Table C-1.

imports. On appeal, the Coalition simply invites the Court to reweigh the evidence on this issue

in its favor. PlBr. at 26-27. The Court should decline that invitation. *Universal Camera*, 340

U.S. at 488.

### c. Plaintiff's Argument Based on End of Period Market Share Fails

Employing its normal mode of analysis, the Commission assessed whether the trend in

subject import market share over the full years of the period correlated with the trend in the

industry's performance over those years. As the Commission noted, these trends did not

correlate: "Subject imports declined . . . relative to apparent U.S. consumption at the same time

the industry's . . . indicators deteriorated from 2021 to 2023." Views at 72; CR at Table C-1.

Because subject imports lost market share as the domestic industry's performance deteriorated,

this supported the Commission's finding that these imports were not responsible for that

deterioration. This lack of trend correlation, in addition to the subject imports' predominant

overselling and other factors, indicated that it was not subject imports causing the industry's

condition to decline from 2021 to 2023.

Dismissing this trend analysis as "overly simplistic," the Coalition suggests that the

Commission should have ignored the lack of correlation between imports and injury and

assumed a causal link between them because subject import market share at the end of the POI,

while lower than at the start, nevertheless remained significant. PlBr. at 29-30. This Court has

previously rejected a similar "economic" argument that the presence of a significant volume of

subject imports mandates an affirmative determination. *T.B. Wood's Inc. v. United States*, 355 F.

Supp. 3d 1265, 1275 (Ct. Int'l Trade 2018).

Indeed, the statute, on its face, does not support Plaintiff's argument. *Loper Bright*

*Enters. v. Raimondo*, 603 U.S. 369, 144 S. Ct. 2244, 219 L. Ed. 2d 832 (2024). If Plaintiff were

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

correct, the mandatory statutory price effects and impact analyses would be superfluous because the Commission would effectively always need to reach an affirmative determination if the initial significant volume box is checked.  *See Pulsifer v. United States*, 601 U.S. 124, 125 (2024) ("That kind of superfluity, in and of itself, refutes Pulsifer's reading.").

Moreover, Plaintiff's approach could generate results totally at odds with the agency's mandate to determine whether a domestic industry is materially injured "by reason of" subject imports.  19 U.S.C. §§ 1671d(b), 1673d(b).  For example, where weakening domestic industry performance coincides with massively declining subject import market share – typically suggesting that this injury is not by reason of those imports – under Plaintiff's preferred methodology, the Commission would nonetheless be required to find such a causal link so long as by the end of the POI the imports still account for a meaningful share of the market.

### d.    Plaintiff's Lost Sales Argument Fails

Ignoring the substantial evidence supporting the Commission's negative determination, Plaintiff cites to a smattering of isolated information and assertions – mostly related to lost sales – that it believes would have supported its preferred outcome.  PlBr. at 30-31.  Putting aside that Plaintiff overlooks the correct standard of review, none of the evidence the Coalition mentions, when read in context, even supports an affirmative determination.  While Plaintiff mentions the absolute volume of confirmed lost sales, [ ▉ ] gross, it omits what this equated to, [ ▉ ] percent of the reported purchases and imports of subject merchandise over the POI and [ ▉ ] percent of the U.S. producers' commercial shipments over the period.  Views at 54 & n.216.  While Plaintiff emphasizes that purchaser [ ▉ ] reported that domestic producers had reduced prices to compete with subject imports, it omits that [ ▉ ] was the only one of 37 responding purchasers to do so.  Views at 60 n.238.  Finally, while Plaintiff asserts that the

Case 1:24-cv-00199-JAL    Document 61    Filed 07/25/25    Page 47 of 52

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

confirmed lost sales can be valued at $[ ████████ ], it omits that even its preferred valuation would equate to only a tiny percentage of the domestic industry's net sales revenue for the POI. CR at Table C-1.  The Coalition's assertion also overlooks that, as the Commission reasonably found, the volume of lost sales was not significant in light of the size of the market and volume of subject imports.  Views at 53-54.  *See Full Member Subgrp. of Am. Inst. of Steel Constr., LLC v. United States*, 547 F. Supp. 3d 1211, 1228-29 (Ct. Int'l Trade 2021) (Commission reasonably found that lost sales data did not support a finding of significant underselling because the lost sales accounted for a small volume relative to the market and did not correlate to a loss of market share).

