UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JOSPEH A. LAROSKI, JR., JUDGE

| | | |
|---|---|---|
| U.S. GLASS PRODUCERS COALITION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Court No. 24-00199 |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | NONCONFIDENTIAL |
| | ) | |
| Defendant, | ) | |
| | ) | |
| BERLIN PACKAGING L.L.C., | ) | |
| TRICORBRAUN INC., ENCORE GLASS, | ) | |
| INC. | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

RESPONSE BRIEF OF
DEFENDANT-INTERVENOR TRICORBRAUN, INC.

Nithya Nagarajan
Stephen W. Brophy

**HUSCH BLACKWELL LLP**
1801 Pennsylvania Avenue, NW,
Suite 1000
Washington, DC 20006
nithya.nagarajan@huschblackwell.com
stephen.brophy@huschblackwell.com
(202) 378-2409

*Counsel to TricorBraun, Inc.*

Dated: August 8, 2025

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   STATEMENT PURSUANT TO RULE 56.2 ...................................................... 1

   A.   Administrative Determination Under Review ............................................. 1

   B.   Issues Presented ............................................................................................ 2

III.  STATEMENT OF FACTS .................................................................................... 2

   A.   The Glass Containers Investigation .............................................................. 2

   B.   The Glass Wine Bottles Investigation .......................................................... 5

IV.   STANDARD OF REVIEW ................................................................................. 12

V.    SUMMARY OF THE ARGUMENT ................................................................. 13

VI.   ARGUMENT ....................................................................................................... 14

   A.   TricorBraun Joins-In and Incorporates the Arguments of Defendant United States
        and Other Defendant-Intervenors ........................................................... 14

   B.   The Commission's Price Effects Findings are Supported by Substantial Evidence
        and in Accordance with Law ..................................................................... 14

        1.   The Commission Collected and Fully Considered an Enormous Amount of
             Information Supporting its Negative Price Effects Determination ....................... 14

        2.   The Commission Considered All of the Record Evidence ....................................... 16

        3.   Plaintiff Misinterprets and Cherry-Picks the Record .............................................. 20

   C.   The Commission's Significant Adverse Impact Finding Is Supported by Substantial
        Evidence and in Accordance with Law ..................................................... 25

   D.   The Commission's Negative Threat Determination is Supported by Substantial
        Evidence and Otherwise in Accordance with Law .................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Am. Silicon Techs. v. United States,*
  261 F.3d 1371 (Fed. Cir. 2001) ............................................................................ 12
*Broadcom Corp. v. Int'l Trade Comm'n,*
  28 F.4th 240 (Fed. Cir. 2022) .............................................................................. 12
*Chemours Co. FC, LLC v. United States,*
  492 F. Supp. 3d 1333, 1335 (Ct. Int'l Trade 2021) ............................................. 12
*Mittal Steel Point Lisas Ltd. v. United States,*
  542 F.3d 867 (Fed. Cir. 2008) .............................................................................. 25
*Nippon Steel Corp. v. U.S. Int'l Trade Comm'n,*
  345 F.3d 1379 (Fed. Cir. 2003) ............................................................................ 25
*Nippon Steel Corp. v. United States,*
  458 F.3d 1345 (Fed. Cir. 2006) ...................................................................... 12, 25
*Nucor Corp. v. United States,*
  28 CIT 188, 318 F. Supp. 2d 1207 (2004) ........................................................... 20
*Sango Int'l L.P. v. United States,*
  567 F.3d 1356 (Fed. Cir. 2009) ............................................................................ 12
*Taiwan Semiconductor Indus. Ass'n v. U.S. Int'l Trade Comm'n,*
  266 F.3d 1339 (Fed. Cir. 2001) ............................................................................ 25
*USEC Inc. v. United States,*
  34 F. App'x 725, 731 (Fed. Cir. 2002)), aff'd, 414 F.3d 1331 (Fed. Cir. 2005)) .................... 20

## Federal Statutes

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................................................. 12
19 U.S.C. § 1677(7)(B) ........................................................................................... 26

## Federal Regulations

89 Fed. Reg. 83,515 (Oct. 16, 2024) .......................................................................... 1

## Other Authorities

Glass Containers from China, Inv. No. 701-TA-630 (Final),
  USITC Pub 5068 (June 2020) ....................................................................... 2, 3, 4, 5
Glass Containers from China, Inv. No. 731-TA-1462 (Final),
  USITC Pub. 5132 (November 2020) ......................................................................... 3
Glass Containers from China, Inv. No. 731-TA-1462 (Preliminary),
  USITC Pub 4996 (November 2019) ......................................................................... 2
Glass Wine Bottles from China and Mexico,
  731-TA-1662-1663 (Final), USITC Pub. 5588 (February 2025) ............................. 6
Glass Wine Bottles from China, Inv. No. 701-TA-703 (Final),
  USITC Pub. 5550 (Oct. 2024) .............................................................................. 1, 6

## I.    INTRODUCTION

On behalf of Defendant-Intervenor TricorBraun, Inc. ("TricorBraun"), we respectfully submit the following response in opposition to the motion for judgment on the agency record and opening brief filed by the U.S. Glass Producers Coalition ("Plaintiff" or "Coalition"). TricorBraun respectfully submits that the Court should affirm the United States International Trade Commission's ("Commission") final negative determination, as it is supported by substantial evidence and otherwise in accordance with law.

TricorBraun adopts the arguments made in Defendant's response brief submitted on July 25, 2025 ("Defendant Br."). Consistent with the Court's Order, TricorBraun provides additional context and argument to aid the Court's understanding of the issues raised in Plaintiff's appeal but does not repeat arguments made by Defendant United States in its response brief filed on July 25, 2025.

## II.    STATEMENT PURSUANT TO RULE 56.2

### A.  Administrative Determination Under Review

Plaintiff seeks review of the Commission's final negative determination in the countervailing duty investigation of glass wine bottles from China, notice of which was published at 89 Fed. Reg. 83,515 (Oct. 16, 2024) (PD188[1]). The Commission's Views and Staff Report for this investigation is contained in <u>Glass Wine Bottles from China</u>, Inv. No. 701-TA-703 (Final), USITC Pub. 5550 (Oct. 2024) ("Glass Wine Bottles Final") (PD187).  The Commission also issued confidential views (CD 279) and a confidential staff report (CD 268).

