**NONCONFIDENTIAL VERSION**
**CONFIDENTIAL INFORMATION DELETED FROM BRACKETS**

UNITED STATES COURT OF INTERNATIONAL TRADE

NEW YORK, NEW YORK

BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

| | | |
|---|---|---|
| ———————————————— ) | | |
| U.S. GLASS PRODUCERS COALITION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Consol. Court No. 24-00199 |
| | ) | |
| UNITED STATES, | ) | **PUBLIC VERSION** |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BERLIN PACKAGING L.L.C., | ) | |
| TRICORBRAUN INC., ENCORE GLASS, INC. | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| ———————————————— ) | | |

### DEFENDANT-INTERVENOR BERLIN PACKAGING L.L.C.'S RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Jared R. Wessel
Michael G. Jacobson
Lyric E. Galvin

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: +1.202.637.6472

*Counsel to Berlin Packaging L.L.C.*

August 8, 2025

**NONCONFIDENTIAL VERSION**
**CONFIDENTIAL INFORMATION DELETED FROM BRACKETS**

# TABLE OF CONTENTS

I.      RULE 56.2 STATEMENT ......................................................................................1

II.     ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT ...................................2

III.    PROCEDURAL HISTORY.....................................................................................6

IV.     STANDARD OF REVIEW ....................................................................................7

V.      ARGUMENT ....................................................................................................9

      A.      The Commission's Price Effects Analysis is Supported by Substantial Evidence and in Accordance with Law ..................................................................................9

      B.      The Commission's Significant Adverse Impact Analysis is Supported by Substantial Evidence and in Accordance with Law...............................................15

      C.      The Commission's Threat Analysis is Supported by Substantial Evidence and in Accordance with Law ............................................................................................20

VI.     CONCLUSION..................................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) .............................................................................. 7, 8

*Goss Graphics Sys., Inc. v. United States,*
    22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1100 (1998),
    *aff'd,* 216 F.3d 1357 (Fed. Cir. 2000) ....................................................................... 8

*Nippon Steel Corp. v. United States,*
    337 F.3d 1373 (Fed. Cir. 2003) ................................................................................. 8

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) ................................................................................. 8

*Nucor Corp. v. United States,*
    28 CIT 188, 234, 318 F. Supp. 2d 1207 (2004) ......................................................... 9

*RHP Bearings Ltd. v. United States,*
    288 F.3d 1334 (Fed. Cir. 2002) ................................................................................. 8

*Timken U.S. Corp. v. United States,*
    421 F.3d 1350 (Fed. Cir. 2005) ................................................................................. 9

*U.S. Steel Grp. v. United States,*
    96 F.3d 1352 (Fed. Cir. 1996) ................................................................................... 8

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951) ................................................................................................... 8

*USEC Inc. v. United States,*
    34 F. App'x 725 (Fed. Cir. 2002) .............................................................................. 9

*Zhejiang DunAn Hetian Metal Co. v. United States,*
    652 F.3d 1333 (Fed. Cir. 2011) ................................................................................. 8

<u>**Statutes**</u>

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................................ 7, 8

19 U.S.C. § 1677(7)(F)(ii) ................................................................................................ 20

28 U.S.C. § 2639(a)(1) ....................................................................................................... 7

## <u>Other Authorities</u>

*Certain Glass Wine Bottles from Chile: Termination of Less-Than-Fair-Value Investigation*,
    89 Fed. Reg. 106,425 (Dec. 30, 2024) ...................................................................................... 22

*Glass Containers from China*,
    85 Fed. Reg. 39,932 (ITC July 2, 2020),
    and Accompanying Views,
    Inv. No. 731-TA-630 (Final), USITC Pub. 5068 (June 2020) .......................................... passim

Statement of Administrative Action accompanying the Uruguay Round Agreements Act,
    H.R. Rep. No. 103- 316, vol. I at 892 (1994) .......................................................................... 10

**DEFENDANT-INTERVENOR BERLIN PACKAGING L.L.C.'S**
**RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT**
**ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, Defendant-Intervenor Berlin Packaging L.L.C. ("Berlin") respectfully submits this response in opposition to the motion for judgment on the agency record filed by Plaintiff, U.S. Glass Producers Coalition ("U.S. GPC" or "Petitioner"). ECF No. 51, 52 ("Pl. Br."). Plaintiff challenges the U.S. International Trade Commission's ("ITC" or the "Commission") final negative determination in its investigation into glass wine bottles from China. *See Glass Wine Bottles from China*, 89 Fed. Reg. 83,515 (Int'l Trade Comm'n Oct. 16, 2024). Specifically, Plaintiff challenges the Commission's price effects analysis, determination that there was no adverse impact by reason of subject imports, and threat analysis.

For the reasons set forth below and consistent with the arguments presented by the Commission in its July 25, 2025 response brief, Plaintiff's contentions are without merit and should be rejected. ECF No. 60, 61 ("Def. Br."). The Commission's final negative determination is supported by substantial evidence and lawful. Accordingly, Plaintiff's motion for judgment on the agency record should be denied and judgment should be entered in favor of Defendant.

## I.     RULE 56.2 STATEMENT

The U.S. GPC contests certain aspects of the ITC's final negative determination in its investigation into glass wine bottles from China, published October 16, 2024. *See Glass Wine Bottles from China*, 89 Fed. Reg. 83,515 (Int'l Trade Comm'n Oct. 16, 2024) ("Final

Determination") (P.R. 187, 188).[1]  The Commission's Public Views and Final Staff Report were released on October 9, 2024.  *Glass Wine Bottles from China*, Inv. Nos. 701-TA-703, USITC Pub. 5550 (Oct. 2024) ("Views") (P.R. 184) (C.R. 279); *see also* confidential final staff report ("Final Staff Report") (C.R. 268).  The Commission's period of investigation ("POI") was January 2021 through March 2024 ("interim 2024").

