**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

---

**U.S. GLASS PRODUCERS COALITION,**

            **Plaintiff,**

    **v.**

**UNITED STATES,**

            **Defendant,**

     **and,**

**BERLIN PACKAGING L.L.C., TRICORBRAUN INC., ENCORE GLASS, INC.**

            **Defendant-Intervenors.**

---

**Before:  Hon. Joseph A. Laroski, Jr., Judge**

**Court No. 24-00199**

---

**REPLY BRIEF IN SUPPORT OF
PLAINTIFF'S 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Daniel B. Pickard, Esq.
Claire M. Webster, Esq.

**BUCHANAN INGERSOLL & ROONEY PC**
1700 K Street, NW
Washington, D.C. 20006
(202) 452-7900

*Counsel to U.S. Glass Producers Coalition*

Dated: September 8, 2025

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................... 1

II.    ARGUMENT ......................................................................................................... 2

    A.   The Commission's Price Effects Analysis Was Not Supported by Substantial Evidence
         and Was Otherwise Contrary to Law .................................................................... 2

        1.   Factually Incorrect and Illogical Statements Regarding Underselling and
             Market Share ................................................................................................. 2

        2.   The Commission Did Not Provide a Reasoned Analysis as to the Data Issues
             Concerning Pricing Products 1 Through 5 ....................................................... 4

        3.   The Commission Failed to Meaningfully Address Contemporaneous Business
             Documentation Regarding Subject Import Underselling .................................. 6

        4.   The Commission Impermissibly Failed to Address the Frequency of Lost Sales .......... 9

        5.   The Commission Failed to Fully Address Evidence of Price Suppression ................... 10

        6.   The Commission's Analysis of the Inventory Overhang and Its Negative Price Effects
             Is Not Supported by Substantial Evidence and Is Otherwise Contrary to Law ............ 12

    B.   The Commission's Determination That There Was No Adverse Impact by Reason of the
         Significant Volume of Unfairly Priced Imports Was Not Supported by Substantial
         Evidence and Was Otherwise Contrary to Law .................................................... 13

        1.   The Commission Misapplied the Causation Standard .................................................. 13

        2.   The Commission Directly Pointed to Demand as an Alternative Cause of Injury,
             Contrary to Its Statements Before the Court ................................................. 13

        3.   The Commission Misapplied the Material Injury Standard ......................................... 14

        4.   The Commission's Overly Simplistic Market Share Trends Analysis Is Inconsistent
             with the Causation Standard ......................................................................... 15

        5.   The Commission Failed to Examine Material Arguments and Evidence that the
             Domestic Industry Entered the POI in an Injured State ................................. 17

        6.   Objectively Factually Incorrect Statements in the Commission's Impact Analysis ..... 18

    C.   The Commission's Threat Analysis Was Not Supported by Substantial Evidence and
         Was Otherwise Contrary to Law ......................................................................... 19

1.  The Commission's Likely Volume of Subject Imports Finding Was Not Supported by Substantial Evidence and Was Otherwise Contrary to Law ......................................... 19

2.  The Views Did Not Address the Likelihood of Continued Closures and Curtailments of Domestic Production ........................................................................ 20

3.  The Commission's Statement That There Was No Evidence of Any Change in Conditions of Competition Is Objectively False ......................................................... 21

III.    CONCLUSION ............................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962)................................................ 3

*Mexichem Fluor, Inc. v. United States*, 179 F. Supp. 3d 1238 (Ct. Int'l Trade 2016).................... 5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...... 13, 20

*Nippon Steel Corp. v. U.S. International Trade Commission*, 345 F.3d 1379 (Fed. Cir. 2003)...... 9

*Nucor Corp. v. United States*, 28 CIT 188, 318 F. Supp. 2d 1207 (2004) ............................... 7, 21

*Roses, Inc. v. United States*, 720 F. Supp. 180, 13 CIT 662 (1989) ................................................ 7

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed. Cir. 1994) ....... 13

*USEC Inc. v. United States*, 34 Fed. Appx. 725 (Fed. Cir. 2002) .................................................. 7

*Usinor v. United States*, 26 CIT 767 (2002) ........................................................................ passim

**Statutes**

19 U.S.C. § 1677(7)(A)......................................................................................................... 15

19 U.S.C. § 1677(7)(F)(i)(III)................................................................................................ 19

19 U.S.C. § 1677(7)(J)........................................................................................................... 16

**Other Authorities**

Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> (2012) ....... 3

*When to Use 'A,' 'An,' or 'The'*, GALLAUDET UNIVERSITY, https://gallaudet.edu/student-success/tutorial-center/english-center/grammar-and-vocabulary/definite-and-indefinite-articles/when-to-use-a-an-or-the/ .............................................................................................. 3

## I.    <u>INTRODUCTION</u>

The U.S. Glass Producers Coalition ("Plaintiff") respectfully submits this reply to the response briefs filed by defendant the United States ("the Commission") and defendant-intervenors TricorBraun, Inc., Encore Glass, Inc., and Berlin Packaging L.L.C. (collectively, "defendant-intervenors").

