PUBLIC VERSION

Slip Op. 26-78

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| U.S. GLASS PRODUCERS COALITION,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>    and<br><br>BERLIN PACKAGING L.L.C.,<br>TRICORBRAUN, INC., ENCORE GLASS,<br>INC.,<br><br>    Defendant-Intervenors. | Before:  Joseph A. Laroski, Jr., Judge<br><br>Court No. 24-00199 |

## OPINION

[Sustaining in full the final negative determination of the U.S. International Trade Commission concerning its countervailing duty investigation of glass wine bottles from China and denying plaintiff's motion for judgment on the agency record.]

Dated: July 22, 2026

Daniel Brian Pickard and Claire M. Webster, Buchanan Ingersoll & Rooney PC, of Washington, D.C., for plaintiff U.S. Glass Producers Coalition.

Jason F. Miller, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, of Washington, D.C., for defendant United States.  With him on the brief were Andrea C. Casson, Assistant General Counsel, and Michael K. Haldenstein.

Jared R. Wessel, Hogan Lovells US LLP, of Washington, D.C., for defendant-intervenor Berlin Packaging L.L.C.  With him on the brief were Michael G. Jacobson and Lyric E. Galvin.

Court No. 24-00199                                                     Page 2
                                                              **PUBLIC VERSION**

Stephen W. Brophy, of Husch Blackwell LLP, of Washington, D.C., for defendant-intervenor TricorBraun, Inc.  With him on the brief was Nithya Nagarajan.

Lizbeth R. Levinson, of Fox Rothschild LLP, of Washington, D.C., for defendant-intervenor Encore Glass, Inc.  With her on the brief were Alexander D. Keyser, and Brittney R. Powell.

Laroski, Judge:  This action concerns the U.S. International Trade Commission's final determination in a countervailing duty investigation concerning imported glass wine bottles from the People's Republic of China ("China").  Glass Wine Bottles from China, 89 Fed. Reg. 83,515, P.R. 188 (Int'l. Trade Comm'n. Oct. 16, 2024) ("Final Determination"); see also the accompanying views of the Commission in Glass Wine Bottles from China, USITC Pub. No. 5550, Inv. Nos. 701-TA-703 (Final), P.R. 184/187, C.R. 297 (Oct. 10, 2024) ("Views").  In that determination, the U.S. International Trade Commission ("Commission") concluded that the domestic industry was not materially injured and was not threatened with material injury by reason of subject imports of glass wine bottles from China.  Id.

The U.S. Glass Producers Coalition (the "Glass Producers Coalition") challenges that determination under section 516A of the Tariff Act of 1930, as amended ("the Act"), arguing that the Commission's analysis of (i) price effects, (ii) adverse impact, and (iii) threat of material injury is unsupported by substantial evidence and otherwise not in accordance with law.  Pl. Mem. in Supp. of Mot. for J. on the Agency R., ECF No. 52, at 2–4 (Apr. 15, 2025) ("Glass Producers Br.") (citing 19 U.S.C. § 1516a).

For the reasons set forth below, the court concludes that the Commission's determinations concerning price effects, adverse impact, and threat of material injury are supported by substantial evidence and otherwise in accordance with law. Accordingly, the court sustains the Commission's determination in full.

## BACKGROUND

### I.    Institution of the Investigation

On December 29, 2023, the Glass Producers Coalition filed petitions with the Commission and the U.S. Department of Commerce ("Commerce") alleging that the domestic glass wine bottle industry was materially injured, or threatened with material injury, by reason of dumped and subsidized imports from China and dumped imports from Mexico and Chile.  Petitions for the Imposition of Antidumping and Countervailing Duties, Certain Glass Wine Bottles from the People's Republic of China, the United Mexican States, and Chile, P.R. 1, C.R. 1, at 1–2 (Dec. 29, 2023).

On the same day, the Commission instituted antidumping and countervailing duty injury investigations concerning glass wine bottles from Chile, China, and Mexico during the period of investigation ("POI") from January 2021 through September 2024.  Glass Wine Bottles from Chile, China, and Mexico: Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations, P.R. 2 (ITC Dec. 29, 2023).  Following institution, the Commission collected production, shipment, pricing, and financial information from domestic producers, importers, and purchasers through questionnaires and other submissions.  See Views at 3–6.

## II.    Preliminary and Final Determinations

In February 2024, the Commission preliminarily found that there was a reasonable indication that an industry in the United States was materially injured by reason of subject imports from China.  Glass Wine Bottles from Chile, China, and Mexico, USITC Pub. No. 5493, Inv. Nos. 701-TA-703 and 731-TA-1661-1663, P.R. 91, C.R. 81 (Feb. 20, 2024) ("Preliminary Determination").  After the preliminary phase, the Glass Producers Coalition withdrew their petition as to Chile.  See Certain Glass Wine Bottles from Chile: Termination of Less-Than-Fair-Value Investigation, 89 Fed. Reg. 106,425 (Dep't Commerce Dec. 30, 2024).

During the final phase, the Commission gathered additional questionnaire responses and other record evidence concerning the condition of the domestic industry, the volume and pricing of subject imports, and the effects of those imports on the domestic industry.  See Draft Questionnaire Comment Letter, P.R. 98 (USITC Mar. 12, 2024); Blank Draft Questionnaires, P.R. 99 (ITC Mar. 12, 2024); Petitioner's Comments on Draft Questionnaires, P.R. 106, C.R. 83/84 (USITC April 19, 2024).  The Commission determined that while subject import volume was significant, the domestic industry was neither materially injured nor threatened with material injury by reason of subject imports from China during the POI. Views at 3.  The Commission published notice of its final negative determination in the Federal Register.  See Final Determination at 1.

PUBLIC VERSION

### III.    The Present Action

The Glass Producers Coalition commenced this action to challenge the Commission's final determination.  Glass Producers Br. at 2.  The Glass Producers Coalition moves for judgment on the agency record under U.S. Court of International Trade ("CIT" or "USCIT") Rule 56.2, arguing that the Commission's determinations concerning price effects, material injury, and threat are unsupported by substantial evidence and otherwise not in accordance with law.  Id. at 1–2.

The Commission opposes the motion and contends that its determination should be sustained because it is supported by substantial evidence and lawful. Def. Resp. in Opp'n to Pl. Mot. for J. on the Agency R., ECF No. 60, at 1–2 (Jul. 25, 2025) ("ITC Br.").  Defendant-Intervenors Berlin Packaging L.L.C., TricorBraun Inc., and Encore Glass, Inc. (collectively, "Defendant-Intervenors") likewise oppose the Glass Producers Coalition's motion.  Def.-Int. Berlin Packaging L.L.C. Resp. in Opp'n. to Pl.'s Mot. for J. on the Agency R., ECF No. 69, at 1 (Aug. 8, 2025) ("DI Berlin Br."); Def.-Int. TricorBraun Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R., ECF No. 63, at 1 (Aug. 8, 2025) ("DI TricorBraun Br."); Def.-Int. Encore Glass, Inc. Resp. in Opp'n. to Pl.'s Mot. for J. on the Agency R., ECF No. 71, at 1 (Aug. 8, 2025) ("DI Encore Br.").

## JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction pursuant to section 516A of the Tariff Act of 1930 ("the Act"), as amended, which authorizes judicial review of final

determinations by the Commission in antidumping and countervailing duty investigations.  See 19 U.S.C. § 1516a(a)(2)(B)(i).  The court reviews such determinations under 28 U.S.C. § 1581(c), which grants the court exclusive jurisdiction over civil actions commenced under section 516A.  See 28 U.S.C. § 1581(c).

The court sustains the Commission's determinations, findings, and conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence constitutes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and requires the court to consider the record as a whole, including evidence that detracts from the agency's determination.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 488 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Although the court does not reweigh the evidence or substitute its judgment for that of the Commission, the agency must provide a reasoned explanation that permits the court to discern the path of its analysis and ensures that it has considered the relevant evidence.  See id.; Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962); Timken U.S. Corp. v. United States, 421 F.3d 1350, 1356–59 (Fed. Cir. 2005).