### e.    Plaintiff's Argument that Imports Injured the Industry at the Start of the POI Fails

The Commission considered and reasonably rejected the Coalition's argument that the industry had entered the final phase POI in an injured condition due to subject imports.  As the Commission explained, the record in the preliminary phase showed that subject imports both pervasively oversold and did not gain market share from the domestic industry before the final phase POI.  Views at 74-75 (citing Preliminary Phase Staff Report (CD79) at Tables C-1 and V-12).  The Court should reject Plaintiff's request that it reweigh the evidence on this issue.  PlBr. at 31-33.  To the extent that any of Plaintiff's bullet points – *id*. at 32 – were not encompassed by the information to which the Commission cited – Views at 75 n.289 – the agency is presumed to have considered all the evidence and did not need to expressly address each piece of anecdotal evidence in the record.  *Nucor*, 28 CIT at 233-34, 318 F. Supp. at 1247; *U.S. Steel Corp. v. United States*, 36 CIT 1172, 1174, 856 F. Supp. 2d 1318, 1321 (2012).  While Plaintiff quotes from the Preliminary Views in an attempt to undermine the Commission's observation that

subject imports pervasively oversold the domestic like product in the 2020-21 period, nothing in this quote contradicts that observation.  PlBr. at 32-33.[22]

**C.    The Commission's Threat Finding Is Supported by Substantial Evidence and In Accordance with Law**

As described in the Statement of Facts above, the Commission's threat analysis was both reasonable and in accordance with the statute.  *See* Views at 76-89.  Nothing Plaintiff argues demonstrates otherwise.  PlBr. at 34-41.

**1.    Plaintiff's Likely Volume Arguments Fail**

The Coalition argues that because subject import market share ticked up between the interim periods, by 1.6 percentage points, the Commission should have found that a significant future increase in these imports was likely.  PlBr. at 34.  The Commission expressly acknowledged this interim period increase, Views at 80, but, reasonably, did not find it indicative of substantially increased future subject imports given the long-term downward trend in these imports from 2021 to 2023.  Views at 81 n.307; CR at Tables IV-2, C-1.

Plaintiff criticizes this analysis by suggesting that, because 2021 was supposedly "aberrational," in assessing the subject imports' long-term trend, the Commission should have ignored their 2021-2023 trend and instead focused on their 2022-23 trend.  PlBr. at 35-36.  The Commission expressly acknowledged the factors the Coalition believes make 2021 "aberrational" – including elevated demand due to the COVID-19 pandemic that year and

_____

[22] The Coalition also appears to be arguing that because subject import market share was higher in 2020 (before the final phase POI) than in 2021 (the first year of the POI), this establishes that the domestic industry indeed entered the POI in an injured condition due to subject imports.  PlBr. at 33.  The basis for Plaintiff's argument is unclear, especially because a moderation in subject import competition going into the POI would seem to undermine, not support, the proposition that the domestic industry entered the period in an injured condition due to subject imports.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

alleged overstocking – clearly reflecting that the agency considered these issues and determined them not to render 2021 data unusable in its analyses.  Views at 39, 64 (acknowledging that COVID "temporarily boosted demand" in 2021, and that destocking happened later in the period following the pandemic).  Plaintiff has not demonstrated that the Commission's use of 2021 data, including in its assessment of the subject imports' long-term trend, was in any way unreasonable. In any event, even if the Commission had considered 2022-2023 in lieu of 2021-2023 in its assessment of long-term subject import trends, these imports would still have registered a decline.  In absolute terms, cumulated subject imports declined by [ ████ ] percent from 2022 to 2023.  CR Table IV-2.