---

[1] Citations to the public record are indicated by "PD," referring to list number 1 on the index of the administrative record, and citations to the confidential record are indicated by "CD," referring to list number 2 on the index of the administrative record.

**B. Issues Presented**

1. Are the Commission's Negative Price Effects Findings Supported by Substantial Evidence and in Accordance with Law?

2. Is the Commission's Negative Adverse Impact Finding Supported by Substantial Evidence and in Accordance with Law?

3. Is the Commission's Negative Threat Finding Supported by Substantial Evidence and in Accordance with Law?

**III.    STATEMENT OF FACTS**

While the petition in the case underlying this appeal was filed on December 29, 2023 (CD 1, PD 1), this case actually has a long history beginning with the filing of an earlier petition on September 25, 2019. That earlier petition alleged that the U.S. industry producing "glass containers" was materially injured or threatened with material injury by reason of dumped and subsidized imports from China. Glass Containers from China, Inv. Nos. 701-TA-630 (Final), USITC Pub 5068 (June 2020) ("Glass Containers Final") and 731-TA-1462 (Preliminary), USITC Pub 4996 (November 2019) ("Glass Containers Preliminary"). That earlier petition also resulted in a negative determination of material injury and threat with respect to the broader category of glass containers, which included the wine and spirit bottles subject to the current case. Glass Containers from China, Inv. No. 701-TA-630 (Final), Pub 5068 (June 2020) ("Glass Containers Final").

**A. The Glass Containers Investigation**

In the preliminary determination and under the less demanding standard applicable to preliminary investigations, the Commission reached an affirmative determination that that there was a reasonable indication that an industry in the United States was materially injured by reason of imports of glass containers from China. Glass Containers Preliminary at 39. The

2

Commission stated that, for purposes of the preliminary determinations, it did not find that there was "clear and convincing evidence that the increases in subject imports did not have a significant adverse impact on the domestic industry." Id. at 36.

Notably, even in the preliminary determination, the Commission found that subject imports predominantly oversold the domestic like product, stating that "the pricing data show that "subject imports oversold the domestic like product in 44 of 49 quarterly price comparisons. Id. at 29. The Commission also noted that there was only a "limited quantity of confirmed lost sales". Id. at 30. Petitioner, however, argued that the pricing products that they themselves proposed "are overly broad and distorted by product mix." Id. at 29. Ultimately, the Commission concluded that it could not conclude "that subject imports did not have adverse price effects on the domestic industry" and stated that it intended to "further examine the nature of price competition between subject imports and the domestic like product in any final phase of these investigations." Id at 32.

Petitioner subsequently declined to align the deadlines for the final antidumping and countervailing duty investigations, which led the Commission to make a final determination in the countervailing duty investigation prior to a determination in the antidumping duty investigation. Glass Containers from China, Inv. No. 701-TA-630 (Final), USITC Pub 5068 (June 2020) and Glass Containers from China, Inv. No. 731-TA-1462 (Final), USITC Pub. 5132 (November 2020).

In the final phase of the investigation, the Commission reached negative determinations of material injury and threat. Instead of four pricing products, the Commission requested that U.S. producers and U.S. importers report data for eight pricing products. Glass Containers Final at 24. Again, the pricing data revealed that subject imports predominantly oversold the domestic

like product. Id. at 25. The Commission also found a "paucity of confirmed lost sales". Id. at 26. Although the domestic industry's unit COGs increased more than unit net sales value, the Commission determined that "the increase in COGS primarily resulted from increases in other factory costs, and these increases in per-unit other factory costs, in turn, resulted primarily from decreased sales volumes." Id. at 30. Moreover, the Commission found that "these declining sales volumes resulted from declining apparent U.S. consumption over the POI." Id. Therefore, the Commission concluded that "further price increases (beyond those already observed during the POI) would not be expected in a declining market, as acknowledged by Petitioner." Id.

The Commission also found that the domestic industry had higher minimum order quantities for customers seeking to purchase glass containers. Id. at 21, fn110. In addition, the Commission found that subject imports served small/medium customers, while the domestic industry served larger customers:

> In addition, in most end use container types, domestic producers' shipments were heavily concentrated to large product manufacturers, while subject import shipments were heavily concentrated to small/medium product manufacturers. As noted above, certain purchasers reported that they had difficulties obtaining glass containers from the domestic industry in small-batch quantities and reported that producers in China had smaller minimum order quantities than domestic producers, which made subject imports a more viable option for some of the small- and medium-sized end users.

Id. at 37-38.

The Commission attributed declines in the domestic producer's output indicators to the decline in apparent U.S. consumption of glass containers overall, and in particular for beer bottles, over the period of investigation ("POI"). Id. at 34.

The record simply did not reflect Plaintiff's claim that an industry in the United States was materially injured or threatened with material injury by reason of subject imports of glass containers from China. Notably, the Commission concluded that "Petitioner's assertion that

subject imports have caused injury in these product segments {i.e., wine and spirits bottles} is not supported by the record." Id. at 36 n.176.

In sum, the Commission found no market share shift to subject imports, no adverse price effects, and no correlation between the performance of the domestic industry and subject imports. Ultimately, the Commission found that there was not substantial evidence that the domestic industry was materially injured or threatened with material injury by reason of subject imports.

**B. The Glass Wine Bottles Investigation**

Four years later, Plaintiff brought the current case against a more limited scope and a more expansive list of countries. (CD 1, PD 1). The new scope covered only glass bottles of a certain size and capacity, meant to encompass wine and certain spirit bottles, and covered Chile, China and Mexico. Id.