## II.    ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT

### 1.    The Commission's Price Effects Analysis was Supported by Substantial Evidence and Otherwise in Accordance with Law

The Commission correctly found that subject imports did not significantly undersell the domestic like product, nor had they depressed or suppressed prices for the domestic like product to a significant degree.  Berlin expands on the Commission's arguments to present the Court with more context and detail pertaining to why Plaintiff's price effects arguments must be rejected, and why the Commission's conclusion is supported by substantial evidence and otherwise in accordance with law.

The Commission clearly explains that the pricing product data demonstrated significant overselling by subject imports.  However, it is also important for the Court to understand that the data demonstrated significant overselling by subject imports regardless of Petitioner's multiple failed attempts to curate the record to the contrary.  Not only did Petitioner bring this case just a few years after it brought a very similar case on *Glass Containers from China* that it also lost (in which it could not establish underselling) but Petitioner also persuaded the Commission to collect different data at the final stage to curate more favorable pricing products

---

[1]     References to public and confidential documents in the administrative record for this appeal are identified as "P.R." and "C.R.," respectively.

after failing to show underselling at the preliminary stage. In fact, Petitioner successfully persuaded the Commission to alter the questionnaires for the final stage, resulting in the Commission collecting pricing product data for both bulk and case packaging products and altering the specific pricing product definitions. Still, the data show significant overselling— including in the very pricing products Petitioner requested.

These data showing overwhelming overselling are further bolstered by purchase cost data, shipment data, and lost sales or lost revenues data, all of which also evidence a lack of significant underselling by subject imports. Thus, regardless of which data the Commission look at (including Petitioner's proposed data), there is simply no evidence of significant underselling on this record.

Finally, there is no price depression or suppression, with prices rising during the POI, and the COGS to net sales ratio improving. There is also a dearth of evidence of correlation between domestic performance and prices and subject imports, amidst evidence of intra-industry competition causing domestic pricing pressures rather than subject imports serving a fundamentally different customer base than domestic producers.

2. **The Commission's Determination That There Was No Adverse Impact by Reason of Subject Imports was Supported by Substantial Evidence and Otherwise in Accordance with Law**

The Commission correctly found that there was no adverse impact on the domestic industry by reason of subject imports. Berlin expands on the Commission's arguments to present to the Court more context pertaining to why Plaintiff's adverse impact arguments must be rejected, and why the Commission's conclusion is supported by substantial evidence and otherwise in accordance with law.

First, there is simply no causal link between subject imports and domestic industry performance during the POI.  Subject imports lost market share during the POI amidst domestic industry performance declines. Then, when subject import market share improved in interim 2024, domestic industry performance improved.  This all occurred as prices continued to rise throughout the POI.

Moreover, the Court must consider the conditions of competition in this case, most importantly that there is a substantial lack of overlap in competition between domestic and imported wine bottles.  Subject imports serve customers that the domestic industry cannot or will not serve: small and medium sized wineries that cannot purchase from domestic producers that command high minimum order quantity requirements, must receive bottles in case packaging when domestic producers largely sell in bulk packaging, and require just-in-time delivery when domestic producers cannot shift production runs for more bespoke bottles on short timelines. These are all requirements that subject importers meet, but that the domestic producers cannot. Instead, the three large domestic producers are competing with each other for the small number of largest customers, while subject imports continue to serve the long tail of small and medium sized wineries.  This segmentation in customer bases causes the domestic industry to largely be unimpacted by subject import competition.

Finally, there is evidence on the record that there are alternative causes for domestic producers' poor performance during the POI, including underinvestment in aging facilities, corresponding inefficiencies in their plants, a lack of sufficient automation, and the overall inability to provide customers their required flexibility, service, and quality.

For all of the foregoing reasons, the Commission's finding that subject imports did not cause adverse impact to the domestic industry is reasonable and supported by substantial evidence.

**3.      The Commission's Threat Analysis Was Supported by Substantial Evidence and Otherwise in Accordance with Law**

The Commission correctly found that the domestic industry is not threatened with material injury by reason of subject imports.  Berlin endorses the Commission's arguments contained in its brief, and provides some additional context and detail as to why the domestic industry is not threatened with material injury by reason of subject imports based on the record before the Commission.  Fundamentally, the conditions of competition and data present during the Commission's POI is not likely to change in the imminent future, and thus non-injurious subject imports are also non-threatening.

First, there is a lack of competitive overlap between subject imports and the domestic industry – and thus there can be no threat of material injury.  Subject import market shares, although increasing slightly in interim 2024, remained lower than they were at the beginning of the POI, thus further demonstrating a lack of threat to the domestic industry.  Subject import price effects similarly show significant overselling and no correlation between subject imports and domestic industry performance.  Furthermore, the Commission considered very similar circumstances in the *Glass Containers from China* case, in which it concluded that there is no threat to the domestic industry because there are no likely volume or price effects, there is a lack of competition between subject imports and the domestic industry, and declining demand and intra-industry competition explain any harm experienced by the domestic industry, rather than subject imports.  The Commission reasonably drew the same conclusion here.  Finally, both participating domestic producers, Ardagh and O-I, publicly demonstrated their optimism for the

future of the domestic industry, thereby undermining Petitioner's claims that subject imports are threatening the industry.

## III.    PROCEDURAL HISTORY

On December 29, 2023, Plaintiff "U.S. Glass Producers Coalition," a coalition led by Ardagh Glass Inc., filed its Petitions in this case alleging material injury and threat thereof to the U.S. glass wine bottle industry by reason of imports of a particular type of glass wine bottles (740-760 ml with particular dimensions) from Chile, China, and Mexico. However, the Court should note that the procedural history of this case goes back several years prior.