The Commission's defense of its findings of no price effects due to subject imports and no volume effects due to subject imports falls short.  First, as to price effects, the Commission provides impermissible post hoc rationalizations of its determination, apparently continues to misunderstand Plaintiff's arguments regarding the level of trade issue discussed throughout the underlying investigation, does not fully engage with Plaintiff's arguments regarding contemporaneous business documentation and lost sales, and doubles down on its illogical determinations as to price suppression and the effects of an inventory overhang in the market.  As to adverse impact, the Commission largely did not directly engage with the arguments that it impermissibly failed to examine material arguments and evidence that the industry entered the POI in an injured state, then provided another post hoc rationalization for a factually incorrect statement in its adverse impact analysis.  Its brief also contradicted its determination below, attempting to deny that it consistently pointed to demand changes as an alternative cause of injury that severed the causal connection between imports and the deteriorating health of the U.S. industry.

Equally as important as what the Commission's brief says is what it does not say.  For example, Plaintiff dedicated a significant portion of its opening brief to identifying the ways in which the Commission's Views did not correctly apply the causation standard.  Rather than rebut these arguments, the Commission's brief only states that it did apply the causation standard, simply because it cited that standard.  Plaintiff's appeal addresses fundamental aspects of the Commission's determination of no threat of material injury.  In response, the Commission provided

only three pages of rebuttal arguments, leaving the bulk of its defense of its negative threat of material injury finding to Defendant-Intervenor Berlin Packaging, which does not speak on behalf of the Commission.

Throughout its brief, the Commission echoes the siren song that it is presumed to have considered all record evidence. This Court has warned in previous cases that the presumption of consideration cannot be a "talismanic justification" for the Commission's determination. *See Usinor v. United States*, 26 CIT 767, 783 (2002). The Commission's determination here runs afoul of *Usinor* and is the definition of that talismanic justification. The Commission's failure to address material evidence and argument, and therefore to provide a reasoned analysis between the facts and its conclusions, is legally impermissible. For these reasons, we respectfully request that the Court remand to the Commission for a reconsideration of its determination.

## II.    ARGUMENT

### A.    The Commission's Price Effects Analysis Was Not Supported by Substantial Evidence and Was Otherwise Contrary to Law

#### 1.    Factually Incorrect and Illogical Statements Regarding Underselling and Market Share

The Commission's Views stated that, "the subject imports that gained market share during the latter portion of the POI were from Mexico, none of which were purchased at a lower cost during that period." Views, PR187 at 42, CR279 at 57. In response to Plaintiff's argument that the Commission's Views were factually incorrect on this statement and ignored that both Mexican and Chinese imports increased in market share over the POI, the Commission provided an impermissible post hoc rationalization, stating that, "{T}he Commission's true statement that Mexican imports gained share does not equate to the false statement that Chinese imports did not. . . . The Commission's focus on gains by Mexican imports simply reflected that it was reasonably focusing its market share shift on those gains by subject imports that accounted for most of the

market share shift from the domestic industry."  Defendant United States International Trade Commission's Memorandum in Opposition to Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record at 32, ECF No. 60 ("ITC Br.").  The Supreme Court has made clear that, "Courts may not accept appellate counsels' *post hoc* rationalizations for agency action . . . ."  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962).  This is exactly what the Commission's brief is attempting to do before this Court: rationalize its determination after it was made.

Moreover, the Commission's argument is illogical.  If the Commission had wanted to examine the total market share shift, then it does not make sense that it only discussed the Mexican market share shift.  Words are presumed to have meaning.  *Cf.* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 56 (2012) (citing Justinian's *Digest*: "Do not depart from the words of the law.").  The word "the" is a definite article, which is used when the meaning is specific, while "a" is an indefinite article, which is used when the meaning is general. *When to Use 'A,' 'An,' or 'The'*, GALLAUDET UNIVERSITY, https://gallaudet.edu/student-success/tutorial-center/english-center/grammar-and-vocabulary/definite-and-indefinite-articles/when-to-use-a-an-or-the/.  The Commission is essentially arguing that when it said that the subject imports that gained market share during the latter portion of the POI were from Mexico, it really meant the subject imports that gained market share were from Mexico and China, but it was only focusing on Mexico because they were the largest source.  This does not pass muster.

The Commission characterizes Plaintiff's brief as contradicting itself, arguing that Plaintiff's statement that "none of the Mexican imports gaining share later in the POI were purchased at lower cost as false is contradicted by its almost immediate concession thereafter that this statement is in fact true."  *See* ITC Br. at 33 (citing Plaintiff's Motion for Judgment on the Agency Record at 14, ECF No. 51 ("Pls. Opening Br.")).  This is an oversimplification of

Plaintiff's argument and a thin attempt to misdirect the Court. Plaintiff argued, verbatim, that "To the extent that the Commission's statement was intended to be limited to only three of the Pricing Products (*i.e.*, 6 through 8), it is technically correct, but it is also highly misleading, as the Commission's own Staff Report confirmed that imports from Mexico were underselling the domestically produced product while they were gaining market share." Pls. Opening Br. at 14. But the Commission's Views stated the opposite. In other words, when the Commission stated that it was imports from Mexico that took market share at the end of the POI but they were not underselling the U.S. produced product, the reality is that imports from Mexico <u>and China</u> were gaining market share <u>and there was evidence that Mexico was underselling the U.S. product at the end of the POI</u>.