Within this framework, the Commission may draw reasonable inferences from the record and weigh conflicting evidence, and the court may not, "displace the [Commission's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de*

*novo.*" Universal Camera Corp., 340 U.S. at 488. The possibility of drawing "two inconsistent conclusions" from the evidence, in other words, does not prevent the Commission's determination from being supported by substantial evidence. See Nippon Steel Corp. v. United States, 458 F.3d 1345, 1352 (Fed. Cir. 2006). At the same time, the Commission must base its determination on the record evidence and may not rely on conjecture or disregard significant contrary evidence without explanation. Id.

Furthermore, the Commission is "is presumed to have considered all of the evidence on the record" and is "not required to explicitly address every piece of evidence presented by the parties" during an investigation. Nucor Corp. v. United States, 318 F. Supp. 2d 1207, 1247 (CIT 2004) (quoting USEC Inc. v. United States, 34 F. App'x 725, 730–31 (Fed. Cir. 2002)), aff'd, 414 F.3d 1331 (Fed. Cir. 2005). Instead, the Commission need only address the issues that are material to its determination. Timken U.S. Corp., 421 F.3d at 1354 (citing Uruguay Round Agreements Act, Statement of Administrative Action, H.R.Rep. No. 103-316, vol. 1, at 892 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ("SAA")).

Finally, when evaluating challenges to the Commission's choice of methodology, this court has explained that it will "affirm the chosen methodology as long as it is reasonable." JMC Steel Grp. v. United States, 70 F. Supp. 3d 1309, 1316 n.4 (CIT 2015) (citing Shandong TTCA Biochem. Co., Ltd. v. United States, 774 F. Supp. 2d 1317, 1327 (CIT 2011) (citations omitted)).

## DISCUSSION

### I.    The Commission reasonably found no significant price effects from subject imports

The Glass Producers Coalition contends that the Commission's negative price effects determination is unsupported by substantial evidence and contrary to law because the agency failed to reasonably grapple with record evidence that, in their view, demonstrated significant adverse price effects from subject imports.  Glass Producers Br. at 13.  The Commission responds that its price effects analysis reflects a comprehensive evaluation of the record and that the Glass Producers Coalition improperly asks the court to reweigh competing evidence and substitute its preferred interpretation of the record for the Commission's reasonable conclusions.  See ITC Br. at 4, 17–18.

The Act directs the Commission to evaluate how subject imports affect the price of the domestic like product by considering whether those imports significantly undersell the domestic like product, depress domestic prices, or prevent price increases that otherwise would have occurred.  See 19 U.S.C. § 1677(7)(C)(ii)(I)–(II).  The Act requires the Commission to assess whether any such effects are "significant," but it does not prescribe a fixed methodology, threshold, or quantitative benchmark for making that determination.  See id..  Instead, Congress committed the evaluation of price effects to the Commission's judgment based on the record as a whole, including pricing data, lost sales and lost revenues, and other indicia of price competition.  Id.  The Commission may weigh competing record evidence, determine the relative importance of particular pricing

Court No. 24-00199                                              Page 9

indicators, and make reasonable interpretations of the evidence.  See Nucor Corp.,

318 F. Supp. 2d at 1247; see also Goss Graphic Sys., Inc. v. United States, 33 F.

Supp. 2d 1082, 1100 (CIT 1998), aff'd, 216 F.3d 1357 (Fed. Cir. 2000).

To establish price depression, the record must show that subject imports

caused domestic prices to decline.  See 19 U.S.C. § 1677(7)(C)(ii)(II).  To establish

price suppression, the record must show that subject imports prevented the

domestic industry from increasing prices to recover rising costs.  Id.  The

Commission evaluates depression and suppression in the context of the overall

market and determines whether any such effects are both attributable to subject

imports and significant in light of the record evidence.  See 19 U.S.C.

§ 1677(7)(C)(ii); Timken U.S. Corp., 421 F.3d at 1358–59.

In concluding that subject merchandise did not have significant price effects

on the domestic industry, the Commission reasonably (i) evaluated underselling and

market share trends; (ii) addressed purported level of trade issues concerning

Pricing Products 1–5; (iii) evaluated contemporaneous business documentation

offered to show underselling; (iv) considered the frequency of underselling and lost

sales evidence; (v) addressed purported evidence of price suppression; and (vi)

evaluated inventory evidence and its asserted price effects.  Below, the court

addresses each of these points in turn.

### A. The Commission reasonably evaluated underselling and market share trends

The Glass Producers Coalition argues that the Commission mischaracterized

the extent and significance of underselling and market share trends by including

certain "objectively factually incorrect" statements in the Views.  Glass Producers
Br. at 13–15.  Specifically, the Glass Producers Coalition takes issue with the
Commission's statement that "the subject imports that gained market share during
the latter portion of the POI were from Mexico," because imports from China also
gained market share during the POI.  Id. at 13–14 (citing Views at 55–56).
Likewise, the Glass Producers Coalition challenges the Commission's statement
that "none" of the Mexican imports that gained market share were "purchased at
lower cost during that period," because this statement purportedly overlooks certain
instances in which Mexican subject imports reflected lower purchase costs while
gaining market share.  Id.

The Commission responds that these challenged statements do not materially
misstate the record or undermine the Commission's reasonable assessment of
pricing data and underselling margins for subject imports.  ITC Br. at 18–24.
Defendant-Intervenor TricorBraun further responds that the Glass Producers
Coalition has improperly "cherry-pick[ed] the record" by concentrating on "selected
and isolated" data points that were not the basis for the Commission's negative
determination.  DI TricorBraun Br. at 13, 20–22.

The Act requires the Commission to evaluate whether subject imports
"significantly" undersold the domestic like product.  19 U.S.C. § 1677(7)(C)(ii)(I).  In
performing that analysis, the Commission may weigh competing evidence and draw
reasonable inferences.  See Nippon Steel, 458 F.3d at 1351–52.  The possibility that

the record could support competing interpretations does not render the

Commission's determination unsupported by substantial evidence. See id.

Here, the Commission reasonably determined that overselling predominated

during the POI, and the discrete statements that the Glass Producers Coalition

challenges do not materially undermine its overselling analysis. While the Glass

Producers Coalition takes issue with certain discrete and isolated phrases in the

Views, the Commission's broader overselling and market share analysis reflects a

detailed understanding of the specific portions of the record at issue in these

statements. See Glass Producers Br. at 13–14; Views at 54–59.

For instance, the Commission's statement that "the subject imports that

gained market share during the latter portion of the POI were from Mexico," see

Glass Producers Br. at 13–14 (citing Views at 55–56), is not a material

misstatement because the Commission explicitly acknowledged in the Views that

Chinese imports gained market share as well. See Views at 73 n.285 ("Subject

imports from China also gained 0.6 percentage points of market share in the

interim period comparison, yet the price comparisons show no underselling by

subject imports from China.") (citation omitted).

Likewise, read in the context of the Views as a whole, the Commission's

statement about whether certain Mexican imports were "purchased at lower cost"

does not materially misrepresent the underlying record, since the Commission

recognizes in the Views that underselling occurred in a number of quarterly

comparisons, including during quarters in which certain subject imports from

Mexico undersold the domestic like product.  See id. at 51, 57; see also Glass

Producers Reply Br. at 4 (conceding that the Commission's statement in the views

"is technically correct" with respect to Pricing Products 6 through 8).  Indeed, the

Commission describes the limited evidence of underselling on the record in

significant detail, including by both frequency and margin, demonstrating that it

did not misunderstand record evidence nor fail to support its conclusions with

substantial evidentiary support.  See Views at 51–59.

Significantly, the Commission's analysis does not rely exclusively or

materially on either of the purportedly "factually incorrect" statements that the

Glass Producers Coalition challenges.  See Glass Producers Br. at 13–14.  Rather,

the Commission concluded that the weight of the underselling and overselling

evidence did not establish significant adverse price effects because the record as a

whole demonstrated mixed pricing trends, declining apparent U.S. consumption,

and purchaser decisions based on non-price factors.  See Views at 65.  The Glass

Producers Coalition's position places undue emphasis on a small number of isolated

data points and statements without sufficiently engaging the broader structure,

content, and depth of the Commission's price effects analysis.  See Altx, Inc. v.