The remainder of the Coalition's likely volume arguments are equally unavailing.  PlBr. at 35-36.  While Plaintiff appears to believe that the projected increase in the subject industries' capacity utilization rate suggests that increased imports are likely, PlBr at 35, increased capacity utilization in fact suggests the opposite.  This means that there will be less available capacity with which to increase production of subject merchandise.  While Plaintiff claims that the Commission ignored the subject industries' "multiyear increase in exports," PlBr. at 36, the subject industries' exports had in fact decreased over the multiyear period, from 5.2 million gross in 2021 to 4.3 million gross in 2023.  Views at 84 n.322; CR at Table VII-10.  Finally, while the Coalition argues that the Commission ignored the subject industries' projected exports for 2024 and 2025, PlBr. at 36, this is not so.  *See* Views at 84 nn.320 & 322 (expressly noting the subject industries' projected exports to the United States and their projected total exports).  Indeed, the subject industries' projections provide substantial evidence supporting the Commission's likely volume finding, including that: (1) the share of their total shipments that they will export will decrease; (2) the share of their total shipments that they will export specifically to the United

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

States will decrease; (3) their home market shipments will increase; and (4) their inventories will decrease.  CR at Tables VII-10-11; Views at 82, 84 n.321 & 88.

### 2.  Plaintiff's Likely Price Effects Arguments Fail

For the reasons discussed above, Plaintiff's reliance on its arguments regarding present price effects fail.  Nor do its arguments regarding the likelihood of future price effects withstand scrutiny.  PlBr. at 37-39.  While it cites the increase in the subject industries' inventories over the POI as supposedly threatening price effects, *Id*. at 38, it fails to explain why inventories held in foreign countries would depress or suppress prices in the United States.  In any event, as discussed, foreign inventories are projected to decrease.  CR at Table VII-11.  Also unavailing are Plaintiff's citations to the increase in the ratio of subject inventories to subject shipments and to the increase in U.S. producer inventories as indicative of likely price effects.  PlBr. at 38-39.  Neither of these factors indicated price effects during the POI, as discussed above, and thus neither indicate them in the imminent future.

### 3.  Plaintiff's Likely Impact Arguments Fail

Plaintiff first reiterates its industry shutdowns and curtailments argument, including its incorrect assertion that the Commission ignored "[                                    ]."  PlBr. at 39-40.  The industry's capacity declines did not suggest adverse impact by reason of subject imports during the POI, as discussed above, and thus likewise do not suggest it in the imminent future.  Although Plaintiff alleges that the Commission ignored certain conditions of competition, PlBr. At 40-41, the Views show that the agency reviewed these conditions, such as changes in capacity, and found no evidence of any changes to them that would cause subject imports to become injurious in the imminent future.  Views at 88-89.  To the extent that it did not expressly discuss each of Plaintiff's bullet points, that does not undermine

its finding.  The Commission is presumed to have considered all evidence in the record.  *Nucor Corp.*, 28 CIT at 234, 318 F. Supp. 2d at 1247.

## V.     CONCLUSION

For the foregoing reasons, the Court should affirm the Commission's negative determination.

Respectfully submitted,

Andrea C. Casson
Assistant General Counsel

*/s/  Jason F. Miller*
Jason F. Miller
Michael K. Haldenstein
Attorney-Advisors
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-2746
Facsimile: (202) 205-3111
jason.f.miller@usitc.gov

*Attorneys for Defendant United States International Trade Commission*

Dated: July 25, 2025

45

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to this Court's Scheduling Order 1(f) and Chambers Procedures 2(B)(1) and (2),

I hereby certify that the attached **DEFENDANT UNITED STATES INTERNATIONAL**

**TRADE COMMISSION'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE**

**56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD** contains 13,545 words,

according to the word-count function of the word processing system used to prepare this brief

(Microsoft Office 365 ProPlus).

Dated: July 25, 2025                    */s/  Jason F. Miller*
                                        Jason F. Miller
                                        Attorney-Advisor
                                        Office of the General Counsel
                                        U.S. International Trade Commission
                                        500 E Street, SW
                                        Washington, DC 20436
                                        Telephone: (202) 205-2647
                                        Facsimile: (202) 205-3111
                                        jason.f.miller@usitc.gov