In its preliminary determination, the Commission once again found that cumulated subject imports predominantly oversold the domestic like product:

> Cumulated subject imports undersold the domestic like product in 9 of 74 quarterly comparisons, or 12.2 percent of the time, with underselling margins ranging between 3.2 percent and 28.4 percent, and averaging 14.4 percent. Cumulated subject imports oversold the domestic like product in the remaining 65 quarterly comparisons, or 87.8 percent of the time, with overselling margins ranging between 0.9 percent and 202.0 percent and averaging 101.6 percent.

Confidential Preliminary Views ("Preliminary Views") (CD81) at 40. The Commission found that the quarters in which there was overselling accounted for 96.7 percent of reported total reported subject import sales volume (497,632 gross). Id. Moreover, the Commission found that lost sales were equivalent to [     ] percent of importers' U.S. shipments of subject imports and [     ] percent of responding purchasers' reported purchases and imports of subject

imports during the POI. Id. at 41.  Nevertheless, under the low reasonable indication standard, the Commission reached an affirmative preliminary determination.

Once again, Plaintiff declined to align the deadlines for the final antidumping and countervailing duty investigations, which led the Commission to make a final determination in the countervailing duty investigation prior to a determination in the antidumping duty investigation.  Glass Wine Bottles from China, Inv. No. 701-TA-703 (Final), USITC Pub. 5550 (October 2024) and Glass Wine Bottles from China and Mexico, 731-TA-1662-1663 (Final), USITC Pub. 5588 (February 2025).

In the final phase of the investigation, Plaintiff argued for a single like product coextensive with the scope and the Commission agreed.  Confidential Final Views ("Final Views") (CD 279) at 10 and 20.   Plaintiff argued that the Commission should cumulate subject imports from China, Mexico, and Chile and the Commission Agreed.  Id. at 26 and 30. The Plaintiff did not argue that the captive production provision applied such that the Commission would focus solely on the merchant market but argued that the Commission should consider captive consumption as a condition of competition.  Id. at 36.  The Commission agreed.  Id. at 38.

As in the previous investigation, the Commission found that the domestic industry and subject imports were concentrated in different market segments.   Specifically, the Commission found that domestic producers' shipments were heavily concentrated to large customers, which buy in bulk, while subject import shipments were heavily concentrated to small/medium customers, which prefer case packs.  Id. at 45.  Approximately, three-quarters of domestic producer's sales were in bulk, while the vast majority of subject imports were sold in case packs. Id. at 45-46.  The Commission also found that domestic producers had higher minimum order

requirements and that nine of 35 responding purchasers reported that they had been refused or declined orders by the domestic industry for reasons such as minimum order sizes or packaging. Id. at 43.

Plaintiff argued that the Commission should collect purchase cost data in order to compare domestic pricing to subject import purchase cost data, which, it alleged, would capture the prices paid by distributors for subject imports, as these distributors directly import subject merchandise themselves. Coalition Questionnaire Comments (PD 106) at 2-3. In fact, after collecting data on three pricing products in the preliminary phase of the investigation, the Commission considered five pricing products and three purchase cost products in the final phase of the investigation. Preliminary Views at 39 (CD81) and Final Views (CD 279) at 50-51, fn 196 and fn 202.

With respect to the pricing data, the Commission found that subject imports oversold the domestic like product in 134 out of 143 quarterly comparisons or 93.7 percent of the time. Final Views (CD 279) at 51. With respect to the purchase cost data, the Commission noted that the purchase costs of subject imports were higher than the sales prices for the domestic like product in the majority of quarters. The Commission also recognized that the purchase costs data may not reflect the total cost of importing noting that seven of ten importers reported that they incurred additional costs, ranging from 3-15 percent, beyond landed duty-paid costs by importing glass wine bottles directly rather than purchasing from a U.S. producer or U.S. importer. Id. at 52-53.

The Commission also found that the pricing data were consistent with the U.S. shipment data on the record, which showed that the average unit values ("AUVs") for subject import shipments were higher than the AUVs for domestic like product shipments:

These U.S. shipment data show that the domestic industry's shipments of case packs to both small and medium wineries and large wineries were generally at lower unit values than U.S. importers' shipments of subject imports in case packs to small and medium wineries and large wineries throughout the POI. Thus, even when looking at sales of glass wine bottles in the same packaging to the same customers, the unit values of subject import shipments generally exceeded those of the domestic industry's shipments.

Id. at 56.

The Commission also considered the trends in the data finding that the domestic industry's sales prices generally increased over the POI. Specifically, the domestic industry's sales prices for pricing products 1-3 and 6-8 increased from [    ] to [    ] percent, depending on the product and that only the sales prices of pricing product 5 decreased, by [    ] percent, although the volumes associated with domestic shipments of that product were the lowest of the various products for which pricing or purchase cost data were collected (aside from pricing product 4, which only saw limited shipments in the early part of the POI). Id. at 59-60.

The Commission also considered the lost sales information on the record finding that only 8 of 37 purchasers reported that they had purchases subject imports over the domestic like product based on their lower prices. The volume of these purchases was equivalent to [    ] percent of the reported purchases and imports of subject merchandise over the POI, [    ] percent of the U.S. producers' commercial shipments over the period, and less than [    ] percent of apparent U.S. consumption during the POI. Id. at 53-54 & n.216.

The Commission also considered the documentation placed on the record by Plaintiff that purported to show lost sales but found that the documents did not contradict the lost sales information on the record or indicate that there was a significant volume of lost sales to subject imports beyond that confirmed by responding. Id. at 57-58. Given all of this information, the Commission reasonably concluded that subject imports had not undersold the domestic like product to a significant degree and had not depressed the prices of the domestic industry.

Nor did the Commission find evidence that subject imports had suppressed domestic prices to a significant degree. The Commission found that the domestic industry was able to increase prices even at a time of declining demand.   The Commission did find that the domestic industry's COGS to net sales ratio increased irregularly by 1.9 percentage points from 2021 to 2023 but improved in interim 2024.  However, the Commission found that the increase in the industry's unit net sales value more than covered its increased costs for raw materials, energy and direct labor and that, to the extent that the increase in the unit net sales value slightly lagged the increase in unit COGS, that was attributable to increased other factory costs, which in turn was largely attributable to declining demand and certain non-recurring costs associated with, for example, the flood event at one of O-I Glass' plants and the cyberattack experienced by Gallo..  Id. at 63-64.