In September 2019, a different coalition called the "American Glass Packaging Coalition," also led by Ardagh Glass Inc., filed petitions alleging material injury and threat thereof to the U.S. glass packaging industry by reason of a much broader set of imports of glass containers solely from China. *See* Final Staff Report at I-5 (C.R. 268). The Commission made unanimous negative (5-0) determinations in that case in two separate determinations, first on the CVD case on July 2, 2020, and second on the AD case on September 18, 2020. *Id.* The reason that two separate determinations were required in that case was that Petitioner did not agree to align and extend the CVD and AD cases despite full respondent participation, causing a split final stage proceeding before the Commission.

The procedural history in the present case has many of the hallmarks of *Glass Containers from China*, 85 Fed. Reg. 39,932 (ITC July 2, 2020), and Accompanying Views, Inv. No. 731-TA-630 (Final), USITC Pub. 5068 (June 2020) ("*Glass Containers from China*, Views"). Both cases involved glass containers from China, Petitioners' choice not to extend and align the AD and CVD cases involving China despite full respondent participation thereby splitting the ITC final stage into two stages, and many common key facts and trends in the data in a market that

has not fundamentally changed in just a few intervening years. And like in the *Glass Containers from China* case, the Commission made a unanimous negative determination in both segments, on the basis of similar reasoning under similar facts.

There are, however, some key differences in the procedural histories of both cases. For one, in the present case, Plaintiff employed a last ditch effort after losing the CVD case to manipulate the data in the AD case by voluntarily dismissing the Petitions on Chile, after vociferously arguing throughout the proceeding that imports from Chile were a cause of injury and threat. This is why we have an unusual circumstance here, where the present appeal involved a record involving Chile, China, and Mexico despite only covering the China CVD case, whereas the trailing appeal involves only China and Mexico covering those AD cases. For another, Ardagh and its prior coalition did not appeal the *Glass Containers from China* negative determinations, but Ardagh and its new coalition have chosen to appeal both of the determinations in these *Glass Wine Bottles* proceedings.

We incorporate by reference the procedural history as further detailed by the ITC in its brief.

## IV.    STANDARD OF REVIEW

This Court must sustain any determination, finding, or conclusion found by an agency that is supported by "substantial evidence on the record" and is otherwise "in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1037 (Fed. Cir. 1996). The Commission's determinations are "presumed to be correct. The burden of proving otherwise shall rest upon the part challenging such decision." 28 U.S.C. § 2639(a)(1). "A party challenging the Commission's determination under the substantial evidence standard

'has chosen a course with a high barrier to reversal.'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

The substantial evidence standard requires "such relevant evidence as a reasonable mind might accept to support a conclusion." *Fujitsu Gen. Ltd.*, 88 F.3d at 1044; *see also* 19 U.S.C. § 1516a(b)(1)(B)(i); *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011) (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003)). Under the substantial evidence standard, a Court may not, "even as to matters not requiring expertise … displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) at 488.

Additionally, this Court shall only hold unlawful an agency action found to be arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. An agency action is not is arbitrary and capricious when the agency provides sufficient reasons for "treating similar situations differently." *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (internal quotations removed). Moreover, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996); *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350 (Fed. Cir. 2006). Accordingly, the Commission has "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis." *Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1100 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000).

Furthermore, since the Commission "'is presumed to have considered all of the evidence on the record,'" it is "'not required to explicitly address every piece of evidence presented by the parties'" during an investigation. *Nucor Corp. v. United States*, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004) (quoting *USEC Inc. v. United States*, 34 F. App'x 725, 731 (Fed. Cir. 2002)). Instead, the Commission need only address the "issues material to {its} determination" so that the "path of the agency may reasonably be discerned." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103- 316, vol. I at 892 (1994) ("SAA"); *see also Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354–57 (Fed. Cir. 2005).

## V.    ARGUMENT

For the following reasons, the Court should reject Plaintiff's arguments and affirm the Commission's negative determination.

### A.  The Commission's Price Effects Analysis is Supported by Substantial Evidence and in Accordance with Law

The Commission correctly found that subject imports did not significantly undersell the domestic like product, nor had they depressed or suppressed prices for the domestic like product to a significant degree. Views at 49 (P.R. 184), 65 (C.R. 279). We endorse and incorporate by reference the Commission's arguments on price effects, Def. Br. at 17–34, and provide below some additional context.

1. **The Commission's Pricing Products Showed Significant Overselling by Subject Imports, Even Using Petitioner's Requested Data**

Petitioner tried multiple times to curate this record so that it would show subject import underselling, and failed. Notably, Petitioner's unsuccessful attempts to create a favorable record before the Commission are reminiscent of the *Glass Containers from China* petitioner's several ex post efforts to explain away or even change the record data demonstrating significant overselling. *Glass Containers from China*, Views at n. 126, n. 128, n. 129, n. 131, n. 132, n. 135. These unsuccessful attempts to influence the record are also prophetic of Petitioner's attempts in this case to procure different record data, explain away unfavorable data, and then to take the extraordinary step to manipulate the record data by terminating the antidumping investigation of glass wine bottles from Chile at the eleventh hour.

At the Preliminary Stage, the data demonstrated that cumulated subject imports oversold the domestic like product in 65 out of 74 quarterly comparisons, or 87.8 percent of the time, with overselling margins averaging 101.6 percent, and ranging up to 202 percent. *Glass Wine Bottles from Chile, China, and Mexico*, Inv. Nos. 701-TA-703 and 731-TA-1661-1663 (Preliminary), USITC Pub. 5493 (Feb. 2024) ("Preliminary Views") at 40–41 (P.R. 91). Average unit values of U.S. shipments of subject imports also exceeded those of the domestic like product. *Id*. (P.R. 91).