**2.      The Commission Did Not Provide a Reasoned Analysis as to the Data Issues Concerning Pricing Products 1 Through 5**

In response to Plaintiff's argument that the Commission did not provide a reasoned analysis as to the data issues concerning pricing products 1 through 5, the Commission argued that Plaintiff changed its argument on appeal and failed to exhaust administrative remedies as a result. *See* ITC Br. at 21. It is astonishing that the Commission is raising an alleged exhaustion issue on an argument that Plaintiff made in virtually all of its submissions in the final phase of the Commission's investigation.

Plaintiff's arguments in this appeal and its arguments before the Commission are exactly the same: that the data collected for pricing products 1 through 5 in the final phase of the Commission's investigation conflated two levels of trade: (1) U.S. producers' direct sales to their purchasers, which include both end users and distributors, and (2) sales from distributors to end users. Plaintiff testified to this argument at the hearing:

> A distributor sells domestic and imported product to a winery. . . . {T}he import price is the price of the distributor to the winery for the imported product. On the domestic side, that comparison is not the price of the distributor to the winery for the domestic product. Rather, it is the price of the domestic producer to the distributor.

Hearing Tr., PR149 at 57. In its prehearing brief, Plaintiff expressly stated that, "{A} significant part of competition in the market occurs in the sales not just from distributors but to distributors." Petitioner Prehearing Br., CR217/225, PR141 at 42 (emphasis in original). Indeed, the Commission's Views explicitly acknowledge that the level of trade argument involved U.S. producers' "reported pricing data included sales to wineries and sales to distributors . . . whereas subject importers{'} reported pricing data included sales by large distributors to wineries." Views, PR187 at 40-41, CR279 at 54.

Despite the Commission's basic acknowledgement of the level of trade issue, its argument before the Court exemplifies its continued misunderstanding of Plaintiff's argument. It cites *Mexichem Fluor* in support of the argument that the Court has "expressly acknowledged that {the approach the Commission used in this underlying investigation} entails an 'apples-to-apples' comparison." ITC Br. at 22. In fact, in *Mexichem Fluor*, while the Commission did use its "usual approach," the Court found that that approach had the "added advantage of covering the same sales activities (shipments to unrelated U.S. customers), which enabled the Commission to make an apples-to-apples comparison between the price of imported merchandise and the price of domestic like products." *Mexichem Fluor, Inc. v. United States*, 179 F. Supp. 3d 1238, 1247 (Ct. Int'l Trade 2016). Contrary to what the Commission would have the Court believe, it is not that the Commission's "usual approach" always results in a like-to-like comparison of subject imports and the domestic like product, it is that a like-to-like comparison is dependent upon the nature of how imports are sold in the United States.

5

Notwithstanding that pricing products 1 through 5 were infected by level of trade issues, pricing products 6 through 8 did in fact have majority underselling at the end of the POI, which the Commission also failed to address in its brief before the Court, focusing only on the entirety of the POI, with no justification for this approach. *See* ITC Br. at 22-23. During the last five quarters of the POI (Q1 2023 through Q1 2024), the subject imports in the apples-to-apples comparisons undersold the domestic product in instances accounting for [    ] percent of the volume. Final Staff Report, PR187, CR268 at V-36.

**Underselling of Bulk-Packed Wine Bottles (Pricing Products 6-8)**

| | *Quarterly Instances* | | | | *Volume* | | | |
|---|---|---|---|---|---|---|---|---|
| | **Undersold** | **Oversold** | **Total** | **% Undersold** | **Undersold** | **Oversold** | **Total** | **% Undersold** |
| 2021 | [ | | | | | | | ] |
| 2022 | [ | | | | | | | ] |
| 2023 | [ | | | | | | | ] |
| 2024.Q1 | [ | | | | | | | ] |
| First 8 quarters | [ | | | | | | | ] |
| Last 5 quarters | [ | | | | | | | ] |

Finally, the Commission rests its argument on the idea that "other substantial evidence" – that the Commission did not cite in support of its underselling determination in its Views – "supports the Commission's underselling finding." *Id.* at 22. This is another attempted post hoc rationalization for its determination. The bottom line is that the Commission utilized a flawed analysis, comparing sales at two different levels of trade, and then cited the results of its flawed analysis to support its determination.