United States, 370 F.3d 1108, 1121 (Fed. Cir. 2004) (holding that the court must

affirm an International Trade Commission determination if "it is reasonable and

supported by the record as a whole, even if some evidence detracts from the

Commission's conclusion (quoting Atlantic Sugar, Ltd. v. United States, 744 F.2d

1556, 1562–64 (Fed. Cir. 1984)).  In sum, because the Commission's broader

Court No. 24-00199                                                    Page 13

analysis demonstrates that it understood and reasonably evaluated record evidence

regarding pricing and market share trends, and because the challenged statements

do not undermine or even underpin that analysis, the Commission's determination

is supported by substantial evidence and in accordance with law.

### B. The Commission reasonably addressed purported level of trade and data issues concerning Pricing Products 1–5

The Glass Producers Coalition argues that the Commission's pricing analysis

for Products 1 through 5 is unsupported by substantial evidence because the

Commission relied on flawed pricing comparisons that failed to account for

differences in levels of trade between domestic and imported merchandise.  Glass

Producers Br. at 15–17.  Specifically, the Glass Producers Coalition contends that

the Commission improperly compared (a) domestic producers' sales to end users,

with (b) sales of subject imports that include a distribution markup before reaching

end users.  See Glass Producers Br. at 15–17.  The Glass Producers Coalition

further contends that the Commission unreasonably declined to collect import

purchase cost data for Pricing Products 1 through 5, which resulted in the flawed

comparison across different levels of trade.  See id.  According to the Glass

Producers Coalition, the competing comparative frameworks operate as follows:

**PUBLIC VERSION**

<u>Commission's comparison framework:</u>

    U.S. Producer (Level #1)    →    End User

    Foreign Producer (Level #1)    →    Distributor/Importer (Level #2)    →    End User

<u>Glass Producers' proposed approach:</u>

    U.S. Producer (Level #1)    →    Distributor

    Foreign Producer (Level #1)    →    Distributor/Importer

<u>See</u> Glass Producers Br. at 15.

The Commission responds that it reasonably employed its standard pricing methodology for Products 1 through 5 and determined that there were no significant adverse price effects. <u>See</u> <u>ITC</u> <u>Br.</u> at 18–24. The Commission also contends that the Glass Producers Coalition failed to exhaust administrative remedies, because as petitioners before the Commission, they offered a qualitatively different level-of-trade argument. <u>See</u> <u>id.</u> at 21.[1]

The court concludes that the Commission reasonably addressed any purported data or methodological issues concerning Pricing Products 1 through 5. The Act does not prescribe a specific comparison methodology for the evaluation of price effects and instead directs the Commission to assess the price effects of subject imports based on the record as a whole. <u>See</u> 19 U.S.C. § 1677(7)(C)(ii). Consistent with the statute, this court has recognized that the Commission may select among reasonable methodologies so long as its approach permits fair price comparisons. <u>See</u> <u>JMC Steel Grp.</u>, F. Supp. 3d at 1316 n.4. In other words, the court will "affirm

---

[1] Because the Glass Producers Coalition's argument does not succeed on the merits, as discussed *infra*, the court need not reach this exhaustion issue.

PUBLIC VERSION

the [Commission's] chosen methodology as long as it is reasonable." Id. (citations omitted).

The Commission applied a reasonable approach here. The record reflects that the Commission consistently collected pricing data on the basis of first sales to unrelated customers and performed its comparisons at that first commercial level. See Views at 50, 54–56. The Commission's approach reflects its "typical underselling methodology," which this court has endorsed as capable of yielding an "apples-to-apples" comparison. See Mexichem Fluor Inc. v. United States, 179 F. Supp. 3d 1238, 1246–47 (CIT 2016).

The Commission's choice of methodology is also reasonable because it aligns with record evidence that both domestic producers and importers predominantly sell case-packed Pricing Products 1 through 5 to wineries, i.e. end users, rather than through distributors. See Views at 55–56 nn.221–222 (citing Memorandum from Nannette Christ, Director, Office of Investigations, to The Commission, re: Investigation Nos. 701- TA-703 and 731-TA-1661-1663 (Final): Glass Wine Bottles from Chile, China, and Mexico – Staff Report, P.R. 184, C.R. 268, at Tables D-1 and D-5 (Sept. 6, 2024) ("Final Staff Report")). Although some subject imports and domestic products were sold through distributors, the majority of transactions on both sides were to wineries. See Final Staff Report at Tables D-1, D-3. The fact that the Commission's pricing comparisons reflect the bulk of relevant transactions, therefore, is yet another reason why the Commission's chosen methodology offers a

reasonable basis to evaluate price competition between subject imports and the domestic like product.

Furthermore, even assuming that the Glass Producers Coalition's proposed alternative comparison is permissible and feasible on the record, any purported deficiency regarding Pricing Products 1–5 would not materially undermine the Commission's ultimate price effects determination. The Commission did not rely exclusively on the pricing comparisons for Products 1 through 5, but instead evaluated multiple independent sources of pricing evidence including purchase cost data for Pricing Products 6–8, average unit values, and broader pricing trends, all of which reasonably indicated to the Commission that subject imports predominantly oversold the domestic like product. See Views at 51–58. Significantly, the Commission's comparisons for Pricing Products 6–8 – which more closely align with the Glass Producers Coalition's preferred methodology – continued to demonstrate predominant overselling rather than underselling, which further supports the Commission's conclusion. See id.

In sum, the Commission was not required to adopt the Glass Producers Coalition's preferred pricing methodology, because the Commission reasonably explained and supported its chosen approach. See JMC Steel Grp., 70 F. Supp. 3d at 1316 n.4. Moreover, even if the Glass Producers Coalition's proposed methodology were both permissible and feasible, the resulting comparisons would not materially undermine the Commission's broader price effects analysis. The

Commission's pricing comparison for Products 1 through 5 is thus supported by

substantial evidence and in accordance with law.

### C. The Commission reasonably evaluated contemporaneous business documentation offered to show underselling

The Glass Producers Coalition contends that the Commission failed to

meaningfully address certain contemporaneous business documentation and lost

sales evidence, including internal communications and purchaser correspondence

that, in their view, demonstrate that purchasers selected subject imports because of

lower prices.  See Glass Producers Br. at 17–19.  The Commission responds that the

it addressed material contemporaneous business documentation and lost sales

allegations, weighed such evidence against contrary record information, and

reasonably determined that the documentation did not demonstrate significant

price depression or suppression attributable to subject imports.  See ITC Br. at 23–

29.

While the Commission must address any material evidence that detracts

from its determination, the Commission is "presumed to have considered all of the

evidence on the record" and need not explicitly "address every piece of evidence

presented by the parties." Nucor Corp., 318 F. Supp. 2d at 1247 (quoting USEC Inc.

v. United States, 34 F. App'x at 730–31).  Here, the Commission's treatment of

contemporaneous business documentation does not warrant remand because the

agency reasonably considered the record and was not required to discuss each

contemporaneous business document individually.  See Views at 57–59; see also

Altx, Inc., 370 F.3d at 1121.  Contrary to the Glass Producers Coalition's argument,

the Views demonstrate that the Commission did consider the relevant contemporaneous business documentation when it expressly discussed lost sales and lost revenue allegations, purchaser questionnaire responses, and testimony concerning the role of price in purchasing decisions. Views at 58–59. The Commission acknowledged that certain purchasers reported switching suppliers based in part on price and that some domestic producers reported instances in which they lost sales to lower-priced subject imports. Id. at 58. The Commission also acknowledged and discussed specific allegations from [[

]][2] and that [[                    ]] shifted a relatively modest purchase order to lower-priced subject imports, among other related assertions. Views at 58 n.228.