The Commission noted that the differing COGs to net sales ratios amongst domestic producers indicated that any cost/price squeeze was caused by internal factors rather than external factors such as subject imports:

> We note that individual domestic producers had different trends in their COGS to net sales ratios over the POI, which suggests that their cost/price squeeze was due to internal factors, not external, industry-wide factors such as subject imports.

Final Views (CD 279) at 61.

The Commission also considered the fact that that [                         ] reporting an increased COGs to net sales ratio actually lost market share to [                    ], not subject imports:

> The Commission notes that of the three U.S. producers, [            ] registered an increase in the COGS to net sales ratio between 2021 and 2023. CR/PR at Table VI-5. However, during this period [        ] lost market share not to subject imports (which saw a decline in market share) but primarily to [      ], which increased its market share by [    ] percentage points at the expense of [

**]**. Nonsubject imports also gained market share during this period (plus 1.3 percentage points), but far less than did **[      ]**.

Id. at 63, fn 248.

The Commission also considered the domestic industry's argument that an "inventory overhang" had suppressed domestic prices. The Commission found, that this was not supported by the record given that 1) that inventories of subject merchandise had declined over the POI, 2) **[                                    ]**, 3) a majority of purchasers (22 of 37) indicated that they were holding their preferred level of inventory, and 4) the only **[**

**]**, indicating that their inventories did not undermine their ability to increase prices beyond their increased costs.  Id. at 64-65.  The Commission also found that the trends in the domestic industry's COGS/net sales ratio did not correlate with the trends in subject import volume or market share.  Id. at 65.

With respect to impact, the Commission found that the declines in the domestic industry's performance correlated with decreasing, not increasing, subject imports and these subject imports were predominantly overselling the domestic industry.  Id. at 72-73.  When subject import market share increased **[      ]** in the interim period, the condition of the domestic industry actually improved.  Id.

> The record shows that the decline in domestic producers' output indicators and consequent decline in financial indicators are consistent with the decline in apparent U.S. consumption during the POI. Given this, as well as the lack of any market share shift from the domestic industry to cumulated subject imports during the 2021-23 period, the absence of significant underselling or adverse price effects, and the lack of any clear correlation between cumulated subject imports and the domestic industry's performance during the POI, we find that subject imports did not have a significant adverse impact on the domestic industry.

Id. at 74.

With respect to threat, the Commission determined that subject imports did not threaten material injury to the domestic industry in the imminent future. The Commission accepted Plaintiff's cumulation arguments and cumulated subject imports for all three countries for purposes of threat. Id. at 77-80.

With respect to likely impact, the Commission found that the subject import trends during the POI did not indicate a likelihood of significantly increased imports. Id. at 81-82. The Commission considered the increase in subject imports in interim 2024, but did not find that a 3.6 percent increase indicated that substantially increased subject imports are likely given the long-term downward trend in subject imports over the previous three calendar years. Id. at fn 81. The Commission also considered the facts that U.S. importers had arranged for declining volumes of subject imports in second through fourth quarters of 2024, that U.S. importer inventories declined over the POI, that subject producers' capacity and production declined over the POI; and that subject producers maintained high capacity utilization. Id. at 81-83.

With respect to likely price effects, the Commission found that the lack of significant underselling and price effects observed during the POI will likely continue in the imminent future given that cumulated subject import volumes are not likely to increase significantly in the imminent future, the absence of significant underselling or adverse price effects during the POI, and the absence of any evidence that subject import pricing patterns are likely to change significantly in the imminent future. Id. at 85-87

With respect to likely impact, the Commission held that that cumulated subject imports were not likely to have a significant adverse impact on the domestic industry in the imminent future given that subject imports were not materially injurious during the

POI and finding no change in the conditions of competition that would cause them to become injurious.  Id. at 87-89.

Therefore, based on a consideration of the entire record, the Commission determined that there was not substantial evidence that the domestic industry was materially injured or threatened with material injury by reason of subject imports.

## IV.    STANDARD OF REVIEW

Under the Tariff Act of 1930, this Court must uphold the Commission's determinations, findings, and conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Chemours Co. FC, LLC v. United States*, 492 F. Supp. 3d 1333, 1335 (Ct. Int'l Trade 2021). "[  ] party challenging the Commission's determination under the substantial evidence standard has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1358 (Fed. Cir. 2006). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Broadcom Corp. v. Int'l Trade Comm'n*, 28 F.4th 240, 249 (Fed. Cir. 2022).  A "determination may be supported by substantial evidence of record even if it is possible to draw two inconsistent conclusions from evidence in the record." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001). "The substantial evidence inquiry takes into account the entire record, which includes evidence that supports and detracts from the conclusion reached." *Sango Int'l L.P. v. United States*, 567 F.3d 1356, 1362 (Fed. Cir. 2009).

## V.     SUMMARY OF THE ARGUMENT

Plaintiff's arguments concentrate on selected and isolated pieces of record evidence and unreasonably assumes that any negative data or trend is evidence of material injury or threat by reason of subject imports. The record as a whole, however, demonstrates that the Commission's negative determination was supported by substantial evidence and otherwise in accordance with law.

Aside from downplaying the declining demand experienced by the industry, Plaintiff has to ignore significant record evidence in order to lay the blame for the domestic industry's problems on subject imports.  Plaintiff does not mention the fact that the domestic industry's condition improved at the same time that subject import market share increased [          ] in the first three months of 2024.  Plaintiff does not mention the fact that the domestic industry and subject imports were concentrated in different market segment with domestic producers heavily concentrated on sales to large customers, which buy in bulk, and subject import shipments heavily concentrated on sales to small/medium customers, which prefer case packs.  Final Views (CD 279) at 45.   Plaintiff does not mention the fact that domestic producers had higher minimum order requirements, which limited its ability to service small customers.  Id. at 43. Plaintiff does not mention the competition between members of the domestic industry during the POI. Id. at 61-63.