Given that these data overwhelmingly supported a finding of overselling, Petitioner submitted extensive comments on the Commission's draft questionnaires before the final stage of this case to seek new data. Letter from Buchanan Ingersoll & Rooney to the International Trade Commission, *Comments on Draft Questionnaires*, Inv. Nos 701-TA-703 and 731-TA-1661-1663 (Final) (Apr. 22, 2024) (P.R. 106) (C.R. 83–84). Included in these comments are Petitioner's claims that the preliminary stage pricing data captured sales by distributors, but did

not reflect prices of imports purchased by importers. *Id*. (P.R. 106) (C.R. 83–84). Accordingly, Petitioner requested that the Commission collect purchase cost data of the distributors by both bulk and case pack to achieve what Petitioner asserted would create an apples-to-apples comparison in the data. *Id*. (P.R. 106) (C.R. 83–84).

The Commission accepted the majority of Petitioner's proposed pricing products in its final stage questionnaires, while rejecting most of the pricing product requests that had been made by respondents.[2] *See* Memorandum from the International Trade Commission, *Blank Questionnaires – U.S. Producer, U.S. Importer, U.S. Purchaser, and Foreign Producer/Exporter (Final Phase)*, Inv. Nos. 701-TA-703 and 731-TA-1661-1663 (June 17, 2024) (P.R. 110). In particular, the Commission adopted Petitioner's additional proposed bulk packed pricing products as products 6-8 to address its apples-to-apples comparison concerns, and revised its approach to case packed bottles to largely align with Petitioner's request. *See id*.

In the Final Stage data, the pricing products demonstrated overwhelming overselling – including for Petitioner's chosen pricing products 6, 7, and 8, the purchase cost data. *See* Views at 38–39 (P.R. 184), 51–52 (C.R. 279); Final Staff Report at Tbl. V-14 (C.R. 268). Petitioner asserts that Pricing Products 6-8 showed increased underselling at the end of the POI, regardless of the predominant overselling throughout the POI. *See* Pl. Br. at 9. However, when (correctly) adjusted for additional costs of importing as compared to buying domestically, Products 6-8 comparisons show [                                                                                    ].

---

[2]     The Commission's final pricing products integrated most of Petitioner's weight requests, removal of the type of finish, and addition of the type of packing (e.g., corrugated, white, 12-bottle carton). *See* Memorandum from the International Trade Commission, *Blank Questionnaires – U.S. Producer, U.S. Importer, U.S. Purchaser, and Foreign Producer/Exporter (Final Phase)*, Inv. Nos. 701-TA-703 and 731-TA-1661-1663 (June 17, 2024) (P.R. 110).

*See* Letter from Hogan Lovells US LLP to the Commission, *Pre-Hearing Brief of Berlin Packaging LLC*, Inv. Nos. 701-TA-703, 731-TA-1661-1663 (Aug. 8, 2024) ("Berlin Pre-Hearing Br.") (P.R. 138) (C.R. 224) at 54, Exh. 2. Furthermore, any minor decrease in overselling in Products 6-8 toward the end of the POI that Petitioner points to coincided with *increased* domestic producer pricing and *improved* financial performance. *See* Final Staff Report at Tbl. C-1 (C.R. 268). In sum, despite Petitioner's best efforts, the final stage data ***still*** show overwhelming overselling irrespective of whether the Commission looks at case pack, bulk pack, sales, or purchase cost data.

## 2. The Commission's Finding of Overselling Was Supported By Overwhelming Record Evidence

Further to the Commission's arguments on this point, we would like to highlight the overwhelming record evidence supporting the Commission's determination. First, the Commission reasonably found that where subject imports oversold the domestic like product in 93.7 percent of quarterly comparisons, with high margins averaging 43.8 percent and ranging to up to 146.2 percent, there was no evidence of significant subject import underselling during the POI. *See* Views at 38 (P.R. 184), 51 (C.R. 279); Final Staff Report at Tbl. V-14 (C.R. 268). There was also predominant overselling by quantity. *Id*. (P.R. 184) (C.R. 268, 279).

Second, that the Commission's conclusion was supported by substantial evidence is further demonstrated by the purchase cost data (demonstrating 55.7 percent quarterly overselling), Views at 39 (P.R. 184), 52 (C.R. 279); *see also* Final Staff Report at Tbl. V-17 (C.R. 268), and shipment data (demonstrating AUVs of subject imports higher than AUVs of domestic like product throughout the POI). Views at 41–42 (P.R. 184), 56 (C.R. 279); Final Staff Report at Tbl. C-1 (C.R. 268).

Third, there were **[          ]** lost sales or lost revenues on the record. Lost revenues

amounted to just **[     ]** percent of the U.S. producers' commercial shipments over the period.

Views at 40, n. 216 (P.R. 184), 53–54, n. 216 (C.R. 279); Final Staff Report at Tbl. V-20-21

(C.R. 268). If, as Petitioner claims, there were concerns with the pricing product scope, Pl. Br.

at 6, the record would have demonstrated underselling in other ways—including through

significant lost sales. But instead, every metric overwhelmingly points away from subject import

underselling.

In an unsuccessful attempt to counter this wealth of evidence against underselling on the

record, including the **[          ]** lost sales and lost revenues, Plaintiff points the Court to

contemporaneous business documentation and suggests that it should consider frequency of lost

sales in absolute, rather than relative terms. Pl. Br. at 17–20. Plaintiff's selected

contemporaneous business documentation **[**

**]** is simply not sufficient to outweigh the pricing product, purchase cost,

shipment, or lost sales and lost revenues data on the record. *See id*. Furthermore, the

Commission appropriately considered the frequency of affirmative lost sales responses in the

context of the total lost sales responses, considering that 29 of 37 responding purchasers did not

report that price was a primary reason for the decision to purchase imported rather than U.S.

product. Final Staff Report at V-39 (C.R. 268).