> **3.     The Commission Failed to Meaningfully Address Contemporaneous Business Documentation Regarding Subject Import Underselling**

The "presumption of consideration" standard on which Defendants rely is not without limits. *See* ITC Br. at 16; Response Brief of Defendant-Intervenor TricorBraun, Inc. at 20, ECF

No. 62 ("Tricor Br."); Defendant-Intervenor Encore Glass Inc.'s Response Brief in Opposition to Plaintiff's Motion for Judgment on the Agency Record at 3, ECF No. 70 ("Encore Br."); Defendant-Intervenor Berlin Packaging L.L.C.'s Response Brief in Opposition to Plaintiff's Motion for Judgment on the Agency Record at 9, ECF No. 68 ("Berlin Br.") (citing *Nucor Corp. v. United States*, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004)). Indeed, the standard reads as follows: "The ITC is not required to explicitly address every piece of evidence presented by the parties, and <u>absent a showing to the contrary</u>, the ITC is presumed to have considered all of the evidence on the record." *USEC Inc. v. United States*, 34 Fed. Appx. 725, 731 (Fed. Cir. 2002) (emphasis added). Importantly, the presumption that the Commission has considered all the evidence is rebuttable, and "the burden is on the plaintiff to make a contrary showing." *Roses, Inc. v. United States*, 720 F. Supp. 180, 185, 13 CIT 662, 668 (1989). Furthermore, the Commission must address material evidence and arguments, and it cannot invoke the presumption of consideration of evidence "as a shield against examination of the Commission's failure to present required analysis of the record evidence" or as a "talismanic justification" for the absence of specific discussion regarding key evidence or arguments of the parties. *Usinor*, 26 CIT at 783.

Plaintiff detailed each relevant piece of record evidence in our opening brief and will not repeat that discussion here. *See* Pls. Opening Br. at 17-18, Exhibit 1. Defendant-Intervenors repeat counterarguments they submitted to the Commission regarding pieces of this contemporaneous business documentation. Tricor Br. at 18-19; *see also* Tricor Post-Hearing Br., PR154, CR249 at Appendix A pp. 5-10, Exhibits 3-4. Regardless, the relevant issue is that the Commission's Views do not meaningfully address this evidence, which directly undermines its conclusions. The Commission's brief justifies its determination by identifying the sole item of contemporaneous business documentation that it directly addressed in Views: the [

].  *See* Views PR187 at 43, CR279 at 55 n.228; Petitioner's Prehearing Brief at Exhibit 6 (emphasis added). However, both the Views and the Commission's brief misquote this evidence and rely on that misquote to substantiate the negative determination.  They state that [

] and then state that the [

]."  *See* Views PR187 at 43, CR279 at 55 n.228; ITC Br. at 24.  However, this piece of evidence [

].  *See* Petitioner's Prehearing Brief at Exhibit 6.  The Commission acknowledged that the evidence existed through its citation to [

], but it did not fully address the evidence in this [     ] that contradicted its determination.  An acknowledgement does not constitute the "required analysis of the record evidence."  *See Usinor*, 26 CIT at 783.

Defendant and Defendant-Intervenors rest their argument on two sentences in the Commission's Views that assert that the correspondence explicitly stating that sales were lost to lower priced Chinese imports does not "detract" from the other record evidence that subject imports were not lower priced than the domestic like product.  Views, PR187 at 43, CR279 at 57-59.  This is exactly the "talismanic justification" that the Court in *Usinor* warned was impermissible under the law.  *See Usinor*, 26 CIT at 783.  Moreover, documents from a customer that [

] exactly "detracts" from a finding that the domestic industry did not lose sales to lower-priced Chinese product.

### 4.     The Commission Impermissibly Failed to Address the Frequency of Lost Sales

The Commission attempts to dodge Plaintiff's argument that the Commission's failure to address the frequency of lost sales was an error requiring remand.  ITC Br. at 25-26.  The Commission's approach is – and was in its determination below – flawed for two reasons.

First, this error speaks to the Commission's fundamental misinterpretation of its own standard.  Subject imports need not be the sole cause of material injury to the domestic industry; they need only be a cause of such injury.  *See Nippon Steel Corp. v. U.S. International Trade Commission*, 345 F.3d 1379, 1381 (Fed. Cir. 2003).  Twenty-two percent of purchasers reported that they purchased subject imports instead of the domestic like product because imports were less expensive.  *See* Views, PR187 at 40, CR279 at 53.  This is clear record evidence that a significant percentage of purchasers purchased subject imports over domestic wine bottles explicitly on the basis of price.  Despite this evidence, the Commission found no causal nexus between imports and the deteriorating health of the domestic industry.  The Commission essentially states that this high percentage of customers is irrelevant as the volumes of reported lost sales were small on an absolute basis.  However, [                                                                    ], did not provide the quantity associated with those lost sales.  *See* Final Staff Report, PR187, CR268 at V-39–V-41.

Second, and relatedly, on appeal, the Commission claims that "expressly discuss{ing} the number of purchasers that reported buying subject imports over the domestic like product based on price" is sufficient to withstand judicial review and to address material evidence and argument.  *See* ITC Br. at 26.  That is, Petitioner raised a material argument that pointed to evidence before the Commission demonstrated that a significant percentage of all purchasers were buying imports on the basis of them being lower priced, but this argument is not addressed in the Views, and the

Commission attempts to fall back on its presumption of consideration rather than providing the required analysis of the record evidence. *See Usinor*, 26 CIT at 783.