---

[2] The Glass Producers Coalition correctly flags that footnote 228 of the Views misquotes an email from [[          ]]. Even so, this error ultimately proves harmless, because even the correct version of the quote reasonably supports the Commission's characterizations and its ultimate conclusion that the record lacks sufficient evidence that [[
]]. See Petitioner's Prehearing Brief, P.R. 141, C.R. 217/225 at Exhibit 6 (Aug. 8, 2024).

Exhibit 6 of Petitioner's Prehearing Brief states that [[
]]. In the Views, by contrast, the Commission incorrectly quotes the exhibit as follows: [[
]]. The Glass Producers Coalition suggests that [[
]] matters because [[
], whereas the correct phrasing – [[

]]. See Glass Producers Reply Br. at 8.

While the Glass Producers Coalition is technically correct that the Commission misquoted Exhibit 6, the Commission's error is harmless because even the correct version of the Exhibit [[
]]. In Exhibit 6,
[
]].
Ultimately, then, the distinction between [[                    ]] and [[                    ]] is harmless in light of the Commission's reasonable analysis of the Exhibit as a whole.

The Commission nevertheless determined that the evidence presented a mixed picture because purchasers also identified non-price considerations – including supply reliability, product quality, lead times, and inventory availability – as important purchasing factors. See Views at 45. The Commission also considered the broader pricing record, including quarterly pricing comparisons, underselling margins, purchase cost data, and shipment average unit value ("AUV") data. See id. at 49–65. Against that broader evidentiary backdrop, the Commission concluded that the record did not establish significant adverse price effects. See id. at 65.

While the Glass Producers Coalition is correct that the Commission did not specifically cite each letter, internal communication, or confidential exhibit they raised, the Commission is presumed to have considered all record evidence, and the absence of a document-by-document analysis does not suggest that the Commission failed to consider material evidence. See Nucor Corp., 318 F. Supp. 2d at 1247. The Commission's discussion reflects that it thoroughly understood the Glass Producers Coalition's theory and weighed that theory against contrary evidence in the record. See Views at 57–59. In light of the Commission's broader discussion of lost sales allegations, purchaser behavior, pricing data, and non-price factors, the court is not persuaded that additional discussion of individual documents would have materially altered the Commission's analysis or negative determination. The Commission therefore reasonably concluded that the contemporaneous business documentation did not outweigh the broader record evidence demonstrating no significant adverse price effects.

### D. The Commission reasonably considered the frequency of underselling and lost sale evidence

The Glass Producers Coalition contends that the Commission failed to meaningfully address their argument that underselling pervaded throughout the POI and that more than one out of five purchasers reported buying subject imports because they were lower priced. See Glass Producers Br. at 19–20. In response, the Commission explains that it reasonably considered the lost sales allegations and purchaser questionnaire responses but permissibly concluded that the evidence did not establish significant adverse price effects when viewed in the context of the record as a whole. See ITC Br. at 10–11.

Neither the Act nor case precedent requires the Commission to treat isolated instances of underselling or purchaser preference evidence as dispositive. See 19 U.S.C. § 1677(7)(C)(ii)(I). Rather, the Commission must evaluate the significance of such evidence within the broader context of the pricing record. See Timken U.S. Corp., 421 F.3d at 1358–59; Nucor Corp., 318 F. Supp. 2d at 1247.

The Glass Producers Coalition's contentions regarding underselling frequency and lost sales do not justify remand, because the agency considered both categories of evidence and reasonably explained why such evidence did not establish significant price adverse price effects. The Commission expressly discussed the frequency of underselling, noting that cumulated subject imports undersold the domestic like product in 9 of 143 quarterly comparisons and that underselling varied considerably by pricing product and period. Views at 51. The Commission also noted that 21 of 37 responding purchasers reported purchasing subject imports

instead of the domestic like product because of lower prices since January 2021.  Id. at 53.  The Commission nevertheless concluded that these data points did not establish a broader pattern of significant adverse price effects because the record also demonstrated mixed pricing trends, evidence of overselling in many comparisons, and substantial evidence that purchasers considered non-price factors when making sourcing decisions.  See id. at 25–30.

The Commission was not required to separately address "every piece of evidence" that the Glass Producers Coalition marshaled in support of its underselling argument.  See Nucor Corp., 318 F. Supp. 2d at 1257.  Nor was it required to give dispositive weight to the frequency of underselling where the record shows that the quarters in which 88.8 percent of total subject import sales took place were quarters in which there was overselling, and only 11.2 percent of sales took place during quarters with underselling.  See id.; Views at 51.  In light of the Commission's broader analysis of pricing data, purchaser responses, lost sale allegations, and conditions of competition, the court concludes that the Commission reasonably addressed the frequency of underselling and permissibly determined that it did not demonstrate significant adverse price effects.

### E.  The Commission reasonably concluded that the record did not demonstrate significant price suppression attributable to subject imports

The Glass Producers Coalition argues that the Commission failed to meaningfully address evidence that domestic producers experienced cost increases that exceeded price increases during the POI.  See Glass Producers Br. at 20–22.  In turn, the Commission argues that it considered cost and net sales data alongside

**PUBLIC VERSION**

the broader pricing record and reasonably determined that there was no evidence

that subject imports caused significant price suppression.  See ITC Br. at 26–29.

Under section 771(7)(C)(ii)(II) of the Act, the Commission must consider

whether "the effect of imports of such merchandise otherwise depresses prices to a

significant degree or prevents price increases, which otherwise would have

occurred, to a significant degree."  19 U.S.C. § 1677(7)(C)(ii)(II).  The statute does

not require the Commission to find price suppression whenever costs increase or

profitability declines; rather the Commission must evaluate whether subject

imports significantly depressed prices or prevented domestic price increases that

otherwise would have occurred.  See id.

Under this framework, the Commission reasonably concluded that the record

did not demonstrate significant price suppression attributable to subject imports.

The Commission expressly recognized that the domestic industry's ratio of cost-of-

goods-sold ("COGS") to net sales increased by [[    ]] percent from [[      ]] percent in

2021 to [[      ]] percent in 2023.  Views at 61.  The Commission nevertheless

determined that trends in the COGS-to-net-sales ratio varied across domestic

producers, with [[

]] from interim 2023

to interim 2024.  Id at 61 n.244.  From these divergent trends, Commission

reasonably inferred that, absent consistent industry-wide effects, the cost pressure

that some domestic producers experienced was likely attributable to "internal

factors" and not "external, industry-wide factors" such as subject imports.  See id.

The Commission also reasonably concluded that certain non-recurring costs associated with curtailments, closures, and other one-time events contributed to the cost pressure that some domestic producers experienced, rather than competition from subject imports. See id. at 63 nn.247–248. While the Glass Producers Coalition contends that these events were themselves caused by subject import competition, see Glass Producers Br. at 21–22, the Commission reasonably determined that the record tied those events to declining demand and reduced consumption rather than to subject imports. See Views at 67. In light of this broader explanation, the court is not persuaded that the Commission impermissibly discounted evidence of price suppression; rather, the Commission reasonably concluded that the record did not establish that subject imports prevented domestic producers from recovering costs or otherwise significantly suppressed prices.

### F. The Commission reasonably evaluated the alleged inventory overhang and its asserted adverse price effects

The Glass Producers Coalition contends that the Commission unreasonably discounted evidence that an inventory overhang of imported merchandise exerted downward pressure on domestic prices and contributed to adverse price effects during the POI. See Glass Producers Br. at 22–24. The Commission, however, responds that it reasonably rejected the Glass Producers Coalition's inventory overhang theory because the record did not establish sustained or imminent price pressure resulting from inventories of subject merchandise. See ITC Br. at 29–33.

In evaluating the record as a whole under section 771(7)(C)(ii) of the Act, the Commission may reasonably determine that inventory volumes do not outweigh

broader contrary evidence concerning pricing trends, market conditions, and purchaser behavior. See 19 U.S.C. § 1677(7)(C)(i)–(ii). The court may not reweigh competing evidence where the Commission reasonably explained its conclusions and supported those conclusions with substantial evidence. See Nippon Steel, 458 F.3d at 1351–52.