It should not be ignored that this is the second time that Plaintiff has sought the imposition of antidumping and countervailing duties on imports of glass wine bottles.  In both cases, Plaintiff was unable to propose pricing products that generated evidence of underselling.  In both cases, Plaintiff was unable to present evidence of significant lost sales to subject imports based on price.  In both cases, the Commission found similar facts that demonstrated the non-injurious and

non-threatening effects of subject imports in the U.S. market.   Despite all of the evidence to the

contrary, Plaintiff continues to attribute all of the domestic industry's problems to subject imports

based on cherry-picked bits and pieces of record evidence taken out of context. The Commission,

on the other hand, considered the record as a whole and reasonably determined that there was not

substantial evidence of material injury or threat of material injury by reason of subject imports.

TricorBraun respectfully requests that the Court affirm the Commission's negative

determination.

## VI.    ARGUMENT

### A.  TricorBraun Joins-In and Incorporates the Arguments of Defendant United States and Other Defendant-Intervenors

TricorBraun hereby joins in and incorporates by reference the arguments presented by

Defendant United States in its response brief filed on July 25, 2025 and by other Defendant-

Intervenors in their response briefs filed on August 8, 2025.   In accordance with the Court's

instructions, TricorBraun has endeavored to avoid repeating arguments made in Defendant's

response brief.

### B.  The Commission's Price Effects Findings are Supported by Substantial Evidence and in Accordance with Law

1.  The Commission Collected and Fully Considered an Enormous Amount of Information Supporting its Negative Price Effects Determination

The Commission collected an enormous amount of information on pricing and purchase

costs in order to give Plaintiff every opportunity to prove its case.   Four times now, in the

preliminary and in the final phases of the Glass Containers case, and twice in this case, Plaintiff

has been given the opportunity to propose pricing and purchase costs products which it thinks

would show underselling. It has failed in all of those attempts.

In the <u>Glass Containers Preliminary</u>, the Commission collected pricing data on four pricing products suggested by Petitioner and found that subject imports predominantly oversold the domestic like product in 44 of 49 quarterly price comparisons. <u>Glass Containers Preliminary</u> at 29.   In the <u>Glass Containers Final</u>, the Commission collected data on eight pricing products and still found that subject imports predominantly oversold the domestic like product.  <u>Glass Containers Final</u> at 25.

In the <u>Glass Wine Bottles Preliminary</u>, the Commission collected data on three pricing products and found that that cumulated subject imports predominantly oversold the domestic like product.  Preliminary Views (CD81) at 40.   In the <u>Glass Wine Bottles Final</u>, the Commission collected data on five pricing products and three purchase cost products and again found predominant overselling.  Final Views (CD 279) at 51-53.

In the face of a record that does not support their position, a record they played a significant role in creating, Plaintiff now suggests that the Commission did not consider level of trade issues in its pricing comparisons.  Plaintiff's Opening Brief ("Pl. Br.") at 15.  As an initial matter, TricorBraun agrees with Defendant's position that Plaintiff raises this argument for the first time on appeal and did not exhaust its administrative remedies before the Commission. Def. Br. at 21. As a result, the Court should disregard this argument.  Even if the Court disagrees, however, TricorBraun also agrees with Defendant that Plaintiff's argument fails on the merits.

The fact is that Plaintiff's arguments repeatedly changed in the proceedings below and now again before this Court. Plaintiff initially proposed the pricing products that the Commission used to compare importer and domestic industry prices.  Petition, Volume I at 22 (CD 1, PD 1) and Preliminary Views (CD81) at 39, fn 167.  When the pricing data did not support its position, Plaintiff asked the Commission to collect purchase cost data.  Coalition Questionnaire

Comments (PD106) at 2-3. The purchase costs data also did not support Plaintiff's position so it now posits a confused and illogical argument alleging level of trade issues.

It appears that Plaintiff wants the Commission to compare domestic industry sales to end users to the price charged by foreign producers to U.S. importer/distributors, but that is exactly what the Commission did when it collected the purchase cost data. The purchase costs data compared the domestic industry's sales price to the landed duty-paid costs of subject imports. Final Views (CD 279) at 52. To the extent that Plaintiff is asking for a remand for the Commission to collect more pricing data, they have already had enough bites at the apple.

    2.  <u>The Commission Considered All of the Record Evidence</u>

Plaintiff also claims that the Commission failed to meaningfully consider certain business documentation that it submitted for the record and that allegedly showed instances of underselling by subject imports. Pl. Br. at 17. While Plaintiff makes the perfunctory statement that it is not asking the Court to reweigh the evidence, that is exactly what it is asking the Court to do. As Defendant argues in its response brief, the Commission considered all of the record evidence, including the business documentation that Plaintiff submitted. Def. Br. at 24.

The Court cannot now reweigh the evidence to conclude that the anecdotal business documentation somehow is more important than the industry-wide pricing and purchase costs data collected by the Commission. Throughout its brief, Plaintiff seems to forget that the Commission must support its determination with substantial evidence. An affirmative opinion based on anecdotal business documentation cannot reasonably be characterized as supported by substantial evidence in light of all of the industry-wide pricing and purchasing costs data that contradicts any finding of underselling. Moreover, as discussed below, that documentation does

not even establish that there were lost sales due to competition from lower priced subject

imports.

In fact, the Commission did consider the documentation submitted by Plaintiff, but

simply decided that it did not detract from the other record evidence:

> The correspondence that Domestic Parties submitted does not contradict the lost
> sales information on the record, however, or indicate that there was a significant
> volume of lost sales to subject imports beyond that confirmed by responding
> purchasers.  Nor does it detract from the other record evidence, including pricing
> data, purchase cost data, and shipment data, indicating that subject imports were
> generally priced higher than the domestic like product, consistent with the small
> volume of confirmed lost sales.

Final Views (CD 279) at 57-59.