> **3. There is No Evidence of Price Depression on the Record, and the Commission's Determination of a Lack of Significant Price Suppression is Supported by Substantial Evidence**

Petitioner claims in its brief that "an inventory overhang in the market both increased

costs for the domestic industry and *depressed* prices in the market." Pl. Br. at 38 (emphasis

added). Petitioner is mistaken. This record is clear and uncontroverted that there is no price

depression as the domestic producers' prices consistently rose during the POI. Views at 45 (P.R.

184), 60–61 (C.R. 279).    Moreover, as the Commission explained, inventories of subject merchandise declined over the POI.  *See* Views at 48 (P.R. 184), 64–65 (C.R. 279).

Furthermore, the record evidence reasonably supports a finding of no significant price suppression.  Petitioner argues that because there is evidence that costs increased more than prices during the POI there is suppression.[3]  *See* Pl. Br. at 20.  This argument fails for two reasons.  First, the Commission has already looked at a very similar record as the record in this case and made the determination that there was no price suppression. In *Glass Containers from China*, the Commission found that "the increase in COGS to net sales does not appear correlated with subject import pricing given the prevalent overselling by subject imports in the pricing data, as well as continued increases in the domestic industry's COGS to net sales ratio even as subject import volumes declined in 2019."  *Glass Containers from China*, Views at 31.  Where, as is the case just like in *Glass Containers from China*, the COGS to net sales ratio increases slightly during the POI, but subject imports decrease in both volume and market share during the same time and there is prevalent overselling, declining demand is to blame, rather than subject imports.

Second, as the Commission explained clearly, [



].[4]  Views

---

[3]     Plaintiff also notes that the Commission did not consider that the U.S. industry as a whole lost market share *in the merchant market* from 2022 to 2023, and again in 2024.  Pl. Br. at 20, n. 5.  Plaintiff is erroneously pointing the Court to the merchant market data when the Commission correctly found that one of the captive production provisions was not satisfied in this investigation, which Plaintiff does not contest.

[4]     Notably, Ardagh has admitted publicly that it has problems on the cost side of the ledger. Ardagh explained to shareholders that it is focusing its efforts on "cost reduction and operational efficiency."  Berlin Pre-Hearing Br. at 62 (P.R. 138) (C.R. 224).  Furthermore, Ardagh has had

at 47, n. 248 (P.R. 184), 63, n. 248 (C.R. 279).  The Commission also addressed this issue in *Glass Containers from China*, explaining that the declining performance of one U.S. producer in the wine market stemmed from reasons other than imports, and in particular that increased other factory costs was the cause of those problems.  *Glass Containers from China*, Views at 36.  Notably, the lead Petitioner company in *Glass Containers from China* is the same as in this case, and it did not appeal the Commission's *Glass Containers from China* determination.

Accordingly, the COGS to net sales ratio in this case simply does not demonstrate industry-wide price suppression caused by subject imports.  The Commission's same conclusion was therefore reasonable.

## B. The Commission's Significant Adverse Impact Analysis is Supported by Substantial Evidence and in Accordance with Law

The Commission correctly found that subject imports did not significantly adversely impact the domestic industry.  Views at 55–56 (P.R. 184), 76 (C.R. 279).  This finding is in accord with U.S. law, the Commission's practice, and supported by substantial evidence.  We endorse and incorporate by reference the Commission's arguments on adverse impact, Def. Br. at 35–42, and provide below some additional context and detail.

### 1. There is No Causation Between Subject Imports and Domestic Industry Performance

As the Commission has explained, and we think it is important to emphasize, there is simply no causal link between subject imports and any adverse impact to the domestic industry.  *See* Def. Br. at 35–41.  In particular, the domestic industry gained market share amidst sharply

---

problems in its Pacific Northwest wine segment, in particular through major cuts in wine production by its very large customer Chateau Ste. Michelle Winery, as well as issues related to its facility.  Berlin Pre-Hearing Br. at 62-63 (P.R. 138) (C.R. 224).

increasing prices during the POI. *See* Views at 35–36, 45, 53 (P.R. 184), 48–49, 61, 72 (C.R. 279). Furthermore, subject imports declined in market share relative to apparent consumption while domestic industry performance declined from 2021 to 2023, and then when domestic industry performance improved in interim 2024, subject import market share also improved. *See* Views at 51, 53, 54 (P.R. 184), 69, 72, 74 (C.R. 279). This is the opposite of the trends that one would expect if subject imports were causing injury. The Commission is obligated to assess trends and correlations for adverse impact—and this record is simply devoid of any evidence connecting subject imports as a cause for the domestic industry's poor performance. Furthermore, Plaintiffs have the burden of demonstrating that subject imports are the cause of any adverse impact, and they have failed to do so in this case.

Plaintiff also erroneously claims that the domestic industry entered the POI in an injured state. However, the Commission in 2019 made a finding in *Glass Containers from China* (which covered a nearly identical domestic industry and set of domestic producers) that there had been no harm to the domestic industry by reason of subject imports. *Glass Containers from China*, Views at 3. This finding was made just prior to the beginning of the POI here, demonstrating that the industry did not, in fact, enter the POI in an injured state.[5] Furthermore, the Commission also determined based on the record in the preliminary phase that the record demonstrated that subject imports both pervasively oversold and did not gain market share form the domestic industry. *See* Views at 54–55 (P.R. 184), 74–75 (C.R. 279) (citing Preliminary Phase Staff

---

[5] Ardagh in this case was also a petitioning company in the *Glass Containers from China* case, and did not appeal that determination by the Commission that there was no injury or threat of injury to the domestic industry as of 2019.

Report at Tables C-1 and V-12).  There is simply no evidence of the domestic industry entering the POI in an injured state.