### 5.    The Commission Failed to Fully Address Evidence of Price Suppression

In defense of its failure to fully address evidence of price suppression, the Commission argued that the cost-price squeeze present throughout the period of investigation was "insignificant" and was sufficient to cover some parts of cost of goods sold ("COGS"). *See* ITC Br. at 20. Its papers largely cite facts in support of their determination but do not meaningfully address Plaintiff's argument. The Commission states that "the domestic industry was to a minor degree unable to fully cover its cost increases between 2021 and 2023," *Id.* at 35, but it fails to recognize that price increases that cover some of an industry's increased costs is another way of saying that the industry was unable to increase prices to cover all of its increased costs. This is the definition of a cost-price squeeze, the Commission's primary indicator of price suppression.

The domestic industry's COGS as a percentage of net sales increased over the three-year period in the total market, from [      ] percent in 2021 to [      ] percent in 2023 and in <u>every year</u> of the POI in the merchant market, from [      ] percent in 2021, to [      ] percent in 2022, to [      ] percent in 2023. Final Staff Report, PR187, CR268 at C-4, C-6. COGS as a percentage of net sales [                    ] in every year of the POI is hardly an "insignificant" or "slight" cost-price squeeze. This error is apparent in the Commission's analysis as well – by focusing solely on the relative change in COGS/net sales, it fails to address the significance of the existing cost-price squeeze throughout the POI. It legitimately raises the question: do costs have to be more than 100 percent of net sales for the Commission to find a "significant" cost-price squeeze?

In its Views, the Commission recognized, as a relevant condition of competition, that a significant portion of domestic production is captively consumed. Views, PR187 at 28-29, CR279 at 38. In the merchant market, COGS as a percentage of net sales is correlated with increasing

subject import market share.  *See* Final Staff Report, PR187, CR268 at C-5–C-6.  It is in attempting to rebut Plaintiff's price suppression argument that the Commission especially falls back on its finding below that any cost-price squeeze was all due to declining demand.  *See* ITC Br. at 28.  This is logically faulty.  If demand is decreasing while a large volume of subject imports is entering the market and taking market share by the end of the POI – as was the case here – then that would make imports <u>more</u> injurious, not less.  Moreover, U.S. shipments at the end of the POI decreased by more than demand.  From interim 2023 to interim 2024, demand decreased by [     ] percent, but U.S. shipments decreased by [     ] percent.  *See* Final Staff Report, PR187, CR268 at Table C-2.  The significant cost-price squeeze, then, must be driven by more than demand.

Similarly, the Commission's argument that "one would generally expect to see directionally similar trends in the suppression of the individual domestic producers' prices," is also economically illogical.  *See* ITC Br. at 28.  Some producers may keep prices high and be willing to lose volume, while others may cut prices to keep volume.  That injury was manifested differently among the U.S. producers is irrelevant especially when the industry as a whole, which the Commission is required to examine, demonstrated COGS as a percentage of net sales increasing in the aggregate.

Finally, the Commission doubled down by relying on removing non-recurring costs from the COGS to net sales ratio in support of its finding of no causation.  *See* ITC Br. at 29.  As Plaintiff argued below, the domestic industry's non-recurring costs were <u>due to</u> subject imports, such as the costs required for the domestic industry to close furnaces and plants.  Namely, [

].  [     ] U.S. Producers' Questionnaire Response, CR121 at III-10b, -10d.  [

]. [            ] U.S. Producers' Questionnaire Response, CR123 at III-10b, III-10d.

[

]. Hearing Tr., PR149 at 34.  By removing non-recurring costs from

COGS, the Commission was literally removing a manifestation of the injury caused by subject

imports, and then stated that when evidence of injury is removed from its consideration, then there

is less evidence of injury.  This should not stand.

> **6.    The Commission's Analysis of the Inventory Overhang and Its Negative Price Effects Is Not Supported by Substantial Evidence and Is Otherwise Contrary to Law**

The Commission defends its inventory overhang analysis by arguing that growing relative

inventories overhanging the market did not have price depressing effects due to decreasing

demand, arguing that "As the increase in this ratio reflects decreasing shipments rather than

increasing inventories, it does not reflect that subject inventories somehow increased . . . ."  ITC

Br. at 30.  This, too, defies economic principles and logic.  The exact inverse is true: growing

relative inventories in a time of decreasing demand would have more price depressing effects.  The

facts here are not in dispute.  During a period of decreasing demand there were larger relative

inventories overhanging the market, yet, without adequate analysis, the Commission essentially

concludes that these inventories that are increasing relative to market size do not exert downward

pressure on prices.

The ratio of U.S. importers' inventories of subject imports to U.S. shipments increased

from [      ] percent in 2021 to [      ] percent in 2023 and reached [      ] percent in 2024.  Final

Staff Report, PR187, CR268 at VII-28.  For China this number increased from [      ] percent in

2021 to [      ] percent in 2023 and increased further to [      ] percent in 2024.  *Id.*  The

Commission's brief attempts to dodge these facts by looking only at absolute numbers.