Here, the Commission expressly considered evidence that inventories of subject imports increased by 9 percent from 2021 to 2023. See Views at 64. The Commission also noted that domestic prices generally increased during the POI as inventories rose, and that the broader pricing record continued to demonstrate predominant overselling rather than underselling, which undermines the Glass Producers Coalition's concern that excess inventories were resulting in underselling in the U.S. market. See id. at 61, 85. Weighing this evidence, the Commission reasonably determined that subject import inventories remained modest relative to the size of the U.S. market and that the record did not demonstrate a meaningful causal relationship between inventories and price effects. See id. at 64–65.

The Commission also reasonably rejected the Glass Producers Coalition's argument that an increase in the inventory-to-shipment ratio necessarily reflected a growing inventory overhang. Although the Glass Producers Coalition emphasizes that the ratio increased during the POI, the Commission explained that the increase was chiefly driven by declining shipments – that is, a smaller denominator – rather than by a substantial buildup in inventories. See Views at 84–85. The Commission permissibly considered this data in the context of declining apparent

Page 25

**PUBLIC VERSION**

U.S. consumption, and the Commission determined that the record did not show that importers used inventories to undersell domestic merchandise or depress prices. See id. at 64–65.  Given the Commission's broader discussion of pricing trends, demand conditions, shipment levels, and inventory ratios, the Commission reasonably determined that subject import inventories did not establish significant adverse price effects, whether on an absolute or relative basis.

## II.    The Commission reasonably found no adverse impact by reason of subject imports

The Glass Producers Coalition contends that the Commission's adverse impact analysis is unsupported by substantial evidence and unlawful because the Commission misapplied both the causation and material injury requirements of the statute and disregarded material record evidence.  See Glass Producers Br. at 24. The Commission responds that it applied the correct causation and material injury standards and reasonably concluded, based on the record as a whole, that the domestic industry was not materially injured by reason of subject imports.  See ITC Br. at 35–36.  Defendant-Intervenor Encore Glass LLC further asserts that the Glass Producers Coalition improperly isolates selective portions of the record while disregarding broader market conditions, demand fluctuations, and contrary evidence supporting the Commission's determination.  See DI Encore Br. at 3–4.

To establish material injury, the Act requires the Commission to determine whether a domestic industry is materially injured "by reason of" subject imports. 19 U.S.C. § 1677(7)(A)–(C).  The Act defines "material injury" as "harm which is not inconsequential, immaterial, or unimportant."  Id. § 1677(7)(A).  In assessing

material injury, the Commission may consider broader market conditions and alternative causes of injury so long as it reasonably evaluates whether subject imports caused material injury within the meaning of the statute. See Mittal Steel Point Lisas Ltd. v. United States, 542 F.3d 867, 872 (Fed. Cir. 2008) (explaining that when "analyzing the issue of causation, the [Commission] has broad authority to consider any relevant factors"). The Commission may also weigh competing economic evidence and evaluate the record as a whole in assessing the domestic industry's condition and the impact of subject imports. See id.

In concluding that subject merchandise did not have a significant adverse impact on domestic industry, the Commission (i) applied the correct causation standard; (ii) applied the correct material injury standard; (iii) reasonably addressed arguments that the industry entered the POI in an injured state; and (iv) reasonably addressed industry performance and market share trends in its adverse impact analysis. The court addresses each of these points below.

## A. The Commission applied the correct causation standard and explained its reasoning

The Glass Producers Coalition argues that the Commission misapplied the "by reason of" causation standard by effectively attributing adverse trends to changes in demand and other non-subject factors without adequately analyzing whether subject imports were a contributing cause of injury. See Glass Producers Br. at 24–30. The Commission responds that it applied the correct causation standard and reasonably concluded, based upon the record as a whole, that subject

Court No. 24-00199                                                                                   Page 27

imports did not have a significant adverse impact on the domestic industry.  ITC Br. at 36–37.

The statute requires the Commission to establish a causal nexus between subject imports and the material injury found.  See 19 U.S.C. § 1677(7)(B)(i)–(ii). Although subject imports need not be the sole or predominant cause of injury, they must be more than an "incidental, tangential, or trivial" cause.  Nippon Steel Corp. v. U.S. International Trade Commission, 345 F.3d 1379, 1381 (Fed. Cir. 2003).  In conducting its analysis, the Commission must consider the volume and price effects of subject imports together with their impacts, and it must address competing explanations for the industry's performance such that it does not attribute injury caused by other factors to subject imports.  See 19 U.S.C. § 1677(7)(B)(ii), (C).  The Commission retains discretion to weigh record evidence and determine the significance of subject imports, provided that it articulates a reasoned explanation that permits the court to discern the path of its analysis.  See Timken U.S. Corp., 421 F.3d at 1355–56.

The Commission applied the correct standard for causation and reasonably concluded that subject imports were not more than an "incidental, tangential, or trivial" cause of the domestic industry's condition.  See Nippon Steel, 345 F.3d at 1381.  The Commission explained that it was required to determine whether subject imports were a cause of material injury, and not merely whether other factors also affected the industry.  See Views at 32 n.109, 34.  The Commission further explained that, although subject imports increased during portions of the POI, the

Court No. 24-00199                                                        Page 28

record did not show that the imports were sufficiently connected to adverse trends

that the industry experienced.  See id. at 75–76.  The Commission therefore did not

require the Glass Producers Coalition to demonstrate that subject imports were the

sole or predominant cause of injury.  Rather, the Commission permissibly concluded

that the record did not establish a sufficient causal nexus between subject imports

and the industry's declining performance.  See id.

The Commission also independently concluded that the adverse impacts that

the Glass Producers Coalition identified were consistent with declining demand.

The Views explain that apparent U.S. consumption declined by 12.5 percent from

2021 to 2023 following the temporary COVID-related increase in demand for wine

bottles.  See id. at 29–30.  The Commission also found that domestic producers'

declining shipments, production, capacity utilization, and financial performance

generally tracked that broader decline in demand.  See id. at 67–68, 75.  The

Commission further observed that the domestic industry lost market share to non-

subject imports and that subject imports did not consistently undersell domestic

merchandise or significantly suppress domestic prices.  See id. at 59, 65.  In light of

these findings, the Commission reasonably determined that the industry's condition

was likely tied to declining consumption and changing market conditions and not to

subject imports.

The Glass Producers Coalition is correct that causation does not require

subject imports to be the sole – or even most important – cause of domestic injury.

See Glass Producers Br. at 28–30 (citing Nippon Steel, 345 F.3d at 1381).  But the

Commission did not apply such a stringent standard here.  The <u>Views</u> do not state

that subject imports must be the primary cause of injury or that demand declines

necessarily preclude a finding of causation.  <u>See</u> <u>Views</u> at 32.  Rather, the

Commission concluded, based on the totality of the record, that subject imports

were not sufficiently connected to the averse trends affecting the industry, and that,

separately, demand declines were.  <u>See</u> <u>id.</u> at 67.  The court therefore concludes that

the Commission applied the correct causation standard and reasonably determined

that subject imports were not a sufficient cause of injury to the domestic industry to

satisfy the statutory standard.  <u>See</u> 19 U.S.C. § 1677(7)(B)(i).

### B. The Commission applied the correct material injury standard and explained its reasoning

The Glass Producers Coalition asserts that the Commission misapplied the

material injury standard by characterizing the industry's performance as stable or

improving despite record evidence of declining profitability, capacity utilization, and

facility curtailments during the period of investigation.  <u>See</u> Glass Producers Br. at

30–33.  The Commission explains that it reasonably evaluated the domestic

industry's condition as a whole and permissibly concluded that the record did not

support a finding of material injury caused by subject imports.  <u>See</u> ITC Br. at 37–

38.

Material injury refers to "harm which is not inconsequential, immaterial, or

unimportant." 19 U.S.C. § 1677(7)(A).  In evaluating material injury, the

Commission must consider the impact of subject imports on the domestic industry

"within the context of the business cycle and conditions of competition that are distinctive to the affected industry." Id. § 1677(7)(C)(iii).