Since much of the business documentation cited in Plaintiff's brief [

                                        ], we note that TricorBraun provided an extensive rebuttal to

Plaintiff's claims in its post-hearing brief. TricorBraun Posthearing Brief at Appendix A, pages

5-10 (CD 249, PD 154).  TricorBraun, during the POI, was the exclusive distributor for the West

Coast for Ardagh of glass wine bottles to small and medium sized wineries. TricorBraun Pre-

Hearing Brief at 1 (CD 220, PD 140).  During the POI, TricorBraun, where necessary, served its

customers through more expensive imports due to domestic producers like Ardagh's restrictive

minimum order quantities ("MOQs"), serious lapses in quality and service, and other non-price

issues. Id. at 3.  TricorBraun values its relationship with Ardagh and prefers to supply its

customers with Ardagh glass wine bottles. Id. Unfortunately, TricorBraun experienced major

problems over the POI due to Ardagh's inability to deliver quality products in a timely manner.

These issues cost both Ardagh and TricorBraun significant business. Id.

As explained in its rebuttal, Plaintiff has conveniently misinterpreted the

communications at issue.  The communications [

17

]. TricorBraun Posthearing Brief at Appendix A, pages 5-10 (CD 249, PD 154).

- [

] Id. at 6.

- [

] Id. at 8.

- [




                                                                         ] Id. at 9

and Exhibit 4.

As TricorBraun explained, TricorBraun also lost business as Ardagh's distributor due to

Ardaugh's failures, and even the business TricorBraun was able to retain through other suppliers

was purchased at higher prices than those being offered by Ardaugh:

> 'Although Ardagh tried to portray us as the perpetrator of this situation,
> TricorBraun also lost more than 3 million of these 4 million cases entirely. The
> vast majority of this volume was lost to other domestic competition, not imports.'
> To be clear, of the 1 million cases that TricorBraun was able to retain,
> approximately [                                        ] and the [
>                    ], in both cases at higher prices than those being offered by Ardagh.

Id. at 9. This information is just an example of Plaintiff attributing its problems to subject

imports even when the facts demonstrate that subject imports are not the problem.  Moreover,

contrary to Plaintiff's claim, these communications were considered by the Commission in its

decision:

> With respect to Ardagh's claims that it lost business with its exclusive distributor,
> TricorBraun, the record shows that Ardagh did not meet its commitments to
> supply TricorBraun, resulting in TricorBraun switching its business to [
>                    ].

Final Views (CD 279) at 58, fn 228.

19

Moreover, to the extent that the Commission did not individually address each and every communication submitted by Plaintiff in its final determination, we note that it also did not individually address each and every one of TricorBraun's rebuttals.  Of course, that is not necessary because the Commission "'is presumed to have considered all of the evidence on the record,'" it is "'not required to explicitly address every piece of evidence presented by the parties'" during an investigation. *Nucor Corp. v. United States*, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004) (*quoting USEC Inc. v. United States*, 34 F. App'x 725, 731 (Fed. Cir. 2002)), aff'd, 414 F.3d 1331 (Fed. Cir. 2005)).

Regardless, the industry-wide pricing and purchase costs data and the lost sales information collected by the Commission demonstrate that subject imports did not have negative price effects on the domestic industry.  Individual anecdotes do not outweigh the record as a whole.

3.  Plaintiff Misinterprets and Cherry-Picks the Record

    a.  The Commission's Allegedly Incorrect Statement

Plaintiff argues that the Commission's decision contains a factually incorrect statement. Specifically, Plaintiff refers to the following:

> Although Domestic Parties argue the purchase cost data show that imports from subject sources were increasingly imported at lower costs than the domestic product during the latter portion of the POI, corresponding to market share gain by subject imports at the expense of domestic producers, the record indicates that the subject imports that gained market share during the latter portion of the POI were from Mexico, none of which were purchased at lower cost during that period.

Pl. Br. at 14 *citing* PR187 at 42, CR279 at 55-56.  According to Plaintiff, both Mexican and Chinese imports were increasing at the end of the period and the pricing data indicates that

Mexican import prices **[**

**]**.[2]

This is just an example of Plaintiff cherry-picking the record and misinterpreting the Commission's opinion. TricorBraun agrees with the argument made by Defendant in its response brief, including the fact that the Commission did consider the fact that Chinese imports also increased.  Def. Br. at 32. We also note that the increase by China was **[          ]** percentage points comparing the first three months of 2023 with the first three months of 2024.  In other words, **[                    ]**.

The Commission's statement, moreover, is not incorrect as Plaintiff argues. The record supports the fact that subject market share from Mexico increased during the POI from **[     ]** percent in 2001 to **[     ]** percent in interim 2024.  The market share of subject imports from Chile declined from **[     ]** percent in 2021 to **[     ]** percent by interim 2024 and the market share of subject imports from China declined from **[     ]** percent in 2021 to **[     ]** percent by interim 2024. *See* Final Staff Report (CD 268, PD 165) at Table C-1.  Moreover, the increase in Mexican market share did occur at the end of the period, i.e. 2023 and interim 2024.  Id.  Over all subject import market shar declined from 24 percent at the beginning of the POI to 23.5 percent at the end of the POI.  Id.

In addition, Plaintiff cites to the **[**

**]**, while the Commission is clearly citing to the purchase cost data.  Pl. Br. at 14.  As the Commission's statement makes clear, the Commission was responding to an argument made by Plaintiff concerning the purchase cost data.  In fact, Plaintiff concedes

---

[2] It is also worth noting that cumulated subject imports [

].  Plaintiff, of course, chose the countries subject to this investigation and argued for cumulation.

that the Commission's statement is correct with respect to the cost data, which is the data that Plaintiff advocated using since they claimed that the pricing data was supposedly aberrational. Id.

Finally, the statement cited by Plaintiff is not the basis for the Commission's negative decision. It is simply a response to one of Plaintiff's arguments concerning the purchase cost data. In fact, the Commission considered the entire record in making its final negative determination, something Plaintiff seeks to avoid. The record as a whole demonstrates that cumulated subject imports oversold the domestic like product and the record does not indicate that subject imports gained market share through underselling.

As the Commission found, the domestic industry's market share at the end of the POI was the same as at the beginning and the domestic industry actually gained market share in the merchandise market.