### 2. There is a Lack of Competitive Overlap Between Subject Imports and the Domestic Industry

One of the reasons for the lack of causation in this case is the substantial lack of overlap in competition between domestic wine bottles and imported wine bottles.  Subject imports are a stable presence in the market that mostly serve customers that the domestic industry cannot or will not serve—*i.e.*, small and medium sized wineries that cannot get the product they need from the domestic industry due to high minimum order quantities ("MOQs"), the need to receive bottles in case packs, and just-in-time delivery.  *See* Berlin Pre-Hearing Br. at 33–35 (P.R. 138) (C.R. 224); Letter from Hogan Lovells US LLP to the Commission, *Post-Hearing Brief of Berlin Packaging LLC,* Inv. Nos. 701-TA-703, 731-TA-1661-1663 (Aug. 23, 2024) ("Berlin Post-Hearing Br.") (P.R. 153) (C.R. 250) at 2, Exh. 1.

In 2023, the domestic industry sold **[      ]** percent of their shipments to "large" wineries, defined as the 39 largest wineries.  Final Staff Report at Tbl. II-1 (C.R. 268).  The domestic industry's sales are particularly concentrated in the top 10 largest wineries within the "large" category, as this small group of winery companies commands more than 70 percent of wine production in California, the leading state for wine production in the United States.  *See* Berlin Pre-Hearing Br. at 23, Exh. 3, **[**

**]**;

*Largest Wineries*, Wine Business Monthly (Feb. 2023) (P.R. 138) (C.R. 224).  *The Final Staff Report* demonstrated that there is no overlap between subject U.S. importers'[6] top 10 customers

---

[6]  Limited to those that reported pricing product data in products 1-5, case pack shipments.

and U.S. producers' top 10 customers in **[      ]** percent of comparisons. *See* Final Staff Report at Tbl. IV-14 (C.R. 268). This is because the U.S. producers' top 10 customers are mostly the very largest wineries that subject imports have minimal ability or opportunity to serve—in particular because subject imports cannot compete with U.S. producers' low prices to customers that meet their MOQs.

Berlin has provided ample record evidence demonstrating that Berlin's customers requested certain bottles from domestic producers that those domestic producers refused to supply. *See* Berlin Post-Hearing Br. at Exh. 1. Furthermore, **[      ]** percent of Berlin's sales of wine bottles are custom, bespoke products. *See* Berlin Post-Hearing Br. at Responses to Commissioner Questions #8, Exh. 1 (P.R. 153) (C.R. 250). These differing views of the nature of the U.S. market prove our point—domestic producers and subject imports are serving fundamentally different parts of the market and have very different experiences on this basis.

### 3. The Record Demonstrates Alternative Reasons for Domestic Producers' Poor Performance During the POI

The record contains evidence of multiple alternative explanations for the domestic industry's problems that make a lot more sense than Petitioner's attempts at showing price-based competition with subject imports that simply does not exist. As explained by a former senior executive of both Ardagh and O-I, the domestic industry's problems are due to their underinvestment in aging facilities, corresponding inefficiencies in their plants, and lack of sufficient automation, and the overall inability to provide customers their required flexibility, service, and quality. Berlin Post-Hearing Br. at Exh. 2, Declaration of Jorge Ivan Hernandez Uribe, Director of Pavisa (P.R. 153) (C.R. 250). For example, Ardagh's very old Seattle plant has been plagued with environmental problems at the same time that top Ardagh customer (Chateau Ste. Michelle) halved wine production in the Pacific Northwest for reasons unrelated

to subject imports.  *See* Berlin Post-Hearing Br. at Responses to Commissioner Questions #9 (P.R. 153) (C.R. 250).  As Berlin outlined in its post-hearing brief, in addition to losing volume from an important customer from its Seattle facility, Ardagh also faced certain costs due to contractual agreement with the county government for lowering emissions and retooling its furnace if it did not shut down when it did.  *See* Berlin Post-Hearing Br. at Responses to Commissioner Questions #9 (P.R. 153) (C.R. 250).  This is what caused Ardagh's corporate decision to idle or shut down production—not subject imports.

Moreover, and as discussed above and in the Commission's brief, intra-industry competition amongst the small group of large domestic producers for sales to a limited number of large customers is another explanation for certain domestic producers' weaker performance during the POI.  The domestic industry's [

]. *See* Final Staff Report at Tbl. VI-5 (C.R. 268).  In fact, [

]. *See* Final Staff Report at VI-17 (C.R. 268); *See* U.S. Producers' Questionnaire Response of Gallo at II-3a, II-3d, III-9a, III-9j, IV-21 (C.R. 122); Gallo Correspondence with ITC staff dated July 15, 2024 (C.R. 155) ( [

]).

## C. The Commission's Threat Analysis is Supported by Substantial Evidence and in Accordance with Law

The Commission correctly found that the domestic industry is not threatened with material injury by reason of subject imports. Views at 65 (P.R. 184), 89 (C.R. 279). This finding is in accord with U.S. law, consistent with the Commission's practice, and supported by substantial evidence. The Commission's governing statute on threat, Section 771(7)(F) of the Tariff Act, directs the Commission to determine whether the U.S. industry is threatened with material injury by reason of subject imports by analyzing whether "further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued or a suspension agreement is accepted." 19 U.S.C. § 1677(7)(F)(ii). The Commission must consider the statutory threat factors "as a whole" in making its determination. We endorse and incorporate by reference the Commission's arguments on threat, Def. Br. at 42–45, and provide below some additional context.