**B.**   **The Commission's Determination That There Was No Adverse Impact by Reason of the Significant Volume of Unfairly Priced Imports Was Not Supported by Substantial Evidence and Was Otherwise Contrary to Law**

**1.**   **The Commission Misapplied the Causation Standard**

The Commission's brief stated that Plaintiff indicated that macroeconomic theory compelled an affirmative determination.  *See* ITC Br. at 34.  This is untrue.  Our argument is that, if the Commission is going to make an apparently illogical finding, then it has to provide a reasoned explanation for why it is doing so.  *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46-47 (1983); *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994); *Usinor*, 26 CIT at 783-85.  In its defense, the Commission claims that it "clearly applied the correct standard – that is, whether the subject imports were contributing more than tangentially or minimally to injury."  ITC Br. at 36.  While the Commission's Views state that standard, there is a difference between stating a standard and applying that standard.

The Commission's brief does not actually grapple with Plaintiff's arguments that it misapplied the standard.  Specifically, our opening brief alleged that (1) a large supply of competing fungible product at a time of decreasing demand is even more injurious, (2) the Commission's misapplication of this standard infected its underselling analysis, and (3) its overly simplistic market share trends analysis is inconsistent with the causation standard.  *See generally* Pls. Opening Br. at 25-30.  The Commission's brief, as well as Defendant-Intervenors' briefs, are silent as to these issues.

**2.**   **The Commission Directly Pointed to Demand as an Alternative Cause of Injury, Contrary to Its Statements Before the Court**

The Commission's brief further attempts to dismiss its identification of a decline in demand as the alleged alternative cause of injury to the domestic industry, and that the decrease in demand

13

severs any causal connection between imports and the health of the domestic industry (as the time

of the worsening demand).  The agency argues, "the Commission found that declines in certain of

the industry's performance indicators were 'consistent' or 'generally commensurate' with the

decline in apparent U.S. consumption."  ITC Br. at 37.  Its Views below state otherwise:

- "The declines in the industry's capacity over the three full years reflected declining demand, as the industry's practical capacity declined by less than the decline in apparent U.S. consumption."  Views, PR187 at 47, CR279 at 67.

- "Although the industry recovered almost all of its increased costs by increasing its prices from 2021 to 2023, declining demand limited its ability to fully pass through its increased costs to its customers until interim 2024."  *Id.*, PR187 at 51, CR279 at 69-70.

- "The domestic industry's financial performance declined from 2021 to 2023 while cumulated subject imports declined, consistent with declining demand and the costs associated with shutdowns related to declining demand."  *Id.*, PR187 at 64, CR279 at 87.

- "Thus, the record indicates that declines in the domestic industry's performance during the POI resulted from declining demand and not cumulated subject imports."  *Id.*, PR187 at 64, CR279 at 88.

That is, the Views directly identified demand as the alternative cause of injury to the domestic

industry, but the Commission is now attempting to walk back those statements.  Even if decreasing

demand was a cause of injury, rather than a relevant condition of competition in which to evaluate

the effects of subject imports, the dumped and subsidized imports need not be the only cause of

injury to the domestic industry, merely a cause of that injury.

### 3.    The Commission Misapplied the Material Injury Standard

The Commission's brief also takes Plaintiff's argument regarding significant import

volumes to an illogical – and not advocated – conclusion.  Plaintiff cited to certain uncontested

facts, including but not limited to: (a) at a minimum, over [    ] percent of all pricing products

undersold the domestic like product and [    ] percent of all imports undersold the domestic like

product in pricing products 6-8; (b) total underselling can be valued at approximately [

]; (c) one of the [                                                    ], reported it had forced U.S.

producers to reduce prices in order to compete with lower-priced imports from China and Mexico,

and this resulted in estimated price reductions of [                                    ] and [

]; and (d) [

].  *See* Pls.

Opening Br. at 30-31.

The Commission does not directly engage with this argument.  Its brief discusses causation

standards but does not directly refute Plaintiff's contentions that it misapplied the material injury

standard.  Rather, it reframes Plaintiff's arguments to be about "lost sales" and then attempts to

discount this evidence in a post hoc rationalization.  *See* ITC Br. at 40-41. This was not Plaintiff's

argument.  Rather, as clearly stated in Plaintiff's opening brief, the Commission did not provide

any analysis or discussion as to why these uncontested facts do not amount to a "harm {that} is

not inconsequential, immaterial or unimportant." *See* 19 U.S.C. § 1677(7)(A). In particular, the

Commission does not explain why lost sales and underselling valued at more than a combined

[            ] does not meet this threshold. To put a fine point on the matter, nowhere in the opinion

does the Commission state, distinct from its faulty causation standard, why uncontested facts of

injury are not more than "inconsequential, immaterial, or unimportant" to the struggling industry.

### 4.  The Commission's Overly Simplistic Market Share Trends Analysis Is Inconsistent with the Causation Standard

In Plaintiff's opening brief, we argued that the Commission found a lack of causation

because import market share was lower in 2023 than in 2021, and reliance on a simplistic trends

analysis without explanation is arbitrary and capricious.

In response, the Commission states that this argument would lead to the conclusion that

"the mandatory statutory price effects and impact analyses would be superfluous because the

Commission would effectively always need to reach an affirmative determination if the initial significant volume box is checked." ITC Br. at 39-40.  Even a cursory review of the opening brief demonstrates that this is a mischaracterization of Plaintiff's argument.  Its lack of any further substantive response is telling.