Here, the Commission reasonably concluded that the domestic industry's condition, although weaker in certain portions of the POI, did not establish material injury. The Commission defined material injury in accordance with the Act as "harm which is not inconsequential, immaterial, or unimportant." Views at 31 (citing 19 U.S.C. § 1677(7)(A)). The Commission explained that capacity, production, capacity utilization, sales, and shipments all declined during the POI, but that those declines were "generally commensurate with the 12.5 percent decline in apparent U.S. consumption from 2021 to 2023." Id. at 67. The Commission also recognized that the industry reported closures, curtailments, and declining profitability, but found that the industry returned to profitability in interim 2024 and that reduced capacity had lowered unit fixed costs. Id. at 67, 88. The Commission therefore did not ignore the adverse facts identified by the Glass Producers Coalition, but instead concluded that those facts did not establish material injury by reason of subject imports.

The Glass Producers Coalition isolates several data points that do not materially undermine or contradict the Commission's broader analysis. The Commission expressly discussed lost sales allegations, underselling, and weakening financial performance, and ultimately determined that there were no significant adverse price effects that were "particularly probative" to its impact analysis. Id. at 66 n.257. The Commission also found that reduced sales, shipments, and capacity

were tied to declining demand and not to subject imports. Id. at 70. The

Commission was not required to treat allegations of lost sales or underselling in

certain comparisons as automatically establishing material injury. See Timken

U.S. Corp., 421 F.3d at 1354–57 (citing SAA at 892). Instead, the Commission

permissibly weighed those facts against the broader record, including declining

apparent consumption, mixed pricing results, non-price purchasing factors, and

certain improving interim 2024 results. See Views at 45, 75. The Commission

therefore applied the correct material injury standard and reasonably explained

why the adverse facts that the Glass Producers Coalition emphasized did not

amount to material injury under the Act.

C. **The Commission reasonably addressed arguments that the industry entered the POI in an injured state**

The Glass Producers Coalition also contends that the Commission failed to

examine its argument that the industry entered the POI in an already injured state

and therefore improperly discounted early-period deterioration of the industry's

condition. See Glass Producers Br. at 31–33. Specifically, the Glass Producers

Coalition argues that the Commission failed to engage with evidence such as pre-

POI financial filings, sworn testimony, and other record materials that purportedly

demonstrate that the industry was already experiencing injury before the POI.

See id. at 30–32. The Commission responds that it reasonably evaluated such

evidence, as well as the industry's condition throughout the POI, and permissibly

concluded that the record did not establish a significant adverse impact caused by

subject imports. See ITC Br. at 41–42.

Under the Act, the Commission must evaluate the domestic industry's condition during the POI based upon the record as a whole. See 19 U.S.C. § 1677(7)(C)(iii). Although the Commission may consider historical industry conditions and pre-period trends, the Act does not require the Commission to presume that adverse conditions at the beginning of the POI or beforehand were caused by subject imports in the investigation at issue. See id.

Here, the Commission reasonably considered the Glass Producers Coalition's argument that the domestic industry entered the POI in an injured state and permissibly concluded that the record did not sufficiently support the Glass Producers Coalition's characterization. The Commission expressly examined conditions immediately preceding the POI and determined that subject imports "pervasively oversold the domestic like product and captured no market share from the domestic industry during the 2020–2021 period, prior to the POI." Views at 74–74. The Commission then reasonably determined that the record did not establish that the industry entered the POI injured because of subject imports. See id.

The Glass Producers Coalition's contrary arguments are unavailing. While the Glass Producers Coalition points to pre-POI filings, testimony from Ardagh and O-I representatives, and other documentary evidence – including generalized corporate risk disclosures – that suggest the industry faced challenges prior to the POI, the Commission reasonably concluded that such evidence does not outweigh market data and pricing comparisons demonstrating that subject imports did not gain market share and frequently oversold domestic merchandise during the

**PUBLIC VERSION**

preliminary phase.  See Glass Producers Br. at 32; Views at 51, 57, 65.  To the

extent that the Glass Producers Coalition points to pre-POI documentary evidence

that the Commission did not individually name or address, the Commission is not

required to treat any one document as dispositive or discuss each document

individually where its reasoning and conclusions are otherwise apparent.  See

Nucor Corp., 318 F. Supp. 2d at 1257 (citations omitted).  In sum, the Commission

acknowledged the Glass Producers Coalition's pre-POI injury theory but

permissibly concluded, based on the record as a whole, that the evidence did not

demonstrate that the industry entered the POI injured because of subject imports.

### D. Plaintiff's asserted factual errors regarding industry performance and market share trends do not warrant remand

The Glass Producers Coalition argues that the Commission's impact analysis

contains certain "factually incorrect" statements[3] concerning industry performance

and market share trends in interim 2024 that undermine the integrity of the

agency's reasoning.  See Glass Producers Br. at 33–34.  The Commission responds

that it addressed these data discrepancies in its trailing views and further explains

that the underlying pricing data for Mexican imports in interim 2024 does not

demonstrate that underselling accounted for any increase in market share for

---

[3] The Glass Producers Coalition first challenges the Commission's statement that, in quarterly price comparisons for interim 2024, subject imports from Mexico were higher priced than the domestic like product for pricing products 1, 3, and 5.  See Glass Producers Br. at 32–34 (citing Views at 73 n.286). The Glass Producers Coalition separately challenges the Commission's statement that, for Pricing Products 1 through 5, subject imports from Mexico "predominantly oversold the domestic like product in interim 2024," because imports from Mexico only oversold in [[
                                             ]].  See id. at 34.

Court No. 24-00199                                                    Page 34

subject imports.  See ITC Br. at 33 n.19 (citing Glass Wine Bottles from China and Mexico, USITC Pub. No. 5588, Inv. Nos. 731-TA-1662-1663 (Feb. 2025) at 38–39).

Under the substantial evidence standard, the Commission's determination must be evaluated based on whether it is "reasonable and supported by the record as a whole," not based on individual statements taken out of context.  See Altx, Inc., 370 F.3d at 1121.  Here, the Commissions' statements regarding pricing product comparisons in interim 2024 do not warrant remand because the Views demonstrate that the agency understood and reasonably evaluated the underlying pricing data in drawing its conclusions regarding adverse impact.  See Views at 73. Even if the Glass Producers Coalition would characterize interim 2024 data differently, nothing in the Views suggests that the Commission misunderstood the underlying record or that its conclusion lacks substantial evidentiary support. See id.  The Views disclose the underlying interim 2024 comparison on which the Commission relied, including the products for which Mexican imports oversold and undersold, the corresponding margins, and the associated quantities.  See id. at 73 n.286.  The Commission also evaluated pricing trends across the full POI and across multiple measures, including quarterly price comparisons, underselling frequency, margins, purchase cost data, and shipment average unit values.  See id. at 62, 73– 74.  Thus, the challenged statements do not show that the Commission overlooked contrary pricing evidence; rather, they reflect the Commission's reasonable assessment of a subset of pricing data within a broader record.

The challenged statements also do not materially affect the Commission's ultimate impact determination.  The Commission's adverse impact analysis rested on broader findings that subject imports declined absolutely as well as relative to apparent U.S. consumption from 2021 to 2023, that subject imports predominantly oversold the domestic like product by any measure, that there were few confirmed lost sales, and that declining industry performance tracked declining apparent U.S. consumption rather than competition from subject imports.  See id. at 53–55.  The Commission likewise determined that, despite an increase in subject import market share in interim 2024, the domestic industry increased unit net sales values by more than unit COGS, reduced its COGS-to-net-sales ratio, and improved financial performance by almost every measure.  See id. at 65, 74.  In that context, any disagreement over how to characterize the interim 2024 Mexican pricing data for certain pricing products does not undermine the Commission's broader reasoning or require remand.