> Although cumulated subject imports gained 1.5 percentage points of market share from the domestic industry in interim 2024 compared to interim 2023, the domestic industry's market share in interim 2024, at 70.7 percent, was the same as in 2021; in contrast, cumulated subject imports' market share was lower in interim 2024, at 23.5 percent, than in 2021, at 24 percent.

Final Views (CD 279) at 48-49.

> In the merchant market, the domestic industry ended the POI with a higher market share in interim 2024, **[     ]** percent, than in 2021, at **[     ]** percent. *See* CR/PR at Tables IV-18 and C-2. In contrast, in the merchant market, cumulated subject imports ended the POI with a lower market share in interim 2024, **[     ]** percent, than in 2021, at **[     ]** percent.

Id. at 49, fn 194.

### b. Other Issues

Plaintiff also attempts to recharacterize the lost sales data to emphasize that one out of every five purchasers (8 of 37) purchased subject imports because they were lower priced. Pl.

Br. at 19.  Plaintiff, however, fails to explain why the "frequency" of lost sales is more important that the absolute volume of underselling.  As Defendant points out, the quantity of lost sales, **[**

**]** gross, was equivalent to **[      ]** percent of the reported purchases and imports of subject merchandise over the POI and **[      ]** percent of the U.S. producers' commercial shipments over the period. Final Staff Report (CD 268, PD 165) at Tables V-20-21 and C-1 (CD 268, PD 165).

Next, Plaintiff argues that the Commission failed to address the domestic industry's inability to increase it prices to cover increased "other factory costs".  Pl. Br. at 21.  The issue, however, is one of causation.  Plaintiff points to no evidence of significant underselling by subject imports that prevented the domestic industry from raising prices further to cover their "other factory costs".  In fact, subject imports cannot be reasonably cited as the cause of Plaintiff's inability to raise prices further, in light of the predominant overselling by subject imports.

In its argument, Plaintiff does not mention the Commission's discussion of the differing COGs to net sales ratios amongst domestic producers which indicated that any cost/price squeeze was caused by internal factors rather than external factors such as subject imports:

> We note that individual domestic producers had different trends in their COGS to net sales ratios over the POI, which suggests that their cost/price squeeze was due to internal factors, not external, industry-wide factors such as subject imports.

Final Views (CD 279) at 61.

Plaintiff also does not mention intra-industry competition.  The Commission also found that **[                         ]** reporting an increased COGs to net sales ratio actually lost market share to **[                              ]**, not subject imports:

> The Commission notes that of the three U.S. producers, **[           ]** registered an increase in the COGS to net sales ratio between 2021 and 2023. CR/PR at

Table VI-5. However, during this period **[          ]** lost market share not to subject imports (which saw a decline in market share) but primarily to **[          ]**, which increased its market share by **[     ]** percentage points at the expense of **[**  **]**. Nonsubject imports also gained market share during this period (plus 1.3 percentage points), but far less than did **[          ]**.

Id. at 63, fn 248.  By contrast, the domestic industry's COGs to net sales ratio increased while subject imports declined and decreased as subject imports increased:

The domestic industry's COGS to net sales ratio increased between 2021 and 2022 - when subject import volume declined by 13.3 percent, subject imports lost 2.9 percentage points of market share, and the average unit value of U.S. importers' U.S. shipments of subject imports increased by 19.4 percent (compared to 11.1 percent for U.S. producers' U.S. shipments) - but declined between 2022 and 2023, even as subject imports gained 1.1 percentage points of market share.

Id. at 65 fn 255.

With respect to the purchase cost data, Plaintiff does not mention that that the data does not account for all of the costs of importing. The Commission recognized that the purchase costs data may not reflect the total cost of importing noting that seven of ten importers reported that they incurred additional costs, ranging from 3-15 percent, beyond landed duty-paid costs by importing glass wine bottles directly rather than purchasing from a U.S. producer or U.S. importer.  Id. at 52-53.  As respondents argued before the Commission, once the subject import AUVs are adjusted to reflect the additional costs to the importer of importing instead of purchasing domestic product, subject imports oversold the domestic industry in **[          ]** quarterly comparisons with **[     ]** percent of the reported subject imports overselling the domestic industry.  TricorBraun Post-hearing Brief at Appendix A, page 18 and Exhibit 7 (CD 249, PD 154).

Plaintiff also does not address the shipment data.  The Commission found that the pricing data were consistent with the U.S. shipment data on the record, which showed that the average unit values ("AUVs") for subject import shipments were higher than the AUVs for domestic like

product shipments, looking at sales of glass wine bottles in the same packages to the same customers:

> These U.S. shipment data show that the domestic industry's shipments of case packs to both small and medium wineries and large wineries were generally at lower unit values than U.S. importers' shipments of subject imports in case packs to small and medium wineries and large wineries throughout the POI. Thus, even when looking at sales of glass wine bottles in the same packaging to the same customers, the unit values of subject import shipments generally exceeded those of the domestic industry's shipments.

Id. at 56.

In light of all of this evidence, it was reasonable for the Commission to conclude that any negative price effects experienced by the domestic industry were not caused by subject imports.

### C. The Commission's Significant Adverse Impact Finding Is Supported by Substantial Evidence and in Accordance with Law

As with its arguments regarding price effects, Plaintiff's arguments regarding impact are also based on a selective reading of the record rather than a consideration of the record as a whole. As argued by Defendant, the Commission clearly applied the correct standard to determine whether the subject imports were contributing more than tangentially or minimally to injury. *See Nippon Steel Corp. v. United States.* 458 F.3d 1345, 1357 (Fed. Cir. 2006); *Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 345 F.3d 1379, 1381 (Fed. Cir. 2003); *Taiwan Semiconductor Indus. Ass'n v. U.S. Int'l Trade Comm'n*, 266 F.3d 1339, 1345 (Fed. Cir. 2001); *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 873 (Fed. Cir. 2008). As pointed out by Defendant, however, this claim is not supported by the record. Def. Br. at 34. Plaintiff's arguments merely assume their conclusions, that any negative performance indicator for the domestic industry during the POI was caused by subject imports.