As an initial matter, for the purposes of its threat determination, the Commission *agreed with the Petitioner* and cumulated subject imports from China, Chile, and Mexico, contrary to the arguments of respondents Berlin Packaging, TricorBraun, and Saverglass. Views at 58 (P.R. 184), 79–80 (C.R. 279). And even with relying upon Petitioner's preferred data using cumulated

imports, the Commission *still* found that cumulated subject imports did not threaten the domestic industry with material injury. Views at 65 (P.R. 184), 89 (C.R. 279).[7]

Moreover, as discussed above, subject imports rarely compete with the domestic producers, because domestic producers serve the largest wineries in bulk packaging, whereas subject imports serve small and medium sized wineries in case packaging. The small to medium sized wineries simply cannot buy from the domestic producers on many occasions because they must purchase wine in case packaging form (that domestic producers often do not sell) and because they want custom designs that do not fit the domestic industry's high-volume runs of common bottles. For this reason alone, there can be no threat of material injury by reason of subject imports to the domestic industry—subject imports and domestic production are simply not competitive products. *See* Berlin Pre-Hearing Br. at 33–35 (P.R. 138) (C.R. 224); Berlin Post-Hearing Br. at 2, Exh. 1 (P.R. 153) (C.R. 250).

Indeed, in *Glass Containers from China*, the Commission correctly found that subject import volumes were unlikely to imminently increase, the lack of significant price effects from 2017 to 2019 were likely to continue in the imminent future, and the lack of significant overlap in competition due to different customer bases demonstrated that the domestic industry's market share losses were unrelated to subject imports, but instead were the result of declining demand. *See Glass Containers from China*, Views at 39–44. The Commission's threat determination in this case mirrors the precedent set in *Glass Containers from China*: there are no likely volume or price effects, there is a lack of competition between subject imports and the domestic product,

---

[7]     Notably, Petitioner then paradoxically voluntarily dismissed the case on Chile after arguing for cumulation for threat to include Chile. *See Certain Glass Wine Bottles from Chile: Termination of Less-Than-Fair-Value Investigation*, 89 Fed. Reg. 106,425 (Dec. 30, 2024).

and declining demand and intra-industry competition or failures explains any harm to the domestic industry, rather than subject imports. The Commission's analysis in *Glass Containers from China* proved correct – there has been no subsequent injury by subject imports in the years since the POI – and therefore its application of this same analysis to the present case is not only reasonable, but has indeed already been borne out.

### 1. Likely Volume Effects Do Not Suggest That Subject Imports Will Threaten the Domestic Industry

Petitioner incorrectly asserts that because subject import market share was increasing at the end of the POI, the Commission should have found that cumulated subject import trends indicated a likelihood of a significant increase in cumulated subject imports in the imminent future absent relief. *See* Pl. Br. at 34–41. As an initial matter, Petitioner provides volume evidence beginning in 2022, completely ignoring 2021, the first year of the POI. *See* Pl. Br. at 35. As the record demonstrates, subject import market share was 24 percent in 2021, and declined to 21.1 percent in 2022, before increasing slightly to 22.2 percent in 2023, and 23.5 percent in interim 2024. Final Staff Report at IV-31 (C.R. 268). Thus, the increasing market share that Petitioner points to as threatening is untrue across the entire POI, and in fact still lower than the market share at the beginning of the POI. As the Commission reasonably explained, this minor increase in market share simply reflects a reversal of the "long-term downward trend" in the volume of subject imports that occurred from 2021 to 2023. Views at 59, n. 307 (P.R. 187), 80–81, n. 307 (C.R. 279). Absolute volumes of subject imports also declined 20.6 percent between 2021 and 2023. Final Staff Report at IV-3 (C.R. 268). All of these declines occurred before the Petition was even filed, which further suggests that these trends are not representative of an imminent increase in shipments to the U.S. market, and further supports the reasonableness of the Commission's determination.

**2. Likely Price Effects Do Not Suggest That Subject Imports Will Threaten the Domestic Industry**

Furthermore, regarding Petitioner's likely price effects arguments, the pricing data demonstrate that subject imports from Mexico have the highest prices, and they accounted for most of the increase in subject import market share in interim 2024 compared to interim 2023. Views at 54 (P.R. 184), 73 (C.R. 279). Petitioner also requests that the Commission assess a likelihood of a cost-price squeeze for the purposes of its threat analysis *only* on an absolute basis, Pl. Br. at 37, ignoring that the Commission found that the domestic industry's COGS to net sales declined from interim 2023 to 2024. Views at 54 (P.R. 184), 74 (C.R. 279). There is simply no correlation that Petitioner can point to between subject import prices and the likelihood of threat to the domestic industry, and it was therefore reasonable for the Commission to find no likelihood of negative price effects by reason of subject imports – regardless of Petitioner's claims.

**3. Inventories Do Not Evidence a Likelihood of Threat of Material Injury to the Domestic Industry**

Petitioner also points to inventories as posing a significant threat to the domestic industry. Pl. Br. at 38–39. However, inventories of subject imports to import shipments have **[         ]** since 2022. Final Staff Report at VII-28 (C.R. 268). This does not suggest that inventories are threatening the domestic industry as destocking is clearly occurring post-pandemic. Furthermore, that U.S. producers' inventories have grown over the POI is merely demonstrative of the domestic industries issues (including intra-industry competition), rather than subject imports. *See* Final Staff Report at III-19 (C.R. 268).

### 4. Record Evidence Demonstrates That Petitioner's Claims of Facility Closures and Curtailments Are Unrelated to Subject Imports

Finally, contrary to Petitioner's claims about continued closures and curtailments to domestic production and the likelihood of adverse impact by reason of subject imports, the Commission reasonably considered all of the evidence on the record, including evidence that the domestic industry is optimistic for the future. Petitioner attempts to portray the record as clearly demonstrating that Ardagh's Seattle plant closure was due to subject imports—but there was ample evidence to the contrary. As explained above, in addition to losing significant demand from an important customer from its Seattle facility (for reasons other than subject imports), Ardagh also faced certain costs due to a contractual agreement with the county government for lowering emissions and retooling its furnace if it did not shut down when it did. *See* Berlin Post-Hearing Br. at 23 (P.R. 153) (C.R. 250). Not only is the record replete with other reasons for the Commission's poor performance during the POI, but the domestic producers themselves have in fact voiced optimism for the future of their industry: Ardagh in a Q1 2024 earnings call predicted a 5-10 percent increase in EDITDA alongside increasing demand, and O-I demonstrated improvement from Q1 to Q2 2024 and predicted further improvement in the second half of 2024. O-I explained that the wine segment is "generally consistent with consumer consumption trends" which "are improving." *See* Berlin Pre-Hearing Br. at 70, Exh. 4 (P.R. 138) (C.R. 224). The Commission's threat determination was therefore reasonable and supported by substantial evidence.