In addition, and in defense of, its determination of no significant adverse impact, the Commission points to some improvement in the domestic industry's performance metrics in interim 2024.  *See* ITC Br. at 35-36.  However, this improvement is clearly driven by the domestic industry's internal consumption, as the merchant market data show different results.  To be clear, Plaintiff is not advocating that the Commission had to apply the captive consumption provision in the underlying investigation.  However, as the Commission recognized that a significant portion of domestic production is captively consumed as a relevant condition of competition, Views, PR187 at 29, CR279 at 38, it cannot then ignore that, as to this relevant condition of competition, the domestic industry was actually performing worse in the market where there is more direct competition with imports.

Even more fundamentally, though, the Commission's governing statute is clear that, "The Commission may not determine that there is no material injury or threat of material injury to an industry in the United States merely because that industry is profitable or because the performance of that industry has recently improved."  19 U.S.C. § 1677(7)(J).  It is literally contrary to law for the Commission to dismiss a domestic industry's injury just because that industry's performance was improving, which is exactly what the Commission did here.

Finally, in response to Plaintiff's argument that its Views never addressed the demonstrated plant curtailments and closures due to subject imports, the Commission argues that it did not ignore these arguments and that the Views cite to "internal documents." ITC Br. at 38 (citing Views,

PR187 at 55, CR279 at 75 n.290).  This footnote states as follows: "Petitioner's Posthearing Br. at 12-13; Petitioner's Prehearing Br. at 22-23 and Exhibit 7 (internal documents).  *See also* O-I Glass's Posthearing Br. at 15."  Views, PR187 at 55, CR279 at 75 n.290.  That is, the Views merely note the existence of "internal documents" by way of a citation and do not actually respond to these documents or discuss what they indicated.  Here, the Commission's brief is internally contradictory.  Having previously declared – only a page prior – that "the Commission did not "essentially determine that all injury to the domestic industry was caused by a decline in demand," *see* ITC Br. at 37 (internal citations omitted), the Commission argues that "these capacity declines, inclusive of shutdowns and curtailments, could be entirely explained by declining demand," *id.* at 38.  Further, the "internal documents" referred to specifically state that the domestic industry was shuttering capacity due to subject imports.    [

].  *See* Petitioner Prehearing Br., CR217/225, PR141 at Exhibit 7.  The Commission's brief begs the question: in light of no evidence to the contrary, how can explicit internal documentation be rebutted by declining demand?

### 5.    The Commission Failed to Examine Material Arguments and Evidence that the Domestic Industry Entered the POI in an Injured State

The Commission failed to address material arguments and evidence that the industry entered the POI in an injured state.  Plaintiff argued below that the domestic industry was [                                              ].  This was substantiated by pre-POI evidence that identified imports as a competitive concern in the domestic market, including 10-K filings with the Securities and Exchange Commission, [

], documentation regarding

growing Chinese capacity, [

] began before the POI, pre-POI public documentation from Ardagh, and sworn testimony

from Ardagh and O-I representatives at the Commission's final phase hearing.  *See* Pls. Opening

Br. at 32.

In defense of its failure to engage with any of this evidence, the Commission incredibly

cites to its preliminary affirmative determination that there was a reasonable indication of material

injury by reason of subject imports, as evidence that the industry was not in an injured state before

the POI.  It then employs the linchpin of its brief: that it is presumed to have considered all the

evidence presented to it.  *See* ITC Br. at 41 (citing to its preliminary phase staff report and

determination).  But not only does the Commission not address the evidence it considers

"anecdotal," it also does not meaningfully contend with Plaintiff's argument.  In our opening brief,

as we did before the Commission, we stated that, because the domestic industry was [

], then that injury cannot be a function of declining demand,

because "the domestic industry was [

]."  *See* Pls. Opening Br. at 31-32.

### 6.    Objectively Factually Incorrect Statements in the Commission's Impact Analysis

In its opening brief, Plaintiff called out that the Commission's Views include factually

incorrect findings regarding Mexican underselling.  Pls. Opening Br. at 33-34.  Specifically, the

Commission found that for "the quarterly price comparisons in interim 2024, subject imports from

Mexico were higher priced than the domestic like product for products 1, 3, and 5 . . . ."  Views,

PR187 at 54, CR279 at 73, n.286 (emphasis added).  [                                            ],

the Commission concluded that, in pricing products 1 through 5, "subject imports from Mexico

predominantly oversold the domestic like product in interim 2024."  Views, PR187 at 54, CR279

at 73.  In fact, Mexican imports undersold the domestic like product in [    ] percent of comparisons and [    ] percent by volume.  Final Staff Report, PR187, CR268 at V-12–V-16.

The Commission now acknowledges this error, stating that it corrected the "data discrepancy in its trailing views" in the companion negative injury determination as to the antidumping duty cases on wine bottles from China and Mexico.  *See* ITC Br. at 33 n.19.  This is obviously does not cure the error in the decision on appeal.

C.  **The Commission's Threat Analysis Was Not Supported by Substantial Evidence and Was Otherwise Contrary to Law**

As an initial matter, Plaintiff notes that the Commission gives Plaintiff's threat of material injury arguments particularly short shrift and fails to provide any meaningful response to those arguments.  *See id.* at 42-45.