Regarding the challenged statement about predominant overselling for Pricing Products 1 through 5 from Mexico, Views at 73, the Commission corrected this discrepancy in its trailing views and further explained that the same underlying data points that do not show "predominant overselling" also do not show any underselling that accounted for increased market share for subject imports. See Glass Wine Bottles from China and Mexico, USITC Pub. No. 5588, Inv. Nos. 731-TA-1662-1663 (Feb. 2025) at 38–39 n.157.  More importantly, as discussed above, the Commission's determination does rest not on this isolated statement

**PUBLIC VERSION**

alone but instead on a broader, more comprehensive evaluation of pricing trends across the POI. See Views at 53–55. The Commission's impact analysis is therefore supported by substantial evidence and in accordance with law, notwithstanding the Glass Producers Coalition's objections to certain discrete characterizations of the record.

## III.   The Commission reasonably found no threat of material injury

The Glass Producers Coalition contends that the Commission's negative threat determination cannot be sustained because the record establishes a clearly foreseen and imminent threat of material injury from subject imports. See Glass Producers Br. at 34. The Commission responds that it evaluated the statutory threat factors and reasonably concluded, on the basis of the record as a whole, that a threat of material injury was not clearly foreseen and imminent. See ITC Br. at 42–44. Defendant-Intervenors reinforce the Commission's position and contend that the Glass Producers Coalition's challenge ultimately reflects disagreement with the Commission's weighing of competing evidence and forecasting judgments rather than a showing that the agency's threat determination lacks substantial evidentiary support.

Section 771(7)(F) of the Act directs the Commission to determine whether a domestic industry is threatened with material injury by reason of subject imports by analyzing whether "further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued or a suspension agreement is accepted." 19 U.S.C. § 1677(7)(F)(ii). The Act provides that the Commission may not base a threat determination on "mere

conjecture or supposition," but instead must rely on record evidence demonstrating

that future injury is likely.  Id.  In making this determination, the Commission

considers several statutory threat factors "as a whole," including unused capacity,

trends in import volume and market penetration, inventories, pricing behavior, and

other conditions indicating probability of future injury.  Id. § 1677(7)(F)(i)–(ii).  The

Commission evaluates these factors using the same general volume, price, and

impact framework applied in the present injury analysis, but with a forward-

looking focus.  See id.

In concluding that subject imports did not pose an imminent threat of

material injury to the domestic industry, the Commission reasonably determined

that (i) the likely volume of subject imports did not support a determination of

threat; (ii) subject imports were not likely to have significant price effects in the

imminent future; (iii) inventory evidence did not indicate a threat of material

injury; (iv) domestic closures and curtailments did not demonstrate an imminent

threat to the domestic industry; and (v) there was no material change in conditions

of competition.  The court addresses each of these factors in turn.

### A. The Commission reasonably determined that the likely volume of subject imports did not support a determination of threat

The Glass Producers Coalition argues that the Commission's likely volume

analysis is unsupported by substantial evidence because record evidence concerning

subject import trends and supply conditions demonstrates a likely increase in

subject imports.  See Glass Producers Br. at 34–37.  The Commission responds that

the Glass Producers' likely volume challenge fails because the Commission

evaluated import trends and the evidence bearing on future shipments and permissibly concluded that the record did not support a likely increase sufficient to indicate threat.  See ITC Br. at 42–44.  Defendant-Intervenor Berlin Packaging additionally argues that the Commission reasonably considered evidence concerning demand conditions and export markets outside of the United States in concluding that increased import volumes were not imminent.  See DI Berlin Br. at 21–23.

Under section 771(7)(F)(i)(III) of the Act, the Commission must consider whether any "existing unused production capacity or imminent, substantial increase in production capacity" is likely to increase the volume of subject imports entering the United States.  19 U.S.C. § 1677(F)(i)(III).  Here, the Commission's likely volume determination is supported by substantial evidence because the Views reflect a reasoned evaluation of import trends, capacity, and foreign producers' projected behavior.  See Views at 76–77.  The Glass Producers Coalition contends that the Commission improperly discounted evidence that subject import market share increased at the end of the POI, including an increase of 1.6 percent in interim 2024 compared to the same period in 2023, and that those increases were even more pronounced in the merchant market.  See Glass Producers Br. at 34.  The Commission, however, expressly acknowledged these interim increases, Views at 80–81, and determined that they did not outweigh the broader trends that (i) subject imports declined in absolute terms from 2021 to 2023, and (ii) domestic producers' market share in interim 2024 remained the same as in 2021, at 70.7 percent.  See id. at 48.  The Commission permissibly concluded that short-term

increases at the end of the POI did not establish that imports were likely to increase

significantly in the imminent future when viewed against the longer-term record.

The Commission also reasonably rejected the Glass Producers Coalition's

arguments concerning foreign producers' capacity and expansion plans. Although

the Glass Producers Coalition points out that 2021 represented an aberrational

base year because of the COVID-19 pandemic, and suggests that the Commission

did not adequately address these trends, see Glass Producers Br. at 35–36, the

Views demonstrate that the Commission acknowledged and thoroughly considered

data from 2021 as well as the impacts of COVID-19. See Views at 39, 44, 88.

Specifically, the Commission acknowledged and analyzed the impact of rising

demand for glass wine bottles during the pandemic as well as declining demand

thereafter as conditions normalized. See Views at 29–30. The Commission

evaluated import trends across the full POI, including both the elevated demand

period and the subsequent decline, and concluded that the subject imports did not

exhibit a trajectory indicative of likely significant future increases. See id. at 83–

85. The Commission was not required to disregard the 2021 data entirely, but

rather to consider it in context, which it did.

The Commission further reasonably rejected the Glass Producers Coalition's

arguments concerning foreign producers' capacity and expansion plans. Although

the Glass Producers Coalition points to evidence that foreign producers brought

additional capacity online and indicated plans to increase imports, see Glass

Producers Br. at 36, the Commission determined that capacity utilization rates

were relatively high in 2023, leaving limited unused capacity available to support a significant increase in exports. See Views at 82–83. The Commission also reasonably considered foreign producers' own projections, which indicated that (i) excess capacity would decline from 1.8 million gross in 2023 to 1.4 million gross in 2024 and 2025; (ii) that their share of exports to the United States would decline from 37.7 percent of total sales in interim 2024 to 29.5 percent in 2025; and (iii) that home market shipments would increase alongside declining exports to the United States. See id. at 83 nn.316, 321. These projections reasonably supported the Commission's conclusion that foreign producers were not poised to direct significantly increased volumes of subject merchandise to the United States market.

Taken together, the Commission's analysis reflects a balanced consideration of recent increases in import market share, longer-term trends, capacity constraints, and foreign producers' anticipated behavior. The court therefore concludes that the Commission reasonably determined that subject imports were not likely to increase significantly in the future.

### B. The Commission reasonably determined that subject imports were not likely to have significant price effects in the imminent future

The Glass Producers Coalition further contends that the Commission's likely price effects analysis in the threat context is unsupported because the record demonstrates that subject imports will continue to undersell and thereby depress or suppress domestic prices. See Glass Producers Br. at 37–38. According to the Glass Producers Coalition, the Commission improperly relied on current pricing trends while disregarding evidence that increasing import inventories and capacity would

intensify future price competition.  Id.  The Commission responds that it reasonably relied on the existing pricing record, including evidence of predominant overselling and generally increasing domestic prices, in concluding that significant adverse price effects were not likely imminent.  See ITC Br. at 44.

Section 771(7)(F)(i)(IV) of the Act provides that the Commission must consider "whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices." 19 U.S.C. § 1677(7)(F)(i)(IV).  The Commission may reasonably rely on existing pricing trends and current conditions to evaluate likely future price effects.  See id.

The Commission's likely price effects determination is supported by substantial evidence because the Commission reasonably explained why the record did not indicate that subject imports would depress or suppress domestic prices in the imminent future.  The Glass Producers Coalition contends that the Commission improperly discounted evidence that domestic producers were unable to pass along cost increases, pointing to increases in the COGS-to-net-sales ratio during the POI and arguing that the Commission relied too heavily on recent improvements in interim 2024.  Glass Producers Br. at 37.  The Commission, however, evaluated pricing trends over the full POI and determined that price effects were mixed, that subject imports did not consistently undersell domestic merchandise, and that domestic producers were able to increase unit net sales values relative to costs in interim 2024.  See Views at 65, 85–87.  The Commission permissibly relied on those findings in assessing whether the record indicated likely future price effects.