Plaintiff assumes that subject imports caused material injury because the volume of subject imports was "large", but volume alone does not prove causation. Pl. Br. at 25. The

simplistic analysis that Plaintiff suggests is not permitted under the statute, which requires the

Commission to also consider pricing and impact.  19 U.S.C. § 1677(7)(B).  The legislative

history also explains that the Commission must examine factors other than subject imports to

ensure that it is not attributing injury from other factors to the subject imports. Statement of

Administrative Action (SAA) to the Uruguay Round Agreements Act (URAA) at 851-52

("{T}he Commission must examine other factors to ensure that it is not attributing injury from

other sources to the subject imports.").  That is exactly what the Commission did in this

investigation.

Plaintiff also assumes that every lost sale and every instance of underselling constitutes

substantial evidence of material injury by reason of subject imports.   Plaintiff attempts to [

] over the entire POI.  Pl. Br. at 30-31.   Even assuming this calculation

methodology is reasonable, Plaintiff assumes that every instance of underselling resulted in lost

revenue to the domestic industry caused by subject imports, an assumption which Plaintiff does

not support with any record evidence. Plaintiff also concludes that this amount is not minimal or

tangential but does not explain what it would consider minimal or tangential in a market where

total apparent U.S. consumption over the POI was over 3.7 billion dollars.  Final Staff Report

(CD 268, PD 165) at Table C-1 (CD 268, PD 165).

Aside from downplaying the declining demand experienced by the industry, Plaintiff has

to ignore significant record evidence in order to lay blame for the domestic industry's problems

on subject imports.  Plaintiff does not mention the fact that there was no correlation between the

increase in subject import market share at the end of the period and the domestic industry's

condition. Final Views (CD 279) at 74.  In fact, the condition of the domestic industry improved

at the same time that subject import market share increased in interim 2024:

> Moreover, the increase in cumulated subject import market share in interim 2024
> compared to interim 2023 did not prevent the domestic industry from increasing
> its unit net sales values by more than the increase in its unit COGS, causing a
> reduction in the industry's COGS to net sales ratio in interim 2024 compared to
> interim 2023.  This enabled the industry to improve its financial performance by
> almost every measure in interim 2024 relative to interim 2023.

Id.  Moreover, the increase in cumulated subject import market share in the first three months of

2024 was **[          ]** percentage points compared to the first three months of 2023.  Final Staff

Report (CD 268, PD 165) at Table C-1 (CD 268, PD 165). Likewise, subject imports declined

absolutely and relative to apparent U.S. consumption at the same time the industry's output and

financial indicators deteriorated from 2021 to 2023.  Id. at 72.

　　　　Plaintiff also does not mention the fact that the domestic industry and subject imports

were concentrated in different market segments. Specifically, the Commission found that

domestic producers' shipments were heavily concentrated to large customers, which buy in bulk,

while subject import shipments were heavily concentrated to small/medium customers, which

prefer case packs.  Final Views (CD 279) at 45.  The Commission also found that domestic

producers had higher minimum order requirements, which limited its ability to service small

customers.  Id. at 43.  As argued above, Plaintiff also does not mention the issue of the intra-

industry competition amongst domestic producers during the POI.

### D.  The Commission's Negative Threat Determination is Supported by Substantial Evidence and Otherwise in Accordance with Law

　　　　This industry has been subject to antidumping and countervailing duty investigations

twice since 2019. In both of those investigations, the Commission found that subject imports

were not causing material injury or threat of material injury to the domestic industry.  While the

earlier investigation had a broader scope and covered fewer countries, both investigations

covered wine and spirit bottles and, in both of the investigations, the Commission found that subject imports played a non-injurious and non-threatening role in the U.S. market.

The records of the investigations demonstrate that role of imports in the U.S. market remained consistent over both periods. In this investigation, as in the Glass Containers investigation, the Commission found predominant overselling by subject imports in the market for glass wine bottles and a paucity of confirmed lost sales. The Commission found in both investigations that the domestic industry and subject imports were concentrated in different market segments. Specifically, the Commission found that domestic producers' shipments were heavily concentrated on sales to large customers, which buy in bulk, while subject import shipments were heavily concentrated on sales to small/medium customers, which prefer case packs, and that U.S. producers had higher minimum order requirements. Final Views (CD 279) at 43 and 45. Approximately, three-quarters of domestic producer's sales were in bulk, while the vast majority of subject imports were sold in case packs. Id. at 45-46.

Given the consistent and noninjurious role served by subject imports over two periods of investigation and the lack of any evidence that these facts will change in the imminent future, there should be no reasonable expectation that subject imports will significantly increase their volumes, decrease their prices, or cause injury to the domestic industry in the imminent future.

Plaintiff's arguments are again based on cherry-picked pieces of record information, all of which the Commission considered. As argued in Defendant's response brief, based on a considerations of the entire record, the Commission reasonably concluded that subject imports would not become injurious in the imminent future. Def. Br. at 42-45.

## VII.    CONCLUSION

For the foregoing reasons, in conjunction with the arguments presented in Defendant's response brief and the other Defendant-Intervenors response briefs, we respectfully request that the Court deny Plaintiff's motion for judgement on the agency record and affirm the Commission's negative determination.

Respectfully submitted,

 /s/ Nithya Nagarajan
Nithya Nagarajan
Stephen W. Brophy
HUSCH BLACKWELL LLP
1801 Pennsylvania Avenue, NW,
Suite 1000
Washington, DC 20006
nithya.nagarajan@huschblackwell.com
stephen.brophy@huschblackwell.com
(202) 378-2409

*Counsel to TricorBraun, Inc.*

Dated: August 8, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(2), the undersigned certifies that this submission complies with the word limitation requirement.  The word count for this submission, as computed by Husch Blackwell's word processing system Microsoft Word, is  8,587 words.

/s/ Nithya Nagarajan
Nithya Nagarajan
HUSCH BLACKWELL LLP
1801 Pennsylvania Avenue, NW,
Suite 1000
Washington, DC 20006
nithya.nagarajan@huschblackwell.com
(202) 378-2409

*Counsel to TricorBraun, Inc.*

Dated: August 8, 2025