### 5. Petitioner's Conditions of Competition Do Not Evidence A Likelihood of Threat to the Domestic Industry

Finally, Petitioner points to six specific pieces of record evidence that, according to them, would cause cumulated subject imports to become injurious in the imminent future. Pl. Br. at 40–41. While we agree with the Commission that it need not specifically have addressed each

of Petitioner's bullet points, as it is presumed to have considered all evidence in the record, Def. Br. at 44–45, we address for the Court below why Petitioner's evidence is not compelling.

First, Petitioner claims that a major Chilean producer paused exports due to a fire and resolved its production problems, posing a threat to the domestic industry. Pl. Br. at 40. As explained by Berlin at the hearing, the fire at Cristal Chile's plant in 2022 had ***no*** impact on wine bottle production or shipments to the U.S. market. *See* Berlin Post-Hearing Br. at Responses to Commission Questions #10 (citing Hearing Tr. at 275 (Mr. Azevedo)) (P.R. 153) (C.R. 250). Thus, the plant's recovery similarly will have no impact on wine bottle production or shipments to the U.S. market. Moreover, the record demonstrates that reported arranged imports from Chile are **[     ]**, and projected to continue to **[          ]** in 2025. Final Staff Report at Tbl. VII-10 (C.R. 168). The Chilean fire (and resuming production) accordingly does not threaten the U.S. industry.

Second, Petitioner argues that the Seattle plant closure is a new condition of competition that makes the industry vulnerable. Pl. Br. at 40. Berlin has repeatedly addressed throughout this brief that there is ample record evidence that the Seattle plant closure was not caused by subject imports. *See e.g.*, Berlin Post-Hearing Br. at Responses to Commissioner Questions #9, Exh. 1 (P.R. 153) (C.R. 250). Furthermore, Ardagh's single plant closure is not sufficient evidence of the overall industry's capacity and vulnerability. The Commission must look to the domestic industry as a whole, and **[     ]** was operating at **[          ]** capacity utilization in 2023, while **[     ]**'s capacity utilization was at its highest in interim 2024 at **[          ]**. Final Staff Report at Tbl. III-9 (C.R. 168). The record evidence suggests that the Seattle plant closed for reasons other than subject imports and that the domestic industry as a whole is not struggling with capacity utilization or vulnerability.

Third, Petitioner points to announced capacity increases by Mexican and Chilean producers.  Pl. Br. at 40.  However, the record also shows that for both Chile and Mexico their share of total shipments exported [          ] from 2021 to 2023, including their share of total shipments exported to the United States.  Final Staff Report at Tbl. VII-10 (C.R. 268).  Therefore, the announced capacity increases do not represent any threat to the domestic industry, particularly where foreign producers are focused on their home markets.

Fourth, Petitioner points to Commerce's critical circumstances finding on imports from China.  Pl. Br. at 40.  While Commerce did make an affirmative critical circumstances determination,  subject imports from China [

]. *See* Final Staff Report at Fig. IV-3, IV-4 (C.R. 268).  Furthermore, record evidence demonstrates that Chinese foreign producers' exports to the United States [          ] from 2021 to 2023, and that they are projected to be [          ] 2021 levels in 2024 and 2025 as well.  Final Staff Report at Tbl. VII-10 (C.R. 268).  Thus, subject imports from China do not threaten the domestic industry.

Fifth, Petitioner cited a quote from the hearing explaining that inventories are injurious.  Pl. Br. at 40–41.  Berlin has already addressed Petitioner's weak inventory arguments above: contrary to Petitioner's meager evidence, ample record evidence demonstrates that subject import inventories were declining during the POI, and subject import market share declined throughout the POI until interim 2024, when the domestic industry exhibited improved financial performance.  *See* Final Staff Report at VII-28, IV-31, Tbl. C-1 (C.R. 268).  Accordingly, inventories are not a changing condition of competition that would cause imports to become injurious in the imminent future.

Finally, Petitioner points to evidence of a "snowballing effect" of lower negotiated contracts coupled with plant closures.  Pl. Br. at 41.  The record is clear that subject imports oversold the domestic industry, including through pricing data, purchase cost data, shipment data, and lost sales and lost revenue data.  The record is also replete with evidence of alternative causes for domestic plant closures, as discussed above.  Thus, Petitioner fails to identify any "snowballing effect" caused by subject imports.

In sum, the record does not demonstrate a likelihood of any significant changes from the conditions that existed during the 2021 through interim 2024 POI, and therefore the Commission's determination of no significant threat of material injury was reasonable and in accordance with law.

## VI.    CONCLUSION

For the foregoing reasons, Berlin respectfully requests that this Court affirm the Commission's final negative determination and deny Plaintiff's Motion for Judgment on the Agency Record.

Respectfully submitted,

/s/ Jared R. Wessel
Jared R. Wessel
Michael G. Jacobson
Lyric E. Galvin

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.6472

*Counsel to Berlin Packaging L.L.C.*

August 8, 2025

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Hogan Lovells US LLP hereby certifies that the foregoing brief complies with the word-count limitation in the Standard Chambers Procedure. This brief contains 7,916 words according to the word-count function of the word-processing software used to prepare the brief. This is less than the 10,500 words permitted for response briefs.

Respectfully submitted,

/s/ Jared R. Wessel
Jared R. Wessel

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  +1.202.637.6472
Jared.wessel@hoganlovells.com

August 8, 2025