1.  **The Commission's Likely Volume of Subject Imports Finding Was Not Supported by Substantial Evidence and Was Otherwise Contrary to Law**

The relevant inquiry for the likely volume of subject imports is "a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports . . . ."  *See* 19 U.S.C. § 1677(7)(F)(i)(III).  The Commission is compelled to review whether imports are likely to increase and typically looks to volumes of projected exports.

Actual exports for all subject foreign industries in 2023 amounted to 2.8 million gross, while projected exports were 3.3 million gross in 2024 and 3.4 million gross in 2025.  Final Staff Report, PR187, CR268 at VII-16.  In other words, foreign producers actually projected that their exports would increase in 2024 and 2025.   In light of this fact, the Commission defends its determination that imports would not increase by relying on the following: (1) the share of their total shipments that they will export will decrease; (2) the share of their total shipments that they

will export specifically to the United States will decrease; (3) their home market shipments will increase; and (4) their inventories will decrease. *See* ITC Br. at 42-44. But these considerations are irrelevant.

The fact that dumped and subsidized exports are going to increase is not in any way lessened or made less threatening by the fact that, for example, the foreign countries' share of total shipments that are exported will decline. Similarly, it is wholly immaterial to the harm posed by imports, which were projected to increase (and with no evidence to the contrary), that the home market shipments will increase in the foreign countries. These findings are no defense at all, and as the Supreme Court has held, an agency's actions is arbitrary and capricious when it offers, "an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### 2. The Views Did Not Address the Likelihood of Continued Closures and Curtailments of Domestic Production

In the opening brief, the Plaintiffs argued that the Views utterly failed to address the effective closure of Ardagh's Seattle manufacturing facility, especially the internal confidential documentation that the closure was due to the harm caused by subject imports, in its threat determination. Indeed, the closure of the Seattle plant was a catastrophic event for the industry and was directly relevant to the future threat posed by subject imports.

In response, the Commission's brief does not even include the word "Seattle." It essentially provides the conclusory statement: "The industry's capacity declines did not suggest adverse impact by reason of subject imports during the POI, as discussed above, and thus likewise do not suggest it in the imminent future." ITC Br. at 44. In large part, the Plaintiffs argument in regard to threat that the Commission never directly addressed that a major plant was curtailed and jobs

were lost, despite sworn testimony that the closure was due to subject imports and [

]

goes unrebutted by the Commission.

### 3.    The Commission's Statement That There Was No Evidence of Any Change in Conditions of Competition Is Objectively False

Plaintiff argued in its opening brief that the Commission's finding that "{t}here is <u>no</u> evidence of <u>any</u> change in conditions of competition that would cause cumulated subject imports to become injurious in the imminent future" is factually untrue (emphasis added). Pls. Opening Br. at 40 (citing Views, PR187 at 65, CR279 at 88).

In response, the Commission cites to pages 88 to 89 of its Views, stating that the agency "reviewed {the} conditions of competition, such as changes in capacity and found no evidence of any changes to them that would cause subject imports to become injurious in the imminent future." ITC Br. at 44.   However, and as Plaintiff addressed in its opening brief, the record included evidence of announced capacity increased by subject producers, a surge of imports that triggered an affirmative critical circumstances determination in the Department of Commerce's companion investigation, the "snowballing" effect of lower negotiated contracts coupled with plant closures, and, importantly, the complete closure of Ardagh's Seattle manufacturing plant. *See* Pls. Opening Br. at 40-41.   These were all important developments in the domestic market's conditions of competition, which the Commission's Views completely ignored.   The Commission can argue that it did not find this evidence to have probative value, but the fact that such evidence did not exist is factually incorrect.

The Commission's brief concludes with its continued reliance on being "presumed to have considered all evidence in the record." ITC Br. at 45 (citing *Nucor*, 28 CIT at 234, 318 F. Supp. 2d at 1247).   But this presumption does not excuse factually incorrect findings.   Furthermore, the

Commission must address material evidence and arguments, and it cannot invoke the presumption of consideration of evidence "as a shield against examination of the Commission's failure to present required analysis of the record evidence" or as a "talismanic justification" for the absence of specific discussion regarding key evidence or arguments of the parties. *Usinor*, 26 CIT at 783. "Every party before an agency of the United States has a right to expect a fair and logical determination containing as much analysis as is necessary to adequately demonstrate the basis for its conclusions." *Id.* at 785. The Commission has not met this basic standard for justice.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, we respectfully request that the Court remand the Commission's price, impact, and threat determinations to the agency for further consideration.

Respectfully submitted,

<u>/s/ Daniel B. Pickard</u>
Daniel B. Pickard, Esq.
Claire M. Webster, Esq.

**BUCHANAN INGERSOLL & ROONEY PC**
1700 K Street, NW
Washington, D.C. 20006
(202) 452-7900

*Counsel to U.S. Glass Producers Coalition*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to sections 2(B)(1) and (2) of the Standard Chambers Procedures of this Court, that this brief contains no more than 6,933 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Claire M. Webster