The Commission also reasonably rejected the Glass Producers Coalition's arguments concerning inventories and alleged downward pricing pressure. While the Glass Producers Coalition contends that the inventories held by foreign producers would contribute to price suppression in the U.S. market, Glass Producers Br. at 38–39, the Commission found that foreign inventories were projected to decrease in 2024 and 2025. Views at 84–85. The Commission also noted that foreign producers anticipated shifting shipments toward home markets rather than increasing exports to the United States in 2024 and 2025, which further reduces the likelihood of imminent threat. Id. In light of the Commission's determinations regarding mixed pricing trends, declining inventories, and the absence of significant price effects during the POI, the court concludes that the Commission reasonably determined that subject imports were not likely to have significant adverse price effects in the imminent future.

### C. The Commission reasonably determined that inventory evidence did not indicate a threat of material injury

The Glass Producers Coalition asserts that the Commission failed to address evidence that large inventories of imported merchandise posed a significant threat to the domestic industry and that such inventories would amplify future price pressure. Glass Producers Br. at 38. The Commission responds that it expressly considered inventory levels and permissibly concluded that the record did not demonstrate that inventories would imminently cause significant adverse price effects or material injury. See ITC Br. at 44–45.

While the Commission must consider inventories of subject merchandise as part of its threat analysis under section 771(7)(F) of the Act, the statute does not require the Commission to treat specific inventory figures, whether absolute or relative to other metrics, as dispositive where the broader record does not demonstrate that inventories are likely to cause imminent material injury. See 19 U.S.C. § 1677(7)(F)(i).

In its Views, the Commission reasonably considered inventory evidence and concluded that inventories did not indicate a threat of material injury. Although the Glass Producers Coalition argues that the Commission failed to address an "inventory overhang," Glass Producers Br. at 38, the Views demonstrate that the Commission evaluated inventories in its price effects and impact analyses and found no evidence that subject import inventories contributed to adverse pricing trends during the POI. See Views at 45, 64–65, 75–76. The Commission also observed that while foreign producers' inventories increased over the POI, those increases coincided with decreasing exports to the United States, suggesting that foreign inventories "are not likely to serve as a source of increased exports" in the imminent future. Id. at 81–82. The Commission further noted that foreign producers' inventories were projected to decrease in 2024 and 2025. See id. These findings reasonably address and refute the Glass Producers Coalition's concern that excess inventories threatened to imminently depress or suppress domestic prices.

Similarly unavailing is the Glass Producers Coalition's assertion that the Commission failed to sufficiently consider inventory volumes relative to shipments.

While the inventory-to-shipment ratio increased during the POI, the Commission found that such increases reflected a declining *denominator* – in other words, fewer shipments associated with reduced demand – rather than a meaningful buildup of inventories indicative of oversupply.  See Final Staff Report at Tables IV-2, VII-17, C-1.  Having determined that inventories did not contribute to adverse price effects during the POI, then, the Commission likewise concluded that inventories did not indicate a threat of future material injury.  See Views at 82.

Because the Glass Producers Coalition does not demonstrate that the Commission failed to consider relevant inventory data or provide a reasoned explanation of inventory-related evidence, the Commission's determination is supported by substantial evidence and in accordance with law.

### D. The Commission reasonably concluded that domestic closures and curtailments did not demonstrate an imminent threat to the domestic industry

The Glass Producers Coalition argues that the Commission did not address the likelihood of continued closures and curtailments and that omission undermines the agency's threat analysis.  Glass Producers Br. at 39; see also Pl. Reply Br. in Supp. Of Mot. for J. on the Agency R., ECF No. 74, at 20 (Sep. 8, 2025) ("Glass Producers Reply Br.").  The Commission responds that it reasonably considered evidence concerning production curtailments and facility closures, but permissibly concluded that the record did not establish imminent material injury caused by subject imports.  ITC Br. at 45.

Under section 771(7)(F) of the Act, the Commission must evaluate the likely impact of subject imports on the domestic industry in the imminent future.  See

19 U.S.C. § 1677(7)(F).  The Commission may reasonably determine that evidence of specific operational disruptions, curtailments, or even facility closures does not establish imminent material injury where the broader record does not demonstrate a sufficient causal nexus to subject imports.  See id.

In its determination, the Commission reasonably considered evidence of domestic plant closures and curtailments and concluded that they did not indicate a threat of material injury.  Although the Glass Producers Coalition characterizes the Seattle closure and related curtailments as a "catastrophic" event that the Commission failed to sufficiently address, Glass Producers Br. at 39, the Commission examined capacity reductions and their implications during the POI. See Views at 63, 67, 75.  Specifically, the Commission determined that "although the domestic industry closed plants and shut down furnaces to reduce capacity in the latter portion of the POI," the industry's financial position "improved in interim 2024" and is likely "to continue to improve" in light of increasing demand.  Id. at 89. Furthermore, having determined that the timing and magnitude of previous closures were explained by declining demand, the Commission permissibly determined that those closures did not indicate that subject imports would cause further shutdowns or curtailments going forward.  See id.  As such, the Commission's treatment of closures and curtailments in its threat analysis is supported by substantial evidence and in accordance with law.

PUBLIC VERSION

### E. The Commission reasonably determined that there was no material change in conditions of competition

Finally, the Glass Producers Coalition contends that the Commission's statement that there was no evidence of any change in conditions of competition is "objectively false" and materially undermines the agency's threat reasoning. Glass Producers Br. at 40. The Commission responds that the Glass Producers Coalition improperly isolates and misinterprets individual phrases from the Views while disregarding the Commission's broader discussion of market dynamics and conditions of competition. See ITC Br. at 44–45.

The Commission's determination must be evaluated based on whether it is "reasonable and supported by the record as a whole," not based on individual statements taken out of context. See Altx, Inc., 370 F.3d at 1121. Here, the Commission's determination reasonably explains that the record did not demonstrate any material change in conditions of competition indicative of a threat. Although the Glass Producers Coalition argues that it was "factually untrue" for the Commission to suggest that there is "no evidence of any changing conditions that would cause … subject imports to become injurious" – pointing to certain record evidence such as capacity expansions, developments at a Chilean facility, and increased imports toward the end of the POI – this argument reflects a disagreement with the Commission's choice of phrasing, rather than a showing that the Commission ignored material evidence or unreasonably weighed it. See Glass Producers Br. at 40–41 (citing Views at 88). Indeed, the Views consistently indicate that the Commission reviewed conditions of competition such as capacity trends,

PUBLIC VERSION

production trends, import behavior, and more, and ultimately concluded that the record did not demonstrate changes likely to result in significantly increased imports or adverse price effects in the imminent future. See Views at 88–89. Read in context, the Commission's statement does not imply that there were no changes in competition whatsoever during the relevant period, but rather that there were no material changes in competitive conditions that would support a finding of imminent threat.

The Commission was likewise not required to individually discuss each document or source that the Glass Producers Coalition cited as evidence of change in conditions of competition. See Glass Producers Br. at 40; see also Nucor Corp., 318 F. Supp. 2d at 1247. Moreover, the Commission reasonably assessed that the factors that Glass Producers cited – such as capacity increases, inventory levels, and recent import trends – did not, individually or collectively, demonstrate a likelihood of materially increased imports or adverse price effects. See Views at 88–89. The Commission's statement regarding the absence of changing conditions of competition is therefore supported by substantial evidence in accordance with law.

## CONCLUSION

The court concludes that the Commission's price effects, adverse impact, and threat determinations are supported by substantial evidence and in accordance with law. Therefore, the court denies plaintiffs' motion for judgment on the agency record and sustains the Commission's final determination in full. Judgment will enter accordingly.

Court No. 24-00199

**PUBLIC VERSION**

/s/      Joseph A. Laroski, Jr.
Judge

Dated: July 22, 2026
        New